UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO. 0:24-cr-60059-JIC-2

UNITED STATES OF AMERICA,                    Fort Lauderdale, Florida

                                             August 21, 2024

          vs.

                                             10:24 AM - 12:40 PM

SAMUEL STEPHEN PANY,

               Defendant.          Pages 1 to 98
_____

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE SENIOR JUDGE JAMES I. COHN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:              Joseph Egozi, Esquire
                                 DOJ-USAO
                                 99 Northeast 4th Street
                                 Miami, Florida 33132


FOR THE DEFENDANT:               Simon A. Gaugush, Esquire
                                 Carlton Fields, P.A.
                                 4221 W. Boy Scout Boulevard
                                 Suite 1000
                                 Tampa, Florida 33607

STENOGRAPHICALLY REPORTED BY:

                         GLENDA POWERS, RPR
                         Official Court Reporter before:
                         The Honorable James I. Cohn
                         United States District Court
                         U.S. Federal Courthouse
                         299 East Broward Boulevard
                         Fort Lauderdale, Florida 33301

(Call to the Order of the Court.)

THE COURT:  Okay.  The matter before the Court is the United States of America versus Samuel Stephan Pany. This is Case Number 24-60059-CR.

Mr. Pany is present.  He is represented by Simon Gaugush.  The Government is represented by Assistant United States Attorney Joseph Egozi.

On May 24, 2024, Mr. Pany entered a plea of guilty to a one-count information, which charged conspiracy to commit healthcare fraud in violation of 18 U.S.C. Section 1349.

Upon acceptance of Mr. Pany's plea, the Court adjudged him guilty, ordered a presentence investigative report, and deferred sentence until today's date.

Have counsel for the respective parties received a copy of the presentence report?

Mr. Egozi?

MR. EGOZI:  Yes, Your Honor.

THE COURT:  And Mr. Gaugush?

MR. GAUGUSH:  Yes, Your Honor.

THE COURT:  And, Mr. Pany, have you received and reviewed the presentence report?

DEFENDANT PANY:  Yes, I did, Your Honor.

THE COURT:  All right.  The Court notes that there are a number of objections that were filed, and the Court will address those objections at this time.

And I suggest that we start with the loss amount, whether we use actual loss or intended loss.  And I've read the pleadings, and I'm very familiar with the issue, but, look, I'll be glad to hear whatever additional argument either party wishes to make.

MR. GAUGUSH:  Thank you, Your Honor.  I'm definitely not looking to just merely regurgitate what I filed, but I do want to impress a few points on the matter.

Should I address the Court from the lectern, or should I just stand?

THE COURT:  Wherever you feel comfortable.  Just make sure you speak into the microphone.

MR. GAUGUSH:  Thank you, Your Honor.

Is it possible for me to use the Elmo as well?

THE COURT:  Certainly.

MR. GAUGUSH:  Your Honor, as I stated in the sentencing memorandum, the thrust of our main argument is that when it comes to the interpretation of 2B1.1(b)(1), the term "loss" is just not ambiguous.

In this case, the only reason to resort or to refer to the commentary to the guidelines is if there's a determination by this Court that there's some genuine ambiguity with that term "loss."

Everyone in this courtroom has used that term in common usage throughout their lives, and I doubt anyone has ever used

it in a manner which has been interpreted the way the Sentencing Commission did in the commentary to the guidelines.

THE COURT:  And you only go to the commentary if the Court finds that the term "loss" is ambiguous; correct?

MR. GAUGUSH:  Correct, Your Honor.

And in the Eleventh Circuit's en banc decision in Dupree really created a sea change in how sentencing judges look at the guidelines.  It used to be that the guideline itself and the commentary -- they complemented each other.  The commentary gave definition, gave detail to what was lacking in the guideline itself.

But the Eleventh Circuit had said, "No, you only look at the guideline, and if there is some genuine ambiguity with the interpretation of that particular guideline, only then can you resort to the commentary."

So that really leaves us with the question of whether or not the term "loss" is generally ambiguous.

And I did put in my sentencing memo snippets of various definitions of "loss."  This one here is from the Oxford American College Dictionary.

And as we can see here, the term "loss" deals with the process of losing something or someone, deprived of someone or something, detriment, disadvantage resulting from losing, badly missed, reduction in power.

None of these things have anything to do with an

intended loss that is unlikely, an intended loss that is impossible.  This dictionary definition, common usage directs the Court to say, "When it comes to the term 'loss,' it actually means actual harm.  It means actual deprivation."  It doesn't mean something which the Sentencing Commission has constructed.

Just another quick example, Random House Webster Unabridged Dictionary -- it's the same thing:  Detriment, disadvantage, deprivation, losing, defeat, destruction, ruin. These are all terms used to express actual harm, not some intended harm that was unlikely or impossible to occur.

I think context also matters in this case.  When we look at 2B1.1, we can see with respect to that table -- which we're also accustomed to referring to -- that it talks in terms of the loss exceeding something.

In context, it makes sense that "actual loss" talks about the loss, the actual loss exceeds these dollar amounts, thereby resulting in a more serious offense level, not "I tried to take something from someone, completely failed, and that impossible loss somehow exceeded a dollar amount."

The sentencing guidelines were obviously designed so that people who engaged in more serious, more severe conduct are treated more harshly.  That actually makes more sense of the context with respect to loss exceeded as actual loss.

In the Government's response to our sentencing memo,

they refer to, in particular, the Maus decision.

THE COURT:  Which doesn't address ambiguity.

MR. GAUGUSH:  Which doesn't.  It doesn't.

Moss, Moran, Orton -- all of the Eleventh Circuit published cases that courts and practitioners rely upon to say intended loss trumps actual loss, each and every one of them resorts to the commentary.

Those cases would have been decided completely differently if the Court had sat down and said, "Well, is the term "loss" genuinely ambiguous?"

And I put this into my objections to the PSR.  I think there's also a red herring here because the last definition I showed, there's a long definition for "loss."  That doesn't mean that because there's different ways that the term "loss" is used that there's some type of genuine ambiguity.

I challenge anyone to look in the dictionary and find one word that's defined by one word.  Every word in the dictionary is defined by multiple words, but in the context here, it makes more sense that it means actual loss and not intended loss.

In the probation officer's response to my objections, they raised an issue about the proposed amendment -- and I emphasize -- the proposed amendment to the sentencing guidelines that was passed on April 17th, 2024, but it doesn't go into effect until November 1st of 2024; and, therefore, it

does not apply here.

2B1.1 -- sorry.  1B1.1(1)(a) of the guidelines, "The Court shall use the guidelines manual in effect on the date that the defendant is sentenced."

That amendment is not in effect.  It may never go into effect.  Whether we think it will probably go into effect is completely irrelevant.  It is not a part of that guideline manual.  And in calculating Mr. Pany's offense level computation, that amendment doesn't apply.

I did say I wasn't going to mention all of my arguments; so at this point, I'm going to sit down in case there's any rebuttal.

THE COURT:  All right.  Mr. Egozi, you seem to rely on Moss.  Moss doesn't mention ambiguity.

MR. EGOZI:  And it does not have to, Your Honor.  And that's the point that I really want to stress here, which is sure, if we skip ahead to the question of ambiguity, whether this is ambiguous, what are the proper definitions -- the Government is confident that our reading is still the correct one.

Let's set that aside and let's just focus on what the Court is tasked with deciding here, and that is whether the rules of binding precedent apply here.

And essentially what the Eleventh Circuit and the Supreme Court have said -- well, first of all, the

Eleventh Circuit in Verdeza, which again wasn't going into the ambiguity question.  It was simply talking about the import of Dupree.  Verdeza is at 69 F.4th 780 at 794.  That's an Eleventh Circuit case from this last year.

It said that Dupree, quote, "did not specifically and directly," end quote, establish that their earlier precedent holding that, quote, "loss means the greater of intended or actual loss is wrong."

Basically, what that's saying is the Eleventh Circuit is telling the lower courts just because Dupree changed the analysis that we go through does not mean that any prior precedent saying that 2B1.1 means intended loss is automatically thrown out.

And then later --

THE COURT:  Well, on the preceding page in Verdeza, the Court said -- the Eleventh Circuit said, and I quote, "But in Dupree, we held that after" -- is it Keiser [as pronounced] or Kisor?  I don't know how it's pronounced.

MR. EGOZI:  Yes.

THE COURT:  -- "versus Wilkie, 588 U.S. 558, 2019, Courts could defer to the commentary only, only when the regulation is genuinely ambiguous after exhausting all the additional tools of construction."

To me, that's pretty clear.

MR. EGOZI:  Yes, Your Honor.  But I think that's a

mandate to how the courts of appeals are going to be reading to precedent.

So we still have Stinson, Kisor -- all of those cases in the background, and then we have the baseline that the Eleventh Circuit has said, which is the doctrine of adherence to prior precedent -- this is United States versus Kaley that I cite on page 5 of my brief, 579 F.3d 1276.

The doctrine of adherence to prior precedent mandates that the intervening Supreme Court or en banc case actually abrogate or directly conflict with, as opposed to merely weaken the holding of the prior panel.

And I don't think we can read Verdeza or any court case from the Eleventh Circuit that has come out since Moss and say Moss is abrogated.  What Verdeza is essentially doing is weakening the import of Moss.  That's why we have a current case up in front of the Eleventh Circuit right now where there's supplemental briefing on, from scratch, what is the right answer?  Right?  Is it loss or intended loss?

And ironically, we're going through this exercise right now based on the current guidelines, but forget come November 1st, the supplemental briefing that our office has filed in Eleventh Circuit case has said that because that amendment that comes into effect on November 1st isn't some new substantive provision, it's a clarification of preexisting provisions, what that means is all the pending appeals right now, not clear

error but the ones that were actually preserved pending appeals, come November 1st, assuming the Eleventh Circuit hasn't decided the case, all of them are going to use actual, not intended loss.

Now, that's more of a prudential point to make.  It doesn't necessarily resolve the issue right here, which is which ones to use.  So I will go into this question based on --

THE COURT:  What is your definition of the plain meaning of the word "loss?"

MR. EGOZI:  Well, they are various, Your Honor.  I cite on page 6 of my brief -- let's see, we have -- it could be -- so American Heritage Dictionary says the amount of something lost or the harm or suffering caused by losing or being lost.

But then also, there's the Oxford Dictionary that says, "The diminution of one's possession or advantages or the detriment or disadvantages involved in being deprived of something."

Then we go into Black's Law.  It says, "An undesirable outcome of a risk.  The disappearance or diminution of value or the failure to maintain possession of a thing."  All of these things encompass both actual and intended loss.  That does not mean that it's necessarily ambiguity.  It just means that intended loss is a fair way to read the term "loss."

We've always thought of a loss as not just a loss in terms of what money is out of my pocket, but what risks and

what missed opportunities we're having as a result of certain harmed cost.

And for the defense to point to 2B1.1, the loss exceeded point, as some sort of gold star reason why there's ambiguity makes no sense. We know exactly what the intended loss is here by this conspiracy and this defendant's conduct because there are actual claims that are submitted to Medicare.

In 99.9 percent of these cases, there's no real issue. And there's a reason why it is not an issue because the guidelines first and foremost tell us that "loss" has to be a reasonable measure.

We just take the preponderance of the evidence, what's a reasonable measure of loss, and certainly the claims are a reasonable measure.

And without sort of relitigating all these prior issues, I just wanted to point out that we have not only the Sixth Circuit and the First Circuit that have ruled against the Third Circuit, which is at first principles saying that loss is reasonably meant to be intended loss, right, regardless of whether they find it the ambiguity or not, those are two cases in the last year that already disagree with the Third Circuit.

And then, just two weeks ago -- I've got copies if you'd like, Your Honor, of the United States v. Rainsford opinion of the Second Circuit.

And here -- may I approach, Your Honor?

THE COURT: Yes.

MR. EGOZI: So if we move ahead -- it's a Westlaw citation, but if we move ahead to -- give me one moment -- Footnote 5 in -- it's on, of the printout you have, it's on page 8.

That's just a couple weeks ago, at first principals of the Second Circuit looking at this issue of loss and saying the continued vitality of Stinson is subject to debate. Then it goes into these citations of the law articles. The holding in Stinson rested on the comparison of the guidelines commentary to an agency's interpretation of its own legislative rule.

After the Supreme Court modified the framework for reviewing an agency's interpretation of its own rule -- and then it quotes or cites that Kisor case, circuit courts have disagreed as to whether the application note defining loss to include the intended loss or continue to receive deference.

We adhere to Stinson and defer to the application note for two reasons. First, the Supreme Court has not overruled Stinson. If a precedent of the Supreme Court is direct application in a case, yet appears to rest on reasons rejected in some other line of objections, the court of appeals should follow the case, which directly controls leaving to the Court the prerogative of overruling its own decision. That's just making the same point that I made earlier, which is Verdeza isn't throwing away Dupree.

But then it's a second -- the guidelines commentary would meet the Kisor standard in any event, because the Sentencing Commission adopts the commentary alongside the guidelines.

It says because the Sentencing Commission adopts the commentary alongside of the guidelines, the commentary necessarily reflects the Commission's authoritative expert-based fair and considered judgment.  Indeed, the guidelines in the commentary operate together as a reticulated hold.  Accordingly, the two are read together.

So these are case after case that are saying that either A, there is an ambiguity and we're going to defer to the commentary in interpreting that ambiguity or saying there's not an ambiguity at all, which is intended loss at Point A is a fair reading of the term "loss."

And then finally, in the defendant's sentencing memo, he cites the Archer case to say essentially that we should just throw away anything post-Dupree in the sphere of actual or intended loss.  But it's important to note that that Archer case was talking about when the Eleventh Circuit specifically should reconsider its own precedent in light of the Supreme Court shifting the standard for evaluating a given issue.

In other words, it is for the Eleventh Circuit to decide whether Moss is still good law in light of Dupree.  It is not for the lower courts to essentially read the tea leaves

and say the law is shifting toward the direction that the defense is asking for here.

The Government maintains there's not discretion here to essentially throw away Moss because Dupree undermined its reasoning.  There's a reason we have a pending case right now before the Eleventh Circuit deciding this various issue -- this exact issue.

So until that case comes out, the guidelines, both the text itself and the commentary, should mandate that intended loss is the proper measure.

MR. GAUGUSH:  Can I respond, Your Honor?

THE COURT:  You may.

MR. GAUGUSH:  Thank you.

Can I get the Elmo again, please?

Thank you.

Your Honor, to take the last point first, as the Court can see in my sentencing memo and my objections to the PSR, I never cite to the Third Circuit decision, even though it goes our way because it's not binding on this Court.  That's why I didn't cite it.

The Sixth Circuit decision, First Circuit decision -- clearly none of these are binding on the Court.

What is binding on this Court is Dupree.  And what Dupree directs all sentencing judges to do, it's procedural. Don't touch the commentary unless the term "loss" is genuinely

ambiguous.

And I'll note when the Government was rattling off their definitions for "loss," at least a handful of those were actual loss.  Failure to hold on to something, that sounds like actual loss to me.

I also think the Government's missing part of the point.  They were getting into the facts of this case.  The facts of this case are actually irrelevant for purposes of this decision.

And I regret to use the term, it's more of an academic discussion about what does the term "loss" mean?

It doesn't matter about what's "loss" in Mr. Pany's case, or what's "loss" or Mr. Johnson's case?  None of that matters.

It's about just looking strictly at the guidelines and using the tools of statutory construction and statutory interpretation to define the meaning of it.

And the question really isn't "What is it?"  It's "Is it genuinely ambiguous?"  And it's not.

The Verdeza decision actually goes our way and not the Government's way.  And here in Verdeza on page 793, the Court says, "In Dupree, we overruled our precedent on how the guidelines and the commentary interact."

Before Dupree, the commentary was binding on federal courts unless the commentary was plainly erroneous or

inconsistent with the guideline itself, a federal statute or the Constitution.

But in Dupree -- and I think I'm quoting what Your Honor already quoted, but in Dupree we held that after Kisor v. Wilke, courts could divert to the commentary only when the regulation is genuinely ambiguous.

One of the points that the Government keeps making -- and I think they're actually missing the point.  They're mixing and matching the prior precedent rule with plain error review. Verdeza is one of those plain error review cases, because the defense counsel didn't preserve this objection in the lower court, unlike what we're doing here.

In there, Verdeza says, "As we've explained, an error cannot be plain under the plain error standard unless the issue has been specifically and directly resolved by on-point precedent from the Supreme Court or this Court.

"Because Dupree didn't specifically and directly resolve that Orton's holding was wrong, we must follow Orton in our plain-error review."

Verdeza is a plain-error review case.

Other decisions that the Government cites to, Jocelyn -- this is a plain-error review case. It holds the same exact thing.

So these citations to prior precedent are being misapplied.  This is not plain-error standard.

Frankly, in terms of the Court making its determination is completely irrelevant what's in the Government's brief before a case pending before the Eleventh Circuit.

Your Honor, looking at this from a statutory construction perspective, loss means actual loss.  It's not genuinely ambiguous.

THE COURT:  All right.  The Court finds clearly after Dupree, the Court cannot defer to Section 2B1.1's commentary without first finding that the guideline itself ambiguous.

The Court further finds that in the context of Section 2B1.1, the plain meaning of the term "loss" is actual, not intended loss.

Accordingly, the defendant's objection to loss will be sustained.

MR. GAUGUSH:  Thank you, Your Honor.

THE COURT:  All right.

So the next issue you raised, I believe, was regarding the zero-point reduction.

MR. GAUGUSH:  Yes, Your Honor.

Your Honor, as we've already stated in our sentencing memorandum in the objections to the PSR, Mr. Pany is eligible for the zero-point offender downward departure.

Now, originally, when we filed our objections, we were contesting the aggravating role enhancement.  That was more so on the basis of why that enhancement was being applied, and we

have since withdrawn that objection.  So we are conceding that the two-level aggravating role enhancement applies.

So, really, the question that we are dealing with here is whether or not, under 4C1.1(a)(10), this Court should be reading the defendant did not receive an adjustment under 3B1.1 and was not engaged in a continuing criminal enterprise.  As creating a combination, these are both required.

If Mr. Pany does not satisfy both, then he is therefore eligible for 4C1.1, or are they to be examined or analyzed individually?

There are things here, aspects of 4C1.1 that indicate that the word "and" means "and."  It means in combination with. And I even intend to talk about Pulsifer and some other similar cases.

But one of the things that struck us when we looked or examined 4C1.1, is that the Sentencing Commission chose to use the word "or," which I have highlighted in Subsections, 3, 4, 7 and 9.  Based on the Government's reading of 4C1.1, the word "and" is to be read "or," even though the Sentencing Commission intentionally and deliberately decided not to use the word "or."

The other thing, which is a clear indication that there's supposed to be in combination is that this is being used within the same subsection itself.  So whereas this "and" reflects the fact that there are individual requirements and

criteria, this "and" is contained within the subsection itself, which under statutory interpretation would leave one to believe that it's a combination.

The other thing that we find persuasive here is the fact that 9 and 10, in particular, are almost identical in terms of referring to two separate guidelines.  So (a)(9), the defendant did not receive an adjustment under 3A1.1 or 3A1.5, yet the Sentencing Commission intentionally chose to then make a "10" different by inserting the word "and" in there.

Now, I'm very familiar with the Pulsifer decision.  In the Pulsifer decision, as this Court is probably aware of as well --

THE COURT:  I'm well aware.

MR. GAUGUSH:  -- dealt with the subsection --

THE COURT:  At least the en banc Eleventh Circuit agreed with me.

MR. GAUGUSH:  The Garcon decision, Your Honor?

THE COURT:  Which is not an easy task.

MR. GAUGUSH:  I understand.

This is distinguishable from Pulsifer.  Pulsifer is different.  In Pulsifer -- and, in fact, one of the things I'd like to show Your Honor, is if we just even compare the structure of the statute in Pulsifer and in 4C1.1, we can see here that 3553(f)(1) has these three subsections, A, B, and C, but they're self-contained.  It's one requirement per

subsection, and then they're separated by the word "and."

Here, the word "and" is actually embedded within the subsection itself.  And the two requirements are not separated by an A or a B or a B and a C.  They're both contained together.

Very similar to the response the probation office gave to our objection to loss, the probation office also pointed out that the Sentencing Commission has developed a fix in this case.

I actually think that that fix goes in our favor, and I think it goes in our favor, Your Honor, because if this was clear, there would be nothing to fix.

As of November 1st, the Sentencing Commission has recommended that 4C1.1 split (a)(10) into two parts.

So after November 1st of 2024, if there's no intervention, (a)(10) is going to become (a)(10) aggravating role enhancement, and (a)(11) is going to be engaged in a continuing criminal enterprise.

If there was no problem here with respect to the interpretation of the word "and," they never would have fixed this.  I feel like that is the Sentencing Commission's acknowledgment that the word "and" either goes in our direction, which is it's a combination because it's self-contained within the same subsection, or it's ambiguous, and in which case, the rule of lenity applies.

And for purposes of this Court's sentencing today, that word "and" should be interpreted as "and," not as "or," the way the Sentencing Commission will design it after November 1st of this year.

THE COURT:  Let me ask you this --

MR. GAUGUSH:  Yes, Your Honor.

THE COURT:  -- how does the wording of the adjustment for certain zero-point offenders in Section 4C1.1 of the guidelines compare with the wording of the safety valve in Section 5C1.2(4)?

I mean, it seems like to me it's almost the exact wording.  And in that instance, there are cases that seem to say in that instance "and" means "or."

MR. GAUGUSH:  And even though there are cases like that, the Sentencing Commission still decided to use the format, which creates this dilemma about what the word "and" means.

The Sentencing Commission knew in advance, because of litigation related to 5C1.2, that this is an issue; so they decide to just double down and create 4C1.1 and insert the word "and" and let us all litigate whether "and" means "and" or "and" means "or."

I go back to the Sentencing Commission's decision to implement its fix.  If it's not broke, don't fix it.

Well, apparently, the Sentencing Commission thinks that

(a)(10) is broke; so they're fixing it.  And for our purposes today, this is how (a)(10) is structured.

One thing that doesn't apply here that did apply in the Pulsifer case, is that there's no inconsistency in reading (a)(10) the way I have suggested it.

In Pulsifer, the Supreme Court said, "Well, if there's a problem, it creates this superfluity's argument" -- I can't really pronounce it, but basically it makes Subsection A superfluous.  That's not the circumstance here.

You can engage in a CCE, and you can have an aggravating role enhancement.  Those two things can exist, unlike the Pulsifer case.

And also, these criteria -- this is a policy decision, whether to exclude someone who's been convicted of a sex offense or has resulted in death or seriously bodily injury -- none of those things are tied to the recidivism issue, which is what the Sentencing Commission was trying to do with 4C1.1.

The Sentencing Commission was acknowledging the fact. They've been doing these recidivism studies since 2001. There's at least three very robust studies, and they all say if you are a zero-point offender -- and they distinguish with the Criminal History Category I defendants who have one criminal history point.

If you are a zero-point offender, you are substantially less likely to recidivate, but they decided, "Let's exclude

certain people nonetheless."

Your Honor, I think in light of the fact that the word "and" means what it looks like, in combination, it should be applied that way here, for the zero-point offender downward departure.

If there wasn't a problem, the Sentencing Commission wouldn't be fixing it in November.

THE COURT:  All right.

Mr. Egozi.

MR. EGOZI:  Let me pick up, Your Honor, from where we just left off.  I think the defense is reading way, way too much into the fact that the Commission is trying to give more certainty to the court in saying, "Hey, this is what we've meant all along."

The fact that people litigate this issue, that causes the Commission to clarify "this is what we meant" does not mean the very issue that was litigated goes in favor of the party that brought the issue up in the first place.

It's circular reasoning.  It's essentially saying because we pointed an arguable question, that means -- and they responded to that, they means we must be right.

So let's just set the import aside, of the fact that the Commission is saying, "Hey, guys, this is clearly what we meant by this whole zero-point offender thing."

But let's focus on the actual text itself.

First of all, Mr. Gaugush is completely incorrect as to the point about superfluousness.  And I mean, like, plain text wrong.

If you look at page 12 of my brief, we cite the guidelines Section 2D1.5, and it's the Commentary Note 1 there. And it's basically saying courts don't apply an aggravating role adjustment if the defendant is engaged in a continuing criminal enterprise.

Now, I'm sure Mr. Gaugush is going to remind you that's commentary, not the text; right?  But for similar reasons we can go into, there is some ambiguity on whether those two things should be applied together; right?

And the Commission is saying, No, don't apply them together."  So practically speaking, we're talking about a limited subset of defendants under the defense's reading of the zero-point offender eligibility rules, where they would have had to be engaged in a continuing criminal enterprise that was not charged but still counted as relevant conduct and then also obtaining an aggravating role enhancement.  That would be the only scenario in which the defense's reading of the zero-point offender provision can ever apply.  It is rendering the text superfluous.

Now, I want to end with what I think is the most important point -- and I appreciate that the defense has framed the provisions side by side on page 11 of their brief because I

think worth looking at exactly as they pointed out.  And I'll just bring it up to the lectern.

So in plain English, when we're reading this provision, which is what was at issue in Pulsifer and we're comparing that with this provision, which is what's at issue here with the zero-point offender, the defense is saying that because A, B and C are broken off and separated by semicolons, that means that grammatically and logically, they must be different from what's going on here.  But we know in plain English that's not true.

When I read -- if a defendant -- if I just literally read through this requirement, this is what's at issue in Pulsifer, where the Court said, as the defense reads it "and" means "or."

Basically, it means that any one of these are disqualified.  I read it the defendant doesn't have either more than four criminal history points and then, you know, excluding any criminal history points resulting from a one-point offense; a prior three-point request, so this, this and this.  It's sort of three requirements -- this, this, and this, whereas here in (10), it's saying either an adjustment 3B1.1, and it's saying "and"; right.

So it's one, two and three.  Here's just one and two. The only difference is if they're separated by semicolons.  It makes no difference grammatically.  We know that a semicolon is

the same thing essentially as a comma in terms of the purpose -- in terms of the role that it's playing.

And the Supreme Court in Pulsifer ruled in the Government's favor, and it said the word "and" conjoins several negative phrases. And so each negative phrase is a separate requirement.

And it basically said, yeah, if you have any of these, those are disqualifying. The same logic applies right here. And that's why every single district court that has confronted this issue in this district -- and of course none of those district courts are binding, but it's certainly persuasive, every district court to have confront this issue has agreed with the Government that any one of these issues and one of these points are disqualified; therefore, the zero-point deduction doesn't apply.

THE COURT: All right. Anything else?

MR. GAUGUSH: No, Your Honor.

THE COURT: The Court finds that the role adjustment that the defendant received under Section 3B1.1 is sufficient in and of itself to disqualify him from eligibility for a two-level reduction under Section 4C1.1.

Appellate decisions that have construed the virtually identical language in Section 5C1.2(a)(4) preclude a defendant in qualifying for the safety valve if he received a role adjustment under the sentencing guidelines, even if the

defendant was not also engaged in continuing criminal enterprise.

And the Court would cite United States v. Salas-Paredes, 278 F.App'x 889, at page 892, Eleventh Circuit, 2008, affirming the denial of safety valve for a defendant who was found to be a supervisor without considering whether the defendant was also engaged in a continuing criminal enterprise.

Also, the Court would cite United States v. Draheim, 958 F.3d, 651, at pages 656 through 658, Seventh Circuit, 2020, rejecting the defendant's argument that the district court had to find that he was both a leader of others in the offense and engaged in a continuing criminal enterprise to disqualify him from safety valve eligibility.

And as pointed out by Mr. Egozi, courts in this district have unanimously read Section 4C1.1(a)(10) as excluding any defendant who either has an aggravated role enhancement or engaged in a continuing criminal enterprise; therefore, the defendant's objection to the failure to award a two-level reduction as a zero-point offender will be overruled.

So next, let's see, paragraph 142, sophisticated means, no enhancement was imposed; so there's no need for a ruling there.

Paragraphs 34 and 35 --

MR. EGOZI:  Unopposed, Your Honor.

THE COURT:  What's that?

MR. EGOZI:  Those are the factual objections; right?

THE COURT:  Yes.

MR. EGOZI:  Unopposed, Your Honor.

THE COURT:  Sustained.

Paragraphs 37 through 40.

MR. GAUGUSH:  Your Honor, I understand the interpretation here -- the issue I was taking with those paragraphs is that it listed owner, operator, and/or manager. As long as "and/or" means -- it could be one, it could be all of them, I will withdraw the objection.

THE COURT:  Well, this is not going to impact the Court's sentence; so the Court finds that no finding is necessary.

Paragraph 52, once again, this isn't going to impact the Court's sentence, so --

MR. EGOZI:  Withdrawn, Your Honor.

THE COURT:  Paragraph 54, I believe the Government does not oppose.

MR. EGOZI:  That's correct, Your Honor.

THE COURT:  So that will be sustained.

And the rest of the objections have been resolved.

MR. EGOZI:  Yes, Your Honor.

THE COURT:  So the Court makes the following findings with respect to advisory guidelines -- give me just one second here -- we have a total offense level of 26 and a Criminal

History Category of I, which places the advisory range at 63 to 78 months. Probation ineligible. Supervised release -- Ms. Hill, does that remain one to three years?

THE PROBATION OFFICER: It does, Your Honor.

THE COURT: What about the fine range?

THE PROBATION OFFICER: The fine range remains the same, $25,000 to $250,000.

THE COURT: $25,000 to $250,000?

THE PROBATION OFFICER: Yes, Your Honor.

THE COURT: Restitution is $7,473,984.42, and there is a mandatory special assessment of $100.

Now, the Court notes that Mr. Pany has filed a sentencing memorandum and a request for downward departure and variance. That's Docket Entry 96.

The Court has reviewed that pleading. The Court has also viewed numerous letters that have been filed on behalf of Mr. Pany. Those are also contained in Docket Entry 96.

In addition, there were a couple of other letters that were filed in Docket Entry 99.

So with that, Mr. Gaugush, I will be glad to hear from you with respect to your motion.

MR. GAUGUSH: Thank you, Your Honor.

Your Honor, we're asking this Court to sentence Mr. Pany to a term of 48 months imprisonment, which would be a 15-month downward variance from the low end of the guidelines.

And what I'm going to discuss with you today is seeking that 15-month downward variance.  We've done a lot of examination of the guidelines, obviously, for this case, and there's some things that I want to share with you in terms of our interpretation of how the guidelines are structured, but also how in a case like this one, there are inflationary aspects to it.

The first, I would say, is healthcare offenses.  Now, the ship has already set sale from the Eleventh Circuit when it comes to people seeking downward departures.  We're not asking for departures.  We're asking for a variance.

This is one of those offenses where a person asks for a thousand dollars, knowing they will never get a thousand, they'll never get 750, they're going to get 500.  And these are those kinds of cases, healthcare cases in particular, where the loss is almost always double.  The actual loss is half of the intended loss amount.  So there's that inflationary aspect when it comes to loss.

Now, we're not dealing with that here because the Court has applied the actual loss amount, but that is an aspect of this case.

One of the things -- and we agreed to the three-level adjustment or enhancement for a loss of $7 million or more under 2B1.1(b)(7), but there are some things I'd like to share with the Court about that.

2B1.1(b)(7), which is the healthcare fraud enhancement has three triggers:  $1 million loss, $7 million, and a $20 million loss.  That guideline was created in 2011.

It has not been adjusted for inflation in the last 13 years, and this Court should consider that in determining the appropriateness of a one-level downward variance in this case.

Now, I'm not coming out of left field with this.  I didn't just come up with this on my own, in my office, thinking about how to justify a downward variance.  The Sentencing Commission actually came up with it.  This is what the Sentencing Commission has done twice to 2B1.1.

In 2015 -- this is supplement to the Appendix C to the guidelines.  In 2015, the Sentencing Commission looked at 2B1.1, and it said, "While some of the monetary values in the Chapter 2 guidelines have been revised since they were originally established in 1987, none of the tables has been specifically revised to account for inflation.

"Due to inflationary changes, there has been a gradual decrease in the value of the dollar over time.  As a result, monetary losses in current offenses reflect, to some degree, a lower degree of harm, a lower degree of culpability than did equivalent amounts when the monetary tables were established or last substantively amended."

So what the Sentencing Commission in 2015 -- it had been 14 years.  So the first adjustment came in 2001.  In 2015,

the Sentencing Commission said we need to adjust for inflation, 14 years later.  And they did.  And they changed the amounts in 2B1.1.  And the way they did it was with this calculator, this CPI inflation calculator, which is provided by the Government.

And I put those numbers -- we're overdue -- for 2B1.1(b)(7) for an inflationary adjustment.  So I put them into the same CPI calculator that the Sentencing Commission used, and this is what it spit out.

I used November because that's when the guideline manual became elective in 2011 for (b)(7), $7 dollars, in today's dollars, you would have to have $9.5 million.  And I used November of '23 because we're using the November 2023 guidelines.  So I didn't even draw it up to 2024.  I don't even want to know how it's changed in the last year.

So, basically, to reach 7 million under the 2011 framework, that 2B1.1(b)(7) was created -- the actual loss would have to be 9.5 million.  But Mr. Pany's actual loss is 7.4 million.

Now, I also did this conversely.  What's -- if we take $7 million today -- or in November of '23, rather, what would it have been worth or the equivalent amount when (b)(7) was created, and that's 5.1 million.

So anyone with a loss of 7 million today would not have met that three-level threshold back in 2011.  Then I took Mr. Pany's actual loss amount.

So his loss amount of 7.4 million in November of 2023 dollars is actually only 5.5 million in November of 2011 dollars.

Again, it's putting us back in the place of the Sentencing Commission when it created this enhancement framework.  It decided, 1, 7, 20.  Those were the numbers, but again, there's been no adjustment for inflation.  And that's an appropriate consideration for this Court in deciding whether or not to grant a one-level downward variance.

And again, this is not something I came up with.  The Sentencing Commission has done this twice to 2B1.1, and the last time was 14 years ago.

Now, the Court did not grant our request for the zero-point offender downward departure, but I still think it's worth mentioning here from a variance perspective, Mr. Pany is a zero-point offender, but he got excluded under the 10-element criteria, but he's still a zero-point offender.

And, Your Honor, the impact of being a zero-point offender is that it basically takes his two-level aggravating role enhancement and makes it a four-level.

And the two-level enhancement he got is enough to distinguish him from AJ Gould or from Joseph Zappoli, who will be sentenced here I think in a month.  It doesn't require a four-level difference.

So what we're asking is in granting our request for a

15-month downward variance, we're asking you to take into consideration the inflationary aspect (b)(7), and also the fact that Mr. Pany is a zero-point offender, and it basically converted his two-level aggravating role enhancement into a four-level enhancement.

And just for the same reasons that the Sentencing Commission created 4B1.1, Mr. Pany is at the lower risk of recidivism because of that. And that's an appropriate consideration by this Court.

One of the things I tried to do in the sentencing memo is answer the question why. I think oftentimes you come to sentencings and people want to know why this happened; how did this happen. And I tried to explain that in the introduction to the sentencing memo.

This is not one of those circumstances where someone is trying to feed a drug habit so they snatch a purse, they rob a liquor store, but you can absolutely trace back the fact that Mr. Pany's now sitting here in front of you today to be sentenced, you can trace that all the way back 16 years to when he first started using drugs.

I'm not talking about a direct nexus. I'm talking about that indirect nexus, that thing where someone goes left and doesn't go right and how it has impacted their life and has landed them here.

Moving to Florida -- and those of us in South Florida

have seen it, people with drug issues up north have moved to South Florida.  They get kind of put into this circuit of rehabs and sober homes, and then when they get out, they get picked up by these call centers, and they're surrounded by corrupting influences, I would say.

And it takes a lot, especially for someone who's trying to stay sober, trying to stay clean, to fend off those corrupting influences.  I think that's why you can have that dichotomy, that person, where you can say "You" are a good person; how did you do this?"  That's where I think it ultimately comes from.

What I can say is this:  It did not require the Government knocking on Sam Pany's door for him to stop.  His son, Grayson -- that's why it stopped.

Becoming a father changes a lot, changes perspective, changes priorities, changes life choices, and that's one of the things that happened here.

He extricated himself from this, didn't require the Government, and then he made life choices to improve his life, that's self-correction.

And I said it in the sentencing memo, Mr. Pany is a genuinely good person.  He's got 21 letters that we attached that reflect that, but as opposed to maybe me just talking about it, I would ask the Court's permission to allow me to bring some of the family and friends --

THE COURT:  Certainly.

MR. GAUGUSH:  -- to address Your Honor.

THE COURT:  Sure.

MR. GAUGUSH:  I would ask Steven Pany to come up here, please.

Can you please introduce yourself to the Court.

MR. PANY:  Sure.  I'm Stephen Pany.  I'm Sam's father.

MR. GAUGUSH:  And what would you like to tell the Court today?

MR. PANY:  Well, a little bit about Sam's past.  A little bit about Sam's presence.  I have an engineering consulting business.  Sam works for me part-time.  He actually designs residential in-ground swimming pools.  I happen to be Sylvan Pools corporate engineer, and Sylvan Pools builds thousands of pools a year.  Sam's involved with a lot of them.

What Sam does, he actually learned in high school.  He uses Auto CAD, which he took a course in high school, learned Auto CAD, and that's computer-aided drafting.  So he works for me part-time.

And what it does -- he's learning about engineering. He initially started as a basic draftsman, but he learned the codes, the standards that apply to -- and material that apply to in -ground swimming pool construction.

He's a valued employee to our company working part-time.  Pools are a small amount of the business.  He does

most of them.

Sam's grandfather was in -- was a general contractor and in the concrete supply business.  Sam's uncles are in construction and development.  Sam, having been exposed to engineering, construction, development, like his cousins, charted his own path.

Sam became addicted to drugs.  He dropped out of college.  He worked in construction for awhile.  He hit rock bottom.

He decided to enter a rehab.  It's 11 and a half years ago.  This is how he got to Delray.  He had to report to this rehab in three days or lose the spot.  It was in February.  There was an impending snowstorm.  The flights were canceled; so we made a road trip, and we arrived.  Drove overnight, arrived with an hour or so to spare.

Sam went through the process.  He struggled with rehab, but eventually, after a few rounds, completed the program.  He lived with a group, got a job at a call center, and then with a DME company.  He learned drugs don't discriminate.  He witnessed the adverse effects on those in his living group and his classmates.

When his high school classmate and a football teammate overdosed and was hospitalized, dead and revived, the parents were devastated.  They didn't know to whom to turn or what to do.  Sam contacted the parents.  I was at their house.

Sam told his story, answered their questions, explained the rehab process, and offered hope that their son could overcome his drug problem.  After that conversation, the parents were in tears from the support that Sam provided.

On another occasion, Sam arranged for drug rehab treatment for another high school classmate.  Sadly, that person relapsed after treatment and died of a drug overdose.

The brother of that deceased person took a picture of the hearse on the way to the cemetery and added the caption, "Tyler's last ride," in the hopes that it would help somebody.

Since becoming a Florida resident, Sam has worked to become independent, support his family.  I request that the Court not impede his future, nor that of my grandson.

Thank you.

THE COURT:  Thank you, Mr. Pany.

MR. GAUGUSH:  I would like to call Anjelika Kouznetsova.

Introduce yourself to the Court, please.

MS. KOUZNETSOVA:  Hello.  My name is Anjelika Kouznetsova.

THE COURT:  Do you want to spell your last name for the court stenographer.

MS. KOUZNETSOVA:  K-O-U-Z-N-E-T-S-O-V-A.

THE COURT:  Go ahead.

MS. KOUZNETSOVA:  I'm the mother of Sam's best friend

for almost five years.  So I mostly speaking here about his character, what I observed for this here.  And I have so many things to talk about but I will focus on two most important to me.

February 24th, 2022, the war in Ukraine started.  This night was devastating for all of us because originally, I am from Kyiv, Ukraine.  I live in the United States almost for 13 years.  I'm a proud citizen and consider myself American.

So when we wake up the morning, devastated, I don't know where to start.  All our family's there and our friends there.  And the first quote, text I have -- it was from Sam.

It wasn't about like, "I'm so sorry about what happened."  The text was, "Anjelika, how can I help?  What can I do?"

The next day was very difficult for us because we didn't know where to begin.  Family needs to be located.  Some people need things.  There's no electricity, nothing.

I said, "Sam, here is a list from the most important necessities that they need."

The next day everything was done.  He sent us everything.  We arranged the shipment to Ukraine.  Send some money because some family needed to be relocated and needed help.

Then I was organizing a big charity to get more money and to bring more help to Ukraine.  Again, Sam was the first

one offering his help -- I will be on the committee.  I will have an event, and he did.

He brought money, physical support, model support -- everything he could.  And it speaks a lot to me because he's young.  We consider him a millennial.  He has a lot of issues by himself.  He's working everything, and he was there every day asking what else can we do?

And now, to the most emotional and most important point -- because we are a small family, and I'm very close with my son and because Sam's family lives out of town, Sam pretty much was every holidays with us -- Christmas, Thanksgiving, New Year, Easter.  And he always was with his son, Grayson.  And pretty much every emotion now going to this point.

Grayson is a kid growing up in a divorced family.  So being that close with his father is very, very important.  I'm observing this all the time -- how close they are.  Every week Sam approached me, "Anjelika, do you know somebody who have a good swimming lessons?  Because I see Grayson interested in swimming."

Sam is handsome, young, single guy, but he never even put much time to his personal life because it's all about Grayson.  Grayson is starting kindergarten this year; so Sam was like, "We need to be prepared.  I will take him to this lesson, to this lesson."

So I don't want to take a longer time of yours because

I know how valuable it is, but I just wanted to put some amazing features of Sam's character. Because we all have a lot of friends in our life, but one friend is different from others. He's an amazing human being, and I hope you take this for consideration.

THE COURT: I've read every letter that was submitted. In reading the letter that you submitted, if it's in here -- I must have missed it -- but how did you and Sam meet?

I know you-all met about seven years ago, but how did the two of you meet?

MS. KOUZNETSOVA: Sam is the best friend of my son, Oleck, who is presented here. Like I said, because we're a very small family, it's just my husband, my son, and me here, everybody who is the best friends of my son are our family.

THE COURT: How did Sam and your son meet?

MS. KOUZNETSOVA: My son was working in the exotic car business. He loves cars and was working as kind of a salesperson. And Sam met him on his dealership to buy a car from him. And they live in the same area in Delray. So everybody kind of who have enthusiasm for cars, they get together at some point.

THE COURT: So Sam bought a car from your son?

MS. KOUZNETSOVA: Yes. And then they --

THE COURT: When was that?

MS. KOUZNETSOVA: I believe it was six or seven years

ago.

THE COURT:  Six or seven years ago.

So 2018?

MS. KOUZNETSOVA:  Yes, yes.

THE COURT:  2017?

MS. KOUZNETSOVA:  Yes, yes.

I will say that I didn't become close with Sam right away.  It was when Sam got married and got Grayson and then got divorced.  And the last three or four years, we become very close.  For our barbecue parties, for our pool parties, Sam was coming with Grayson to join us.

THE COURT:  Grayson is three now?

MS. KOUZNETSOVA:  No, he's five.

THE COURT:  Five.

MS. KOUZNETSOVA:  Yes.

THE COURT:  How long did Sam live with his wife?

MS. KOUZNETSOVA:  This, I don't know.  I only remember how my son was buying gifts for his -- when Grayson was born. I didn't met [sic] his wife.

THE COURT:  All right.  You've known Sam for seven years; correct?

MS. KOUZNETSOVA:  Yeah, but we meet him briefly, briefly, briefly.  We become very close, we become, like, three, four years ago.  I believe it's when he got divorced.

THE COURT:  So you and Sam were friends when Grayson

was born?

MS. KOUZNETSOVA:  Yes.  And Grayson -- I have a lot of proof on my video.  Like my birthday or holidays, he will call me and say, "I love you, Anjelika," because we love and adore this little guy.

THE COURT:  Did you ever meet Sam's wife?

MS. KOUZNETSOVA:  I just met his ex-wife.  Ex-wife.

THE COURT:  Wife at the time?

MS. KOUZNETSOVA:  No.  I just met her today, I believe. I never met -- I always met Grayson and Sam himself.

THE COURT:  So when did Sam go through his divorce?

MS. KOUZNETSOVA:  I believe like four years ago or five, after Grayson was born.  I don't think it was a quick divorce or something, but I never met his wife because Grayson was separated between his wife and Sam.  So when Grayson was with Sam, they invited Sam to Christmas parties if Grayson was with him.

THE COURT:  So you and Sam were friends at the time Sam was going through his divorce?

MS. Kouznetsova:  Yes.  But we wasn't that close because he was the best friend of my son.  And I live up in Tequesta, and they live in Delray.

THE COURT:  But he used to come to your house for Thanksgiving every day?

MS. KOUZNETSOVA:  No.  It was in our club.  We were

celebrating in the club and everything, plus three or four years, when he already was divorced, I believe.  So we wasn't close with his wife because I was getting to know Sam more and more because every holiday, I wanted to be with my son.  And he was always asking, "Oh, can I bring Sam?"

And we said, "Of course.  Your friend is our friend." That's how we treat the friends.  If you want to be with our kids, we need to be friends with their friends.

So this is how we got closer, closer.  It wasn't the amazing best friendship in the beginning.  It was because we are with people who need to learn about friends, too; so it was taking time to become friends that I can spoke [sic] about.

And especially when Ukraine started two and a half years ago, then when I opened my heart for Sam, because he was, like I said, the first one approached to me.

THE COURT:  Did Sam just buy the one car from your son, or did he buy other cars from him?

MS. KOUZNETSOVA:  That, I don't know.

THE COURT:  All right.

MS. KOUZNETSOVA:  Like I said, we become very close after February 2022, when the war started, because that's how you know who is your real friends and who's not because we wanted a lot of help.

It was frustrating.  We needed to relocate my mom here and some of our friend from Kyiv somewhere; so that's when we

become close friends that I can specifically talk about.

THE COURT:  Last question.  Were you able to get your mom over here?

MS. KOUZNETSOVA:  My mom was with us for two years. She just left a few months ago, yes.

THE COURT:  To go back?

MS. KOUZNETSOVA:  Yes.  She's in Kyiv right now because it's too hard for her during the summer.  She's coming back in November, yes.

THE COURT:  Thank you, very much for your comments.

MS. KOUZNETSOVA:  Thank you, Your Honor.

MR. GAUGUSH:  Actually, I would like to invite up Sam's ex-wife, Alexa Pany, please.

THE COURT:  I was amazed at reading the PSI as to Sam and to Mr. Gould, the ex-wives have nothing but glowing things to say about the spouse, which is not always the case.

MR. GAUGUSH:  Right, right.  Exactly.

THE COURT:  So you are Alexa?

MS. PANY:  Yes, Your Honor.

Hello.

THE COURT:  Go ahead.

MS. PANY:  I'm a mess; so I didn't write anything.  I didn't have anything prepared to say today.

THE COURT:  That's not necessary.  It's best just to come from the heart.

MS. PANY:  I've known Sam now for 11, 12 years.  I actually picked him up from his halfway house and brought him into my family.  We fell in love, like, right away.  And then, I mean, we just grew apart.  It happens in marriages, and that really was the only reason we got divorced.  We have one beautiful son.

THE COURT:  When were you all married?

MS. PANY:  We got married in 2017.

THE COURT:  '17.

And when did you divorce?

MS. PANY:  We separated in 2021, and the exact divorce -- I try to leave that behind me.

THE COURT:  Sure.

MS. PANY:  It took almost like a year for all the paperwork and stuff to be finalized, but it was either 2021 or 2022 is when we officially divorced.

But despite that, like, he's still my best friend.  I run to him for everything.  We tell each other everything.  No matter what he's going through, whether -- like, I've seen him at his lowest lows, and I've seen him at his highest highs, and no matter what he's going through, he's always, like, positive.

He's always like, "I'm going to get through this.  We're going to get through this."

If anyone else is going through anything and it's unrelated to him at all, he's always the first person there.

He's always there to help.  He's like, "What can I do?  How can I make things better?"

Our beautiful son that we have -- like, I have never questioned his fatherhood at all.  He's been the best father that I could ever ask for my son.

Grayson -- like when I have Grayson, because we have split custody, Grayson raves about his dad.  Like, he can't wait to go back to his dad's house.  He can't wait for Daddy to coach him in any kind of sports that they want to play.

He always asks when we go to events, like, "Is Daddy coming?"  Like, we try to do everything as a family.  Even though we're divorced, we still do everything together.

We still go out to places for dinner together.  We do all his sports together.  Everything is done together.

Like, I'm a nurse; so I work 12-hour shifts.  I'm gone for 13, 14 hours a day.  And I know I have Sam, who takes care of Grayson greatly, when I'm at work.  I don't know what I'm going to do otherwise because I'm by myself.  I don't get help.  Sam is my help.

Other than that, he's like an animal lover.  Like, we've had many animals in our household.  Like, I've gone with him for his Habitat for Humanity.  The second that we walk onto the property, like everybody comes to Sam.  "Sam, where should I go?  What should I do?  How do I do this?"  He's just a natural-born leader, and everyone comes to him for everything.

My family still loves him.  We still include him in everything.  I don't have anything really bad to say about him, to be honest with you.

THE COURT:  Thank you for your comments.

MR. GAUGUSH:  Two more people, if I could, Your Honor.  Andrew Sloan.

MR. SLOAN:  Thank you, Your Honor, for allowing me to speak with you today.

THE COURT:  Certainly.

MR. SLOAN:  As he said, my name is Andrew Sloan.  I've known Sam probably just about longer than anybody else here, other than his parents.  We grew up together.  I've known him for literally over 30 years, since we were little toddlers.

Like Alexa said, I saw him at his highs and lows.  I have been with him every step along the way.

I would like to spend some time kind of talking to you about the Sam I know and the entirety of Sam and not just for the reasons we are here today.

I truly think that he is a good person.  I wouldn't be here if I didn't.  I live in Maryland.  I flew down here.  I would do anything for Sam.  He is my best friend.  We were in each other's weddings.  I remember giving the speech at his, being his best man.

I remember sharing all the good moments of fatherhood with him.  I have two small children as well.  My son is

Jackson.  And Sam was with Grayson.  They had the same due date.  So the whole pregnancies, we were talking with them every day.  My wife and I and Alexa and Sam.  We shared all those highs and scary moments along the way.  And the birth of our sons is one of the truly coolest things, I think, that we, as fathers, can do.

And one of the cool things I can do, besides being a father to my kids, is seeing my best friend become a father and the love that they have for each other and the role model that he's trying to be for his son.

Look, we're here not because Sam has done everything right in his life.  Life and the journey that he's on has not been a straight arrow.  He's had some rough moments.

We've worked through those.  I've been there for him, and I will continue to be there unwaveringly and support him in every step along the way.  And hopefully he and I can become the best fathers and versions of ourselves that we can in our future for our kids.

That is our truly driving force and why we want to be better people.  I talk with Sam every day.  Most of the time, it's about our sons.  "Guess what Grayson did today?"  And he would kind of tell a story about the craziness that Grayson and him got to experience that day, whether it was doing stuff with sports, which Sam and I grew up doing all the time and being competitive.

I'm kind of rambling; so I apologize there. But I do think that Sam is the epitome of someone who deserves a second chance. He's putting himself through school. He's trying to be the better role model, not just for his son but for those around him.

He is a natural leader, and people gravitate towards him. He can make a real difference in those around him in his community. And he's not just -- I'm not saying he can do it. He is doing it. He is making a difference. He is changing his actions. He is being very generous with his time, with his time for Habitat for Humanity.

Life gets busy, but he's making time to make those around him better. He always makes people feel better about themselves. I don't know many people that can do that.

I don't think I'm one of those people that can always pick somebody up, but Sam is that for me. He will always be that for me, and I will do my best to be there for him.

The maturity and growth that I have seen in Sam -- again, I've known him since he was a toddler biting my back as little kids and kind of going through all the sports and all the school stuff.

The maturity and growth that he's exhibited over the last five years, really with the birth of his son has been resounding. And I stand here before you because I think for his future, the best is yet to come.

He will continue to be better, and I ask that you consider that in the entirety of kind of who he's becoming, not just who he's been. But I truly stand behind Sam and will continue to support him through every step of the way and hopefully to continue to support him becoming a better father and a better person and come out on the other side of this stronger and better than ever because I will help him through that.

THE COURT: What is your occupation?

MR. SLOAN: I'm an actuary, sir.

THE COURT: All right.

Well, thank you very much for your comments.

MR. SLOAN: Thank you very much.

MR. GAUGUSH: Your Honor, last, I would like to call up Lisa Kadar.

THE COURT: That's Sam's mother?

MR. GAUGUSH: Yes, Your Honor.

THE COURT: Thank you for the lovely letter, and I also got a letter from Sam's dad.

Each of you have spoken. I've read your letters.

MS. KADAR: Thank you so much. Thank you for giving me --

THE COURT: I particularly remember the mother's letter.

MS. KADAR: Thank you.

My name is Lisa Kadar, K-A-D-A-R, "radar" with a K.

I'm a school teacher for 24 years; so I have been around a lot of children.  I have been blessed with my job, and I have been blessed with my son and my daughter.

Thank you for giving me this opportunity to share with you what I know about my son and how he is.

Sam has always, always been this person that wore his heart on his sleeve.  He cares deeply about others.

If you look at the back, you can see each of those people that Sam has had a positive, positive impact on his life -- on their lives, and he as well on his.

He has a big, big, heart.  I mean, he is kind.  He is respectful.  And one of my stories that I have to tell you, as a mom, it's about Sam and Andrew.  They grew up in Schnecksville, Pennsylvania.  They were Tampa Bay fans.  Tampa Bay played the Eagles in the Super Bowl.

DEFENDANT PANY:  Championship.

MS. KADAR:  Championship?  Okay.

It was the championship, but nobody wanted in Pennsylvania, especially Eastern Pennsylvania, for Tampa Bay to win.  They took a lot of ribbing.  Sam was in fifth grade at the time, and they took a lot of ribbing.

When the Bucks beat the Eagles, besides a lot of happy tears, Sam went to school the day.  He found his principal, Mr. Hauck, and shook his hand and said, "It was a good game,

Mr. Hauck."

And the principal was so amazed that this fifth grade boy went and found him, shook his hand -- and Sam and Andrew were happier -- but he called me to say, "What a good son."

I have seen that throughout different things.  Sam has had his lows, and Sam has had his highs, but he continues to help others.  He continues to show respect for others, whether it's family, friends, or strangers.

Volunteering for Habitat For Humanity.  You heard that spoken before.  As a single mom now, single woman, Sam has helped me.  If I have financial questions about certain things, if I need house repairs, if I need somebody to cut my grass, he's my go-to guy being a thousand miles away.

Family is key to Sam.  His love of all of us is evident.  His relationship with Alexa is amazing.  They always do the right thing in raising their beautiful, beautiful son, Grayson.

I have been teaching and I've seen thousands of students, and I have to tell you -- and this isn't a grandmother speaking, this is a person speaking that works with kids -- there's not really any child that I've seen as happy-go-lucky and as well adjusted as Grayson is from a divorced family.  I can't get over that.
Grayson is Sam's mini me.  You saw that picture.  He looks like him.  He acts like him.  The two of them are best

friends.

You've heard people say, "Sam's my best friend; Sam's my best friend."  Grayson is Sam's best friend, and Sam is Grayson's best friend.

Whether they're playing Legos, whether they're reading, whether they're swimming -- they are bonded together in a special way.  They're besties.

I know what having a best friend is because my dad was my best friend.  I lost my dad 50 years ago.  My life has never been the same.  My best friend was taken from me, and my life changed from that day.

I've had a lot of walls built around me.  I keep myself to myself.  I know what it did.  The effect of losing my father, it's just -- 50 years later, it's still the same.  It affects me each and every day and will affect me all my living days.

Saying that, I worry about Grayson losing his best buddy and him not being around.  Grayson is not going to understand or comprehend Sam's absence or that call every day of communication, "Hey, Daddy.  Hey, Daddy."  It's going to affect him in all aspects.  I worry so much as a teacher, a mom, and a grandmother.  It's just so, so hard to think about that because his best buddy is going to -- Grayson's best buddy is going to go away possibly.

I just ask for you to take that into consideration,

when you're thinking about what sentence, Sam is Grayson's Daddy.  Sam is my son.  Sam is Steve's son.  He's Hanna's brother.  He's friends with all of these people.  He's a good person who made a mistake.  He is loved by so many, but importantly, Sam loves all of us as well.

Thank you so much for giving me this time to share with you about my beautiful, wonderful son, Sam.

THE COURT:  Thank you, Ms. Kadar.

MS. KADAR:  Thank you.

MR. GAUGUSH:  Your Honor, you've been very generous with the time and with the people speaking.

I was going to cite to some of these letters.  I know you've read them; so there's no reason to do that.  There's just a couple more points I would like to make before closing.

The work that Sam has done with Habitat for Humanity was not motivated by any of this.  He started doing that in August of 2022.  A knock came to his door a year later.

So this type of work that he's been doing, this is all Sam Pany.  It's kind of like the dichotomy that I was talking about when I started this part of the presentation.

Who is Sam Pany?

This is part of who he is.  They made him a crew leader because he's so amazing at guiding people, his skill set.

Going back to school -- he went back to school in January of 2023.  Again, before the Government came knocking.

He realized that to improve his live, he had to improve his education; so he went back to school.

He's been attending school at Palm Beach State College. Again, since January 1st of 2023, self-correction, self-improvement.  He's been getting A's.  In fact, I think he's got seven A's and maybe one B -- I'm sorry, eight A's and one B.  So he's doing well in school, which means he's studying, which means he's taking it seriously.

He's also tutoring.  I mentioned that in the sentencing memo.  One of the people he was tutoring was taking the class over because he got an F at that time.  That person graduated or completed the class with an A.

And as Sam Pany's dad addressed this Court, he's been also working as a designer for his company.  Sam wants to take over that company someday.  I'm not sure if his father is hearing that for the first time today, but he wants to take over the business because he's good at math; he's good at design; he's good at engineering; and it's a good fit.

Part of what I just want to end with is the person you're sentencing today is not the person who was committing this offense three and a half years ago.

Mr. Pany is going to be the first one to tell you he is solely to blame for this; this is his fault; this is his choice; and he fully accepts responsibility for that.

And to tie into that, when Mr. Pany first decided he

was going to waive indictment, he was going to plead guilty, the first thing he said is "I want to cooperate," and he has been going gangbusters cooperating.

Before he even pleaded guilty, he sat down with me and put together a 14-page single-spaced memorandum, which we gave to the Government, listing information about 26 subjects and targets. Not many people -- and it took two months to do it and many, many sessions to get that all down into a memo. And we have been having cooperation session after cooperation session with Mr. Egozi's colleagues.

THE COURT: Is there any chance of a Rule 35?

MR. EGOZI: Yes, Your Honor, there is. And we will make argument on how that should be considered.

THE COURT: All right.

MR. GAUGUSH: There's been one indictment already after the cooperation, and we expect there to be more, and there may be a couple of trials.

So cooperation is ongoing, and it is substantial. We just want the Court to take that into consideration in terms of our request for the 15-month downward variance.

Your Honor, this might be a good point in time for Mr. Pany to address you, or would you like to hear from the Government first.

THE COURT: Well, I like to give the defendant the last word.

MR. GAUGUSH:  Okay.

THE COURT:  So let me hear from Egozi.

MR. EGOZI:  Thank you, Your Honor.

THE COURT:  Yes, sir.

MR. EGOZI:  So right now we have a guidelines range of 63 to 78 months.  I understand the defense is asking for 48 months.  The Government is asking for 68.

Before I go into some of the arguments and some of the legal issues in the defense's memorandum, I want to just anchor the Court as to why we sort of got to that number.

As Your Honor is aware, we have a four-defendant conspiracy here.

We have, as the Government sees it, Mr. Bonaventura, then Mr. Pany, then Mr. Zappoli, then Mr. Gould.

So Mr. Gould, at the bottom there, just received a sentence of 40 months imprisonment with a lot of the very similar community support and encouraging mitigating circumstances as Mr. Pany.  Of course, we look at each defendant individually.

And so the Government is concerned that if we start at a position from where the defense is recommending, accounting for the likelihood of a Rule 35, which as far as I see it, the only reason it can't be filed now is simply because there's too much left to be done.

But the Government is relatively confident that there

will be a Rule 35.  So what I fear, Your Honor, is a scenario in which we anchor a leader of this four-defendant conspiracy anywhere below the guidelines and then he gets a Rule 35, he will end up spending less time in prison than the person that is least culpable in this scheme, Mr. Gould.

And the reason that that is unfair and considered an unwarranted disparity is because, while, of course, to Mr. Pany's credit, the fact of cooperation should be considered, and he should get the merit and the benefit of that cooperation, and he has been very thorough thus far.

The reason why he has that opportunity is because he was a leader.  He was a leader of this scheme, and so he has been living in this DME space, not more recently but, at that time, for a period of four years.

So he had had so many connections and so many encounters conducting fraud and essentially paying and soliciting kickbacks that he now has the opportunity to cooperate.

So now we have this paradox; right?  We want to give the defendant the benefit of cooperation but not end up in a scenario in which defendants are essentially out of order prison-wise in terms of culpability.

And so I start with that, Your Honor, and say that any variance at all below the current guidelines range, if the Government eventually recommends what I think is a somewhat

normal Rule 35, with but of course we will look at the particular circumstances as the time comes, but let's say one-third off, right, that's a common Rule 35 that is sometimes given.

One-third off, what the defense is asking for, or even a few months higher will end up leaving Mr. Pany with a sentence that is lower than Mr. Gould, which I think is a very, very perverse incentive when we look at general deterrence and the signal that we want to send to those in the community; that if you are leader in a fraudulent conspiracy, you will essentially be able to end up with less time if you just trade on the relationships that you've built in this fraud space.  So that's where I wanted to start.

Now, to hit a few of the points that the defense makes, Mr. Gaugush says that it's essentially excessive to apply both the two-level aggravating role enhancement while withholding the two-level deduction for a zero-point offender because it's a four-level gap between this defendant and Mr. Zappoli or Mr. Gould.

Congress, by virtue of ratifying the guidelines and the Sentencing Commission with all their expertise, has said that is exactly the gap that there should be between defendants by virtue of withholding the zero-point offender reduction from those that are leaders.

They are essentially saying, "Yes, you deserve credit

for being a zero-point offender by virtue of your lower criminal history category, but you're not going to be only two levels apart from these other individuals.  You're going to be four levels apart."  So I don't think it's right to anchor a variance on that basis.

Next, I think Mr. Gaugush, to his credit, is very creative with his point about inflation.  And to be frank, it's not a point I've heard made before, and I don't think it's a very common one.  I almost think it's too creative, to be frank, Your Honor.  Defendants in this district are not getting that credit, that benefit.

I think we would be creating an unwarranted disparity between this defendant and all the other defendants that so clearly are above the $7 million threshold of loss to a Government health program by virtue of essentially just knocking an offense level off.

And I think the point that Mr. Gaugush made when he said, "Hey, I got this idea from the Sentencing Commission," actually cuts against him because the Sentencing Commission made a calculated choice to only apply, we will call it, a COLA adjustment, right, essentially an inflation adjustment to the fraud guidelines, the actual loss amount, not the subsections that we're talking about here.

So Mr. Gaugush is making essentially a policy argument that the Commission messed up and they should have applied it,

but they made a specific decision not to.  So it would not be fair here to say that simply because Mr. Pany's actual loss is a little bit above 7 million, he should get some sort of inflation adjustment.

I also think it's worth noting, Your Honor, as to that specific 7.4 million -- the only reason that that is the restitution amount is because during the administrative process with Medicare, there was pretty extensive repayment; right?

They were essentially knocking on the doors at the DMEs, saying, "Hey, this was not legitimate.  You owe us money."

So after the fraud was already committed, after the claims were submitted, the defendants' DME companies paid some money back.  And I say that because the actual loss amount is not 7.4 really.  We are talking about over $8 million in successful claims, right, which is a lot closer to the cutoff that Mr. Gaugush was talking about when we're comparing sort of inflationary years.

Regardless, I just don't think it's a point that should lead to a variance.

Next, the defense is saying this offense conduct was so, so long ago and making the point that this individual as to specific deterrent is unlikely to re-offend.  And I believe that.

I don't think Mr. Pany, given the community support

that he has here and his background, is likely to re-offend. But that is not the only factor that we look at here; right? We look at general deterrence as well.

But as to the sort of shift from criminal conduct to what we will call a more upstanding life, I think it's worth noting that it's not the case that Mr. Pany stopped committing fraud simply because he became a father.  The dates on the information directly rebut that.

This conspiracy was from late 2017, as charged, all the way through early 2021, and his son is five years old, which means that Mr. Pany was in the middle of this conspiracy when he became a father.

So he didn't just quit cold turkey.  He didn't become reformed immediately upon becoming a father.  I have no doubt that becoming a father did ultimately influence him, but one of the larger reasons why this fraud ended is because Medicare stopped paying.

There was payment suspension on nearly each and every one of these durable medical equipment companies; so the money dried out, which is so often a reason why these criminal conspiracies come to an end.

So I don't believe it's fair to credit this defendant for some sort of reformation when that really did not happen.

The fraud was no longer being successful.  And as I understand it, from these various witnesses, there was a

falling-out between Mr. Pany and Mr. Bonaventura, the other leader of this conspiracy.

So that falling-out and disagreement at the same time that CMS was asking for money back essentially gave this defendant no choice but to stop.

Now, it doesn't mean he doesn't deserve credit once he stops for really improving his prospects; right?  I agree that that is worth some consideration, but I don't believe it's fair to grant a variance under the faulty assumption that he stopped cold turkey because he just felt bad.  Really the incentives just weren't aligned for him to continue committing fraud.

Next, I want to point out, Your Honor, there's a chart in the defendant's sentencing memo.  That's Exhibit 7, which is essentially the way Government's sees it, it's basically a cherry-picked chart of recent healthcare fraud sentences, one of which isn't even in this district and was filed five years ago.

There is no standard that we can articulate for why certain cases were or were not included.  We don't have those PSIs in front of us.  We don't know the specific facts as to any of those cases.  So I don't think we can glean anything from that chart as to what a normal or appropriate sentence would be.  All we have here, Your Honor, are these facts and the guidelines to inform our decision.

Next, just to turn to culpability, as we mentioned

before, Your Honor, this defendant was a leader.  He was not the only leader, but he was a leader of this conspiracy -- paying kickbacks, soliciting kickbacks, providing essentially needless braces and durable medical equipment to individuals really across the country who didn't even need them and didn't ask for them, just racking up fraud and abuse of our Medicare system.

And I think it's worth noting while certainly it is a mitigating circumstance that this defendant appears to have been generous in the last several years and certainly involved in his community, I think it's hard to say -- and it's a little bit harsh, but I think the point needs to be made -- it's a lot easier, Your Honor, to be generous when it's not your money.  That's just the frank truth; right?

Those that are doing it the right way and struggling to make ends meet tend to not have the ability to be as generous as this defendant was, whether it was with his time or with his money.

And this defendant, quite frankly, didn't have to work as hard for his money because he and his conspirators were essentially just committing fraudulent claims to Medicare; so it was a lot easier to be generous at that time.

Next, I just want to talk about the sheer volume of the claims here, as to just the DMEs that this defendant was involved with.  His conduct contributed to nearly $18 million

in fraudulent claims to Medicare, 18 million.

And I understand we're talking now about actual loss and lowering the guidelines, but even if we just talk about actual loss, over $8 million of those claims were paid because of what this defendant did.  He personally profited over $2.2 million, which goes back to the generosity.

You can't look at any of these factors in a vacuum.  I understand it's a bit of a paradox.  How does a man that has done so much good do bad for so long?  But that needs to be considered; that this was not a one-off mistake.

I think the phrase "regrettable mistake" was in one of the letters.  It wasn't.  You want to talk about the dictionary definition of terms?  A "mistake" is not something that lasted for three and a half years.  It was a lifestyle.

Now, I understand there were reasons that sort of motivated Mr. Pany to enter this space and to do fraud, but when we talk about the seriousness of the offense, respect for the criminal laws and general deterrence, it has to be noted how long this fraud went on, and that fraud leads to all Americans having higher insurance premiums.

There's an Eleventh Circuit case that came out a couple years ago.  It was United States v. Howard.  And the specific defendant was a doctor, Dr. Bramwell, who contributed about -- I think it was about four or $500,000 in fraudulent claims for some sort of cream to the TriCare Insurance.  The loss was way,

way, way lower than what we have here with Mr. Pany and his colleagues.

And the Eleventh Circuit said in that case -- and this is 28 F.4th 180 at 207, white collar medical crimes, like Bramwell, are serious because they can disrupt health care markets, and that was as to a few hundred thousand dollars in claims. We're talking about $18 million in claims. It can't be overstated how much this impacts each and every individual in health care fraud at its core.

So finally, Your Honor, while Mr. Pany, like I said before, the defendant does deserve the benefit of some of his good deeds and his conduct and a little bit of turning his life around, I think that doesn't mean that a variance is appropriate because the last point that I will make, Your Honor, is really just the sheer technicality of the fact that his guidelines are where they are.

And of course I'm getting to the actual loss and intended loss.

The point that I made about the supplemental brief that we're filing in front of the Eleventh Circuit and the sort of the fast-moving area of the law, it is a sheer lucky coincidence that this individual happens to be sentenced on August -- I can't even tell you the date, but not after November 1st of 2024.

It does not make sense. There is no logical

distinction to give this defendant the benefit of having been sentenced a couple months before these other individuals, especially in light of all of the pending appeals for those formerly sentenced defendants that are currently pending in front of the Eleventh Circuit.

All those appeals are likely going to end up being resolved with intended loss being the correct measure because of the clarification by the Sentencing Commission.

It's not a substantive change.  It's a clarification. So whether it comes by virtue of an actual decision on the merits or the sheer likelihood of the Eleventh Circuit -- if they just wait two and a half more months, it doesn't have to decide the issue, which I think is a more likely occurrence -- all of the opinions and all of those defendants were similarly situated as Samuel Pany will end up being sentenced with a guidelines range that is tethered to intended loss, not actual.

So when you take that and the dynamic that I described before about cooperation and making sure that Mr. Pany is sentenced to a high enough prison term so that he doesn't end up spending less time in prison than somebody who was significantly less culpable, I think all of that means that yes, Mr. Pany deserves the benefit of all of this.

THE COURT:  Is that an appropriate consideration for the Court?

MR. EGOZI:  I do think so, Your Honor.

THE COURT:  Where does it say that the Court should consider that?

MR. EGOZI:  In 3553(a), it says we have to avoid unwarranted disparities.  So it is exactly the dictate to all of us to consider whether the disparity in guidelines is tethered to the actual seriousness of the conduct, and it's not.

THE COURT:  But the disparity in this case would be as a result of the amount of cooperation provided by this defendant.

MR. EGOZI:  But the reason he would be able to cooperate to such a degree is because he was a leader of the scheme.  So why should Mr. Gould be punished by not having been involved enough to acquire the connections to then trade on and cooperate?

I'm not trying to punish cooperators, Your Honor.  If it ultimately arises to the level of substantial assistance, Samuel Pany will earn a Rule 35 motion, but we have to account for where we start that prison term so that when the public looks at the ordering of these individuals, they see, "Hey, was this guy just able to trade on the fact that he was a leader so that he spends less time than his codefendant and his childhood best friend?"

It doesn't seem right to me, Your Honor.

And with that, Your Honor, we do ask for a term of 68

months in prison.

Thank you.

THE COURT:  Mr. Pany, is there something you'd like to say, sir?

DEFENDANT PANY:  Yes, Your Honor.

MR. GAUGUSH:  Would you like him to address Your Honor from the table or the lectern?

THE COURT:  Just speak into a microphone.  It doesn't matter whether it's there or at the podium.  I just want to be able to hear what you say.

DEFENDANT PANY:  Absolutely, Your Honor.

As kind of everyone said -- and you saw me -- I'm a very emotional person; so I decided to write my stuff down just because it will be easier to read.

As I stand before you today, I'm filled with a deep sense of remorse and responsibility for the actions that have brought me here.  The situation is a stark departure from the values I was raised with and the principles I hold dear.  My parents instilled in me a strong sense of right and wrong, and they raised me to be a person of integrity, to respect others, and to lead a life guided by honesty and compassion.

I recognize that my actions have not only let down those who believed in me, but also contradicted everything I was taught.  This is not who I am, and this is certainly not the example I want to set for myself.

Reflecting on the impact of my choices, I cannot state the profound regret I feel.  If I can turn back time and undo the damages I've caused, I would do so without hesitation. Every day I grapple with the knowledge that I could have chosen differently -- and make no mistake, this was my choice, and I have to live with that, and I am deeply sorry for the pain that I've caused.

One of my greatest fears is the effect that my absence will have on my family, especially my son.  At the end of the day, my son is probably the person who will end up hurt the most for my conduct.  He's not here for me to apologize to. He's still young and relies on me for guidance, support, and love.

As his father, it is my duty to be there for him, to help him navigate life's challenges and to ensure he grows up feeling safe and secure.  My son looks up to me as his role model.  After today, I'm not so sure about that.  Some day I'm going to have to explain all this to him.  I just hope he forgives me.

I worry deeply about how my incarceration could affect his future emotionally, mentally and physically.  The bond between a parent and child is irreplaceable.  I remember the impact my parents' divorce had on me.  This is a whole different level.

I fear that my absence could create a void in his life

that could have lasting repercussions.  These are my fears.

Now, I just want to make one thing clear -- what's happening today is my fault, and it's no one's fault but my own, and I have no one to blame but myself.

Beyond my role as a father, I understand the broader implications of my actions on my family.  They already suffer because of my mistake, and the thought of causing them further pain is something that weighs heavily on my conscience.

My family depends on me, and I'm keenly aware that my absence will create significant hardship for them.  I've always strived to be a source of strength and support for my loved ones, and the prospect of me being unable to fulfill that role fills me with deep sorrow.

In the wake of my actions, I take serious steps to make amends and to ensure that I never find myself in this position again.  I've done everything in my power to cooperate fully with the Government.  I don't see my cooperation as a matter of fulfilling legal obligations.  It's my way of trying to make things right, to continue positively for the resolution of this matter and to demonstrate my commitment to change.

I've made significant changes in my life to ensure that I do not repeat the mistakes in my past.  In January of last year, before this whole case arose, I enrolled in school with the goal of furthering my education and taking over my father's engineering company.  I wish I had done that six years ago.

I understand that in order to provide a better future for my son, I must also build a better future for myself. Returning to school is not just about gaining knowledge; it is about demonstrating to my son and now to society that I am serious and positive about change.

Your Honor, I stand before you today to express my deep regret for what I have done.  I'm not seeking to escape the consequences of my actions, but I want you to see that there's more to Sam Pany than what you see in that presentence report.

And when I look at that document, I ask myself, "Who is that person?  That can't be me."  But unfortunately, that was part of my life, and I have to come to the terms of it and all its truths.

I fully understand the gravity of my actions, and I am committed to doing everything in my power to ensure that I never stray from the path of integrity again.

I humbly ask for your consideration.  I want you to see me for who I am and not just the person described in this offense.

I accept responsibility for my actions, but I am also -- I also ask for a sentence that can allow me to return to my son as soon as possible and to provide a better future for him.

Thank you, Your Honor.

THE COURT:  Mr. Gaugush, anything else?

MR. GAUGUSH:  Your Honor, I would just be remiss if I didn't mention two things, if I may.

One is that in the PSR, the probation office -- I believe it was paragraph 155, if I'm not mistaken -- when Mr. Pany originally was a Level 28, she had looked at the -- I think it's pronounced the JSON data, which had reflected 155, which reflected that a person at Level 28 ordinarily gets, it appears, to be a reduction in their sentence of about 18 months -- or 16 months, rather.  We don't have the data for Level 26, but I think it's probably pretty close to that.

And again, I just wanted to say that we're asking for a 15-month downward variance.  Nobody knows why AJ Gould did not earn a Rule 35 other than AJ Gould.  He may not have tried very hard to help the Government.

It really would not be fair to hold that against Mr. Pany, who's done everything in his power to cooperate with the Government.

And I would just note for the record that in terms of there being an imbalance, there is an imbalance already.  Joey Zappoli is not actually being held fully accountable for his entire loss amount.

In the PSR, in the table, he has a loss amount of 10 million intended, and $5 million actual, but his plea agreement says 1.5 million to 3.5 million.  So he's probably going to score out to about a Level 21, which is 37 months, and he's

more culpable --

THE COURT:  However --

MR. GAUGUSH:  Yes.

THE COURT:  -- Mr. Gould, his loss amount was the intended loss amount?

MR. GAUGUSH:  Right.  I understand.

THE COURT:  He was actually punished more severely than Mr. Pany.

MR. GAUGUSH:  Well, Your Honor, I just want to acknowledge this catch-22.  Mr. Pany -- he may be more culpable than Mr. Gould, but he has gone above and beyond to cooperate with the Government and do everything in his power to make amends, and I think the Court should be taking that into consideration.

I hope to be here on a Rule 35.

THE COURT:  It sounds like to me you will be.

MR. GAUGUSH:  But there's no guarantee.

THE COURT:  I understand.

MR. GAUGUSH:  And that's what worries me.

THE COURT:  I understand.

MR. GAUGUSH:  That's my deep -- that's my deep worry.

THE COURT:  It appeared to this Court that it's pretty certain that one will be coming down the pike.

And Mr. Egozi is nodding affirmatively.

MR. GAUGUSH:  Well, Your Honor, like I said --

THE COURT:  But I understand.

MR. GAUGUSH:  -- we're asking for a 15-month variance. I appreciate the indulgence you've given us in presenting today.

THE COURT:  All right.

MR. GAUGUSH:  Thank you.

THE COURT:  Thank you.

The Court has considered the statements of all parties, the presentence report, which contains the advisory guidelines, as well as each of the statutory factors set forth in 18 U.S.C. Section 3553(a).

You know, in sentencing, we talk all these numbers, you know -- two-level reduction for this, three-level enhancement for that -- but the number that strikes me the most is the over $7 million that was defrauded from the Medicare program.  It bothers me.  I don't mind telling you it bothers me a heck of a lot.

It bothers me seeing the frequency that Medicare cases come before this Court, in one district, of one state.  I don't know what the national figure is for Medicare fraud, but it's mind-boggling.  It has to be.

It is, in my mind, a very serious crime.  But fortunately, in federal court, we have rules.  We have rules that we follow to ensure unwarranted disparities.

However, I disagree with the Government that in

determining an appropriate sentence prior to an anticipated Rule 35, that the Court somehow needs to take into consideration what another defendant has already received.  I don't buy that.  I'm sorry, I just don't.

I'm basing my decision solely upon the guidelines and the 3553(a) factors, and in doing so, Mr. Pany is being given the benefit of the fact that the he pled guilty and he pled guilty early.

But this Court finds that a sentence that provides just punishment, adequate deterrence, promotes respect for the law, and is sufficient but not greater than necessary to accomplish all those goals is 63 months in prison, the bottom of the advisory guideline range.

Now, granted, it's been represented that, in all probability, a Rule 35 will come down the pike.  At that point in time, the Court will assess the degree of assistance provided by Mr. Pany and, in all likelihood, will grant a reduction.

Right now, the law requires that I consider the advisory guidelines and the 3553(a) factors, and in doing so, the Court finds that a sentence at the bottom of the advisory guideline range accomplishes all considerations required by statute.

It is therefore, the judgment of this Court that the defendant, Samuel Stephen -- is it Stephen or Steven [as

pronounced]?

DEFENDANT PANY: Steven [as pronounced.] Your Honor.

THE COURT: Okay -- Stephen Pany is hereby committed to the custody of the Bureau of Prisons to be in prison for a term of 63 months. It is further ordered that Mr. Pany shall pay restitution in the amount of $7,473,984.42 to be paid jointly and severally with the codefendants Jason Matthew -- and I understand it's pronounced Bonaventura.

MR. GAUGUSH: That's my understanding.

THE COURT: I think I was saying Bona Ventura [as pronounced.]

Am I wrong?

DEFENDANT PANY: It's Bonaventura.

THE COURT: Bonaventura. It's kind of a combination of the two.

Anthony Joseph Gould and Joseph Anthony Zappoli, the third.

The defendant shall pay restitution at the rate of 10 percent of his monthly gross earning until such time as the Court may alter that payment schedule in the interest of justice.

The U.S. Bureau of Prisons, the U.S. Probation Office and the U.S. Attorney's Office shall monitor the payment of restitution and report to the Court any material change in the defendant's ability to pay.

These payments do not preclude the Government and subsequently, the U.S. Probation Office from using any other anticipated or unexpected financial gains as extra income of the defendant in order to satisfy the restitution obligations.

Restitution shall be made payable to the clerk of the United States Courts and forwarded to the U.S. Clerk's Office, attention, financial section, in Miami.

The clerk will forward the restitution to the Centers for Medicare and Medicaid Services, attention to the division of accounting, Medicare Part B, located in Baltimore, Maryland.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years.  Within 72 hours of release, the defendant shall report in person to the probation office in the district where released.

While on supervised release, the defendant shall comply with the mandatory and standard conditions of supervised release as referenced in Part F of the presentence report.

The defendant shall also comply with the following special conditions:  Association restriction, financial disclosure requirement, health care business restriction, no new debt restriction, substance abuse treatment, and unpaid restitution, fines, or special assessments, all as noted in Part F of the presentence report.

It is further ordered that the defendant shall pay immediately to the United States a special assessment of $100.

The total sentence is 63 months imprisonment, three years supervised release, 7,473,984.42 in restitution, $100 special assessment.

Forfeiture of the defendant's right, title and interest in certain property is hereby ordered.  That will be made a part of the final judgment.

MR. GAUGUSH:  Consistent with the Court's preliminary order.

THE COURT:  Yes.

Now that sentence has been imposed, does the defendant or his counsel object to the Court's finding of fact or to the manner in which sentence was pronounced?

MR. GAUGUSH:  No objections, Your Honor, to either, but we have recommendations.

THE COURT:  All right.  Let me hear those at this time.

MR. GAUGUSH:  Your Honor, you heard a presentation today about Mr. Pany's battle with drug addiction.  It's a constant battle, and the probation office even noted --

THE COURT:  The Court will recommend the --

MR. GAUGUSH:  RDAP?

THE COURT:  -- the RDAP program.

MR. GAUGUSH:  Thank you, Your Honor.

The second recommendation we have is either Pensacola or Miami.

THE COURT:  I do district.

MR. GAUGUSH:  Okay.

THE COURT:  I don't designate a specific facility, but if you want the Southern District or you want the Northern District.

His son lives in the Southern District.

MR. GAUGUSH:  And that's what we're asking.

THE COURT:  Okay.  Then the Court will recommend to the Bureau of Prisons that Mr. Pany be designated to a facility located within the Southern District of Florida.

MR. GAUGUSH:  Yes, Your Honor.

Thank you.

And the last request is given the fact that Mr. Pany is continuing to operate with the Government, that cooperation is ongoing, he even had a session last Friday, we're asking for a 90-day self-surrender so that he can complete as much cooperation as possible before having to surrender himself to the BOP.

THE COURT:  What is the Government's position?

MR. EGOZI:  No objection.

THE COURT:  All right.  Notify.

THE COURTROOM DEPUTY:  November 19th.

THE COURT:  All right.  The Court will set self-surrender for November 19, 2024, at the facility designated by the Bureau of Prisons.

If, for some reason -- and I can't imagine in 90 days a

facility won't be designated by then, but should there not be a designated facility, you are ordered to surrender to the U.S. Marshal Service located in the Wilkie D. Ferguson, Jr. Federal Courthouse in Miami on November 19, 2024, no later than 12 noon.

Let me further advise you that you do have the right to appeal the sentence imposed. Any notice of appeal must be filed within 14 days after the entry of judgment.

If you're unable to pay for the cost of an appeal, you may apply for leave to appeal in forma pauperis.

Gentlemen, is there anything further?

MR. EGOZI: Yes. Very briefly, Your Honor, just to protect the record. The Government would object to the use of actual loss instead of intended loss, but that's all.

THE COURT: So noted. Okay.

MR. EGOZI: Nothing further, Your Honor.

THE COURT: That would conclude this hearing.

And, folks, thank you all for appearing in support of Mr. Pany. I hope all of you will continue to be there for him while he's away.

Okay. That will conclude this hearing.

MR. EGOZI: Thank you, Your Honor.

MR. GAUGUSH: Thank you, Your Honor.

DEFENDANT PANY: Thank you, Your Honor.

(Proceedings concluded at 12:40 p.m.)

C E R T I F I C A T E


I, PATRICIA BAILEY-ENTIN, hereby certify that the foregoing transcription is a true and accurate transcription from the notes and audio backup of the proceedings in the above-entitled matter, which was originally reported by GLENDA POWERS.


DATE:  3/17/2026          /s/Patricia Bailey-Entin
                          PATRICIA BAILEY-ENTIN, FPR, RPR
                          Official Court Reporter
                          United States District Court
                          Southern District of Florida
                          U.S. Federal Courthouse
                          299 East Broward Boulevard
                          Fort Lauderdale, Florida 33301

## $

**$100** [3] - 29:11, 79:25, 80:2
**$18** [2] - 65:25, 67:7
**$20** [1] - 31:2
**$25,000** [2] - 29:7, 29:8
**$250,000** [2] - 29:7, 29:8
**$500,000** [1] - 66:24
**$7,473,984.42** [2] - 29:10, 78:6

## '

**'17** [1] - 46:9
**'23** [2] - 32:12, 32:20
**'loss** [1] - 5:3

## /

**/s/Patricia** [1] - 83:10

## 0

**0:24-cr-60059-JIC-2** [1] - 1:3

## 1

**1** [4] - 1:8, 24:5, 31:2, 33:6
**1.5** [1] - 74:24
**10** [5] - 19:5, 19:9, 25:21, 74:22, 78:18
**10-element** [1] - 33:16
**1000** [1] - 1:18
**10:24** [1] - 1:6
**11** [3] - 24:25, 37:10, 46:1
**12** [3] - 24:4, 46:1, 82:5
**12-hour** [1] - 47:15
**1276** [1] - 9:7
**12:40** [2] - 1:6, 82:25
**13** [3] - 31:4, 39:7, 47:16
**1349** [1] - 2:10
**14** [5] - 31:25, 32:2, 33:12, 47:16, 82:8
**14-page** [1] - 57:5
**142** [1] - 27:20
**15-month** [6] - 29:25, 30:2, 34:1, 57:20, 74:12, 76:2
**155** [2] - 74:4, 74:6
**16** [2] - 34:19, 74:9
**17th** [1] - 6:24
**18** [4] - 2:10, 66:1,

74:8, 76:10
**180** [1] - 67:4
**19** [2] - 81:23, 82:4
**1987** [1] - 31:16
**19th** [1] - 81:21
**1B1.1(1)(a** [1] - 7:2
**1st** [9] - 6:25, 9:21, 9:23, 10:2, 20:13, 20:15, 21:3, 56:4, 67:24

## 2

**2** [1] - 31:15
**2.2** [1] - 66:5
**20** [1] - 33:6
**2001** [2] - 22:19, 31:25
**2008** [1] - 27:5
**2011** [5] - 31:3, 32:10, 32:15, 32:24, 33:2
**2015** [4] - 31:12, 31:13, 31:24, 31:25
**2017** [3] - 42:5, 46:8, 63:9
**2018** [1] - 42:3
**2019** [1] - 8:20
**2020** [1] - 27:9
**2021** [3] - 46:11, 46:15, 63:10
**2022** [4] - 39:5, 44:21, 46:16, 55:17
**2023** [4] - 32:12, 33:1, 55:25, 56:4
**2024** [9] - 1:5, 2:8, 6:24, 6:25, 20:15, 32:13, 67:24, 81:23, 82:4
**207** [1] - 67:4
**21** [3] - 1:5, 35:22, 74:25
**24** [2] - 2:8, 52:2
**24-60059-CR** [1] - 2:4
**24th** [1] - 39:5
**26** [3] - 28:25, 57:6, 74:10
**278** [1] - 27:4
**28** [3] - 67:4, 74:5, 74:7
**299** [2] - 1:23, 83:13
**2B1.1** [9] - 5:13, 7:2, 8:12, 11:3, 17:11, 31:11, 31:14, 32:3, 33:11
**2B1.1's** [1] - 17:8
**2B1.1(b)(1** [1] - 3:18
**2B1.1(b)(7** [4] - 30:24, 31:1, 32:6, 32:16
**2D1.5** [1] - 24:5

## 3

**3** [1] - 18:17
**3.5** [1] - 74:24
**3/17/2026** [1] - 83:10
**30** [1] - 48:13
**33132** [1] - 1:15
**33301** [2] - 1:23, 83:13
**33607** [1] - 1:18
**34** [1] - 27:23
**35** [12] - 27:23, 57:11, 58:22, 59:1, 59:3, 60:1, 60:3, 69:18, 74:13, 75:15, 77:2, 77:15
**3553(a** [3] - 69:3, 77:6, 77:20
**3553(a)** [1] - 76:11
**3553(f)(1** [1] - 19:24
**37** [2] - 28:5, 74:25
**3A1.1** [1] - 19:7
**3A1.5** [1] - 19:7
**3B1.1** [3] - 18:5, 25:21, 26:19

## 4

**4** [1] - 18:17
**40** [2] - 28:5, 58:16
**4221** [1] - 1:17
**48** [2] - 29:24, 58:6
**4B1.1** [1] - 34:7
**4C1.1** [10] - 18:9, 18:11, 18:16, 18:18, 19:23, 20:14, 21:8, 21:20, 22:17, 26:21
**4C1.1(a)(10** [2] - 18:4, 27:15
**4th** [1] - 1:14

## 5

**5** [3] - 9:7, 12:4, 74:23
**5.1** [1] - 32:22
**5.5** [1] - 33:2
**50** [2] - 54:9, 54:14
**500** [1] - 30:14
**52** [1] - 28:14
**54** [1] - 28:17
**558** [1] - 8:20
**579** [1] - 9:7
**588** [1] - 8:20
**5C1.2** [1] - 21:19
**5C1.2(4** [1] - 21:10
**5C1.2(a)(4** [1] - 26:23

## 6

**6** [1] - 10:11
**63** [5] - 29:1, 58:6,

77:12, 78:5, 80:1
**651** [1] - 27:9
**656** [1] - 27:9
**658** [1] - 27:9
**68** [2] - 58:7, 69:25
**69** [1] - 8:3

## 7

**7** [12] - 18:17, 30:23, 31:2, 32:10, 32:15, 32:20, 32:23, 33:6, 61:14, 62:3, 64:13, 76:15
**7,473,984.42** [1] - 80:2
**7.4** [4] - 32:18, 33:1, 62:6, 62:15
**72** [1] - 79:13
**750** [1] - 30:14
**78** [2] - 29:2, 58:6
**780** [1] - 8:3
**793** [1] - 15:21
**794** [1] - 8:3

## 8

**8** [3] - 12:5, 62:15, 66:4
**889** [1] - 27:4
**892** [1] - 27:4

## 9

**9** [2] - 18:18, 19:5
**9.5** [2] - 32:11, 32:17
**90** [1] - 81:25
**90-day** [1] - 81:15
**958** [1] - 27:9
**96** [2] - 29:14, 29:17
**99** [2] - 1:14, 29:19
**99.9** [1] - 11:8

## A

**A's** [3] - 56:5, 56:6
**a)(10** [6] - 20:14, 20:16, 22:1, 22:2, 22:5
**a)(11** [1] - 20:17
**a)(9** [1] - 19:6
**ability** [2] - 65:16, 78:25
**able** [5] - 45:2, 60:11, 69:11, 69:21, 70:10
**above-entitled** [1] - 83:6
**abrogate** [1] - 9:10
**abrogated** [1] - 9:14
**absence** [4] - 54:19, 71:8, 71:25, 72:10

**absolutely** [2] - 34:17, 70:11
**abuse** [2] - 65:6, 79:21
**academic** [1] - 15:10
**accept** [1] - 73:20
**acceptance** [1] - 2:11
**accepts** [1] - 56:24
**accomplish** [1] - 77:11
**accomplishes** [1] - 77:22
**accordingly** [2] - 13:10, 17:13
**account** [2] - 31:17, 69:18
**accountable** [1] - 74:20
**accounting** [2] - 58:21, 79:10
**accurate** [1] - 83:4
**accustomed** [1] - 5:14
**acknowledge** [1] - 75:10
**acknowledging** [1] - 22:18
**acknowledgment** [1] - 20:22
**acquire** [1] - 69:14
**actions** [8] - 50:10, 70:16, 70:22, 72:6, 72:14, 73:8, 73:14, 73:20
**acts** [1] - 53:25
**actual** [35] - 3:2, 5:4, 5:10, 5:16, 5:17, 5:24, 6:6, 6:19, 8:8, 10:3, 10:21, 11:7, 13:18, 15:4, 15:5, 17:5, 17:11, 23:25, 30:16, 30:20, 32:16, 32:17, 32:25, 61:22, 62:2, 62:14, 66:2, 66:4, 67:17, 68:10, 68:16, 69:6, 74:23, 82:14
**actuary** [1] - 51:10
**added** [1] - 38:9
**addicted** [1] - 37:7
**addiction** [1] - 80:17
**addition** [1] - 29:18
**additional** [2] - 3:4, 8:23
**address** [6] - 2:25, 3:9, 6:2, 36:2, 57:22, 70:6
**addressed** [1] - 56:13
**adequate** [1] - 77:10
**adhere** [1] - 12:17
**adherence** [2] - 9:5, 9:8

**adjudged** [1] - 2:11
**adjust** [1] - 32:1
**adjusted** [2] - 31:4, 53:22
**adjustment** [14] - 18:5, 19:7, 21:7, 24:7, 25:21, 26:18, 26:25, 30:23, 31:25, 32:6, 33:7, 61:21, 62:4
**administrative** [1] - 62:7
**adopts** [2] - 13:3, 13:5
**adore** [1] - 43:4
**advance** [1] - 21:18
**advantages** [1] - 10:15
**adverse** [1] - 37:20
**advise** [1] - 82:6
**advisory** [6] - 28:24, 29:1, 76:9, 77:13, 77:20, 77:21
**affect** [3] - 54:15, 54:21, 71:20
**affects** [1] - 54:15
**affirmatively** [1] - 75:24
**affirming** [1] - 27:5
**agency's** [2] - 12:11, 12:13
**aggravated** [1] - 27:16
**aggravating** [9] - 17:24, 18:2, 20:16, 22:11, 24:6, 24:19, 33:19, 34:4, 60:16
**ago** [17] - 11:22, 12:6, 33:12, 37:11, 41:9, 42:1, 42:2, 42:24, 43:12, 44:14, 45:5, 54:9, 56:21, 62:22, 64:17, 66:22, 72:25
**agree** [1] - 64:7
**agreed** [3] - 19:16, 26:12, 30:22
**agreement** [1] - 74:23
**ahead** [5] - 7:17, 12:2, 12:3, 38:24, 45:21
**aided** [1] - 36:18
**AJ** [3] - 33:22, 74:12, 74:13
**Alexa** [5] - 45:13, 45:18, 48:14, 49:3, 53:15
**aligned** [1] - 64:11
**allow** [2] - 35:24, 73:21
**allowing** [1] - 48:7
**almost** [7] - 19:5, 21:11, 30:16, 39:1, 39:7, 46:14, 61:9

**alongside** [2] - 13:3, 13:6
**alter** [1] - 78:20
**AM** [1] - 1:6
**amazed** [2] - 45:14, 53:2
**amazing** [5] - 41:2, 41:4, 44:10, 53:15, 55:23
**ambiguity** [14] - 3:22, 4:13, 6:2, 6:15, 7:14, 7:17, 8:2, 10:22, 11:5, 11:20, 13:12, 13:13, 13:14, 24:11
**ambiguous** [12] - 3:19, 4:4, 4:17, 6:10, 7:18, 8:22, 15:1, 15:19, 16:6, 17:6, 17:9, 20:24
**amended** [1] - 31:23
**amendment** [5] - 6:22, 6:23, 7:5, 7:9, 9:22
**amends** [2] - 72:15, 75:13
**AMERICA** [1] - 1:4
**America** [1] - 2:3
**American** [3] - 4:20, 10:12, 39:8
**Americans** [1] - 66:20
**amount** [18] - 3:1, 5:20, 10:12, 30:17, 30:20, 32:21, 32:25, 33:1, 36:25, 61:22, 62:7, 62:14, 69:9, 74:21, 74:22, 75:4, 75:5, 78:6
**amounts** [3] - 5:17, 31:22, 32:2
**analysis** [1] - 8:11
**analyzed** [1] - 18:9
**anchor** [3] - 58:9, 59:2, 61:4
**Andrew** [4] - 48:6, 48:10, 52:14, 53:3
**animal** [1] - 47:20
**animals** [1] - 47:21
**Anjelika** [5] - 38:16, 38:19, 39:13, 40:17, 43:4
**answer** [2] - 9:18, 34:11
**answered** [1] - 38:1
**Anthony** [2] - 78:16
**anticipated** [2] - 77:1, 79:3
**apart** [3] - 46:4, 61:3, 61:4
**apologize** [2] - 50:1, 71:11
**appeal** [4] - 82:7, 82:9,

82:10
**appeals** [6] - 9:1, 9:25, 10:2, 12:21, 68:3, 68:6
**APPEARANCES** [1] - 1:12
**appeared** [1] - 75:22
**appearing** [1] - 82:18
**appellate** [1] - 26:22
**Appendix** [1] - 31:12
**application** [3] - 12:15, 12:17, 12:20
**applied** [5] - 17:25, 23:4, 24:12, 30:20, 61:25
**applies** [3] - 18:2, 20:25, 26:8
**apply** [14] - 7:1, 7:9, 7:23, 22:3, 24:6, 24:13, 24:21, 26:15, 36:22, 60:15, 61:20, 82:10
**appreciate** [2] - 24:24, 76:3
**approach** [1] - 11:25
**approached** [2] - 40:17, 44:15
**appropriate** [6] - 33:8, 34:8, 64:22, 67:14, 68:23, 77:1
**appropriateness** [1] - 31:6
**April** [1] - 6:24
**Archer** [2] - 13:17, 13:19
**area** [2] - 41:19, 67:21
**arguable** [1] - 23:20
**argument** [6] - 3:4, 3:17, 22:7, 27:10, 57:13, 61:24
**arguments** [2] - 7:11, 58:8
**arises** [1] - 69:17
**arose** [1] - 72:23
**arranged** [2] - 38:5, 39:21
**arrived** [2] - 37:14, 37:15
**arrow** [1] - 49:13
**articles** [1] - 12:9
**articulate** [1] - 64:18
**aside** [2] - 7:21, 23:22
**aspect** [3] - 30:17, 30:20, 34:2
**aspects** [3] - 18:11, 30:7, 54:21
**assess** [1] - 77:16
**assessment** [3] - 29:11, 79:25, 80:3
**assessments** [1] -

79:22
**assistance** [2] - 69:17, 77:16
**Assistant** [1] - 2:6
**association** [1] - 79:19
**assuming** [1] - 10:2
**assumption** [1] - 64:9
**attached** [1] - 35:22
**attending** [1] - 56:3
**attention** [2] - 79:7, 79:9
**Attorney** [1] - 2:7
**Attorney's** [1] - 78:23
**audio** [1] - 83:5
**August** [3] - 1:5, 55:17, 67:23
**authoritative** [1] - 13:7
**Auto** [2] - 36:17, 36:18
**automatically** [1] - 8:13
**avoid** [1] - 69:3
**award** [1] - 27:18
**aware** [4] - 19:11, 19:13, 58:11, 72:9
**awhile** [1] - 37:8

**B**

**b)(7** [3] - 32:10, 32:21, 34:2
**background** [2] - 9:4, 63:1
**backup** [1] - 83:5
**bad** [3] - 48:2, 64:10, 66:9
**badly** [1] - 4:23
**BAILEY** [2] - 83:3, 83:10
**Bailey** [1] - 83:10
**BAILEY-ENTIN** [2] - 83:3, 83:10
**Bailey-Entin** [1] - 83:10
**Baltimore** [1] - 79:10
**banc** [3] - 4:6, 9:9, 19:15
**barbecue** [1] - 42:10
**based** [4] - 9:20, 10:7, 13:8, 18:18
**baseline** [1] - 9:4
**basic** [1] - 36:21
**basing** [1] - 77:5
**basis** [2] - 17:25, 61:5
**battle** [2] - 80:17, 80:18
**Bay** [3] - 52:15, 52:16, 52:20
**Beach** [1] - 56:3
**beat** [1] - 52:23

**beautiful** [5] - 46:6, 47:3, 53:16, 55:7
**became** [4] - 32:10, 37:7, 63:7, 63:12
**become** [12] - 20:16, 38:12, 42:7, 42:9, 42:23, 44:12, 44:20, 45:1, 49:8, 49:16, 63:13
**becoming** [6] - 35:15, 38:11, 51:2, 51:5, 63:14, 63:15
**BEFORE** [1] - 1:10
**begin** [1] - 39:16
**beginning** [1] - 44:10
**behalf** [1] - 29:16
**behind** [2] - 46:12, 51:3
**below** [2] - 59:3, 59:24
**benefit** [7] - 59:9, 59:20, 61:11, 67:11, 68:1, 68:22, 77:7
**best** [26] - 38:25, 41:11, 41:14, 43:21, 44:10, 45:24, 46:17, 47:4, 48:21, 48:23, 49:8, 49:17, 50:17, 50:25, 53:25, 54:2, 54:3, 54:4, 54:8, 54:9, 54:10, 54:17, 54:23, 69:23
**besties** [1] - 54:7
**better** [12] - 47:2, 49:20, 50:4, 50:13, 51:1, 51:5, 51:6, 51:7, 73:1, 73:2, 73:22
**between** [6] - 43:15, 60:18, 60:22, 61:13, 64:1, 71:22
**beyond** [2] - 72:5, 75:11
**big** [3] - 39:24, 52:12
**binding** [6] - 7:23, 14:19, 14:22, 14:23, 15:24, 26:11
**birth** [2] - 49:4, 50:23
**birthday** [1] - 43:3
**bit** [6] - 36:10, 36:11, 62:3, 65:12, 66:8, 67:12
**biting** [1] - 50:19
**Black's** [1] - 10:18
**blame** [2] - 56:23, 72:4
**blessed** [2] - 52:3, 52:4
**bodily** [1] - 22:15
**boggling** [1] - 76:21
**Bona** [1] - 78:10
**Bonaventura** [5] -

58:13, 64:1, 78:8, 78:13, 78:14
**bond** [1] - 71:21
**bonded** [1] - 54:6
**BOP** [1] - 81:17
**born** [4] - 42:18, 43:1, 43:13, 47:25
**bothers** [3] - 76:16, 76:18
**bottom** [4] - 37:9, 58:15, 77:12, 77:21
**bought** [1] - 41:22
**Boulevard** [3] - 1:17, 1:23, 83:13
**Bowl** [1] - 52:16
**Boy** [1] - 1:17
**boy** [1] - 53:3
**braces** [1] - 65:4
**Bramwell** [2] - 66:23, 67:5
**brief** [6] - 9:7, 10:11, 17:2, 24:4, 24:25, 67:19
**briefing** [2] - 9:17, 9:21
**briefly** [4] - 42:22, 42:23, 82:12
**bring** [4] - 25:2, 35:25, 39:25, 44:5
**broader** [1] - 72:5
**broke** [2] - 21:24, 22:1
**broken** [1] - 25:7
**brother** [2] - 38:8, 55:3
**brought** [4] - 23:18, 40:3, 46:2, 70:17
**Broward** [2] - 1:23, 83:13
**Bucks** [1] - 52:23
**buddy** [3] - 54:18, 54:23
**build** [1] - 73:2
**builds** [1] - 36:14
**built** [2] - 54:12, 60:12
**Bureau** [4] - 78:4, 78:22, 81:8, 81:24
**business** [6] - 36:12, 36:25, 37:3, 41:17, 56:17, 79:20
**busy** [1] - 50:12
**buy** [4] - 41:18, 44:16, 44:17, 77:4
**buying** [1] - 42:18
**BY** [1] - 1:19

## C

**CAD** [2] - 36:17, 36:18
**calculated** [1] - 61:20
**calculating** [1] - 7:8

**calculator** [3] - 32:3, 32:4, 32:7
**canceled** [1] - 37:13
**cannot** [3] - 16:14, 17:8, 71:1
**caption** [1] - 38:9
**car** [4] - 41:16, 41:18, 41:22, 44:16
**care** [4] - 47:16, 67:5, 67:9, 79:20
**cares** [1] - 52:8
**Carlton** [1] - 1:17
**cars** [3] - 41:17, 41:20, 44:17
**case** [39] - 3:20, 5:12, 7:11, 8:4, 9:9, 9:12, 9:16, 9:22, 10:3, 12:14, 12:20, 12:22, 13:11, 13:17, 13:20, 14:5, 14:8, 15:7, 15:8, 15:13, 16:20, 16:22, 17:3, 20:9, 20:25, 22:4, 22:12, 30:3, 30:6, 30:21, 31:6, 45:16, 63:6, 66:21, 67:3, 69:8, 72:23
**Case** [1] - 2:4
**CASE** [1] - 1:3
**cases** [14] - 6:5, 6:8, 9:3, 11:8, 11:20, 16:10, 18:14, 21:12, 21:14, 30:15, 64:19, 64:21, 76:18
**catch-22** [1] - 75:10
**category** [1] - 61:2
**Category** [2] - 22:22, 29:1
**caused** [3] - 10:13, 71:3, 71:7
**causes** [1] - 23:15
**causing** [1] - 72:7
**CCE** [1] - 22:10
**celebrating** [1] - 44:1
**cemetery** [1] - 38:9
**center** [1] - 37:18
**centers** [1] - 35:4
**Centers** [1] - 79:8
**certain** [7] - 11:1, 21:8, 23:1, 53:11, 64:19, 75:23, 80:5
**certainly** [8] - 3:15, 11:13, 26:11, 36:1, 48:9, 65:8, 65:10, 70:24
**certainty** [1] - 23:13
**certify** [1] - 83:3
**challenge** [1] - 6:16
**challenges** [1] - 71:15
**championship** [2] -

52:17, 52:19
**Championship** [1] - 52:18
**chance** [2] - 50:3, 57:11
**change** [5] - 4:7, 68:9, 72:20, 73:5, 78:24
**changed** [4] - 8:10, 32:2, 32:14, 54:11
**changes** [6] - 31:18, 35:15, 35:16, 72:21
**changing** [1] - 50:9
**Chapter** [1] - 31:15
**character** [2] - 39:2, 41:2
**charged** [3] - 2:9, 24:18, 63:9
**charity** [1] - 39:24
**chart** [3] - 64:12, 64:15, 64:22
**charted** [1] - 37:6
**cherry** [1] - 64:15
**cherry-picked** [1] - 64:15
**child** [2] - 53:21, 71:22
**childhood** [1] - 69:22
**children** [2] - 48:25, 52:3
**choice** [4] - 56:24, 61:20, 64:5, 71:5
**choices** [3] - 35:16, 35:19, 71:1
**chose** [2] - 18:16, 19:8
**chosen** [1] - 71:4
**Christmas** [2] - 40:11, 43:16
**circuit** [2] - 12:14, 35:2
**Circuit** [34] - 4:12, 6:4, 7:24, 8:1, 8:4, 8:9, 8:16, 9:5, 9:13, 9:16, 9:22, 10:2, 11:17, 11:18, 11:21, 11:24, 12:7, 13:20, 13:23, 14:6, 14:18, 14:21, 17:3, 19:15, 27:4, 27:9, 30:9, 66:21, 67:3, 67:20, 68:5, 68:11
**Circuit's** [1] - 4:6
**circular** [1] - 23:19
**circumstance** [2] - 22:9, 65:9
**circumstances** [3] - 34:15, 58:18, 60:2
**citation** [1] - 12:3
**citations** [2] - 12:9, 16:24
**cite** [8] - 9:7, 10:10, 14:18, 14:20, 24:4,

27:3, 27:8, 55:12
**cites** [3] - 12:14, 13:17, 16:21
**citizen** [1] - 39:8
**claims** [11] - 11:7, 11:13, 62:13, 62:16, 65:21, 65:24, 66:1, 66:4, 66:24, 67:7
**clarification** [3] - 9:24, 68:8, 68:9
**clarify** [1] - 23:16
**class** [2] - 56:10, 56:12
**classmate** [2] - 37:22, 38:6
**classmates** [1] - 37:21
**clean** [1] - 35:7
**clear** [5] - 8:24, 9:25, 18:22, 20:12, 72:2
**clearly** [4] - 14:22, 17:7, 23:23, 61:14
**clerk** [2] - 79:5, 79:8
**Clerk's** [1] - 79:6
**close** [11] - 40:9, 40:15, 40:16, 42:7, 42:10, 42:23, 43:20, 44:3, 44:20, 45:1, 74:10
**closer** [3] - 44:9, 62:16
**closing** [1] - 55:14
**club** [2] - 43:25, 44:1
**CMS** [1] - 64:4
**coach** [1] - 47:9
**codefendant** [1] - 69:22
**codefendants** [1] - 78:7
**codes** [1] - 36:22
**COHN** [1] - 1:10
**Cohn** [1] - 1:21
**coincidence** [1] - 67:22
**COLA** [1] - 61:20
**cold** [2] - 63:13, 64:10
**collar** [1] - 67:4
**colleagues** [2] - 57:10, 67:2
**College** [2] - 4:20, 56:3
**college** [1] - 37:8
**combination** [7] - 18:7, 18:12, 18:23, 19:3, 20:23, 23:3, 78:14
**comfortable** [1] - 3:11
**coming** [5] - 31:7, 42:11, 45:8, 47:11, 75:23
**comma** [1] - 26:1

**Commentary** [1] - 24:5
**commentary** [23] - 3:21, 4:2, 4:3, 4:9, 4:10, 4:15, 6:7, 8:21, 12:10, 13:1, 13:3, 13:6, 13:9, 13:13, 14:9, 14:25, 15:23, 15:24, 15:25, 16:5, 17:8, 24:10
**comments** [3] - 45:10, 48:4, 51:12
**Commission** [34] - 4:2, 5:5, 13:3, 13:5, 18:16, 18:19, 19:8, 20:8, 20:13, 21:3, 21:15, 21:18, 21:25, 22:17, 22:18, 23:6, 23:12, 23:16, 23:23, 24:13, 31:10, 31:11, 31:13, 31:24, 32:1, 32:7, 33:5, 33:11, 34:7, 60:21, 61:18, 61:19, 61:25, 68:8
**Commission's** [3] - 13:7, 20:21, 21:23
**commit** [1] - 2:9
**commitment** [1] - 72:20
**committed** [3] - 62:12, 73:15, 78:3
**committee** [1] - 40:1
**committing** [4] - 56:20, 63:6, 64:11, 65:21
**common** [4] - 3:24, 5:2, 60:3, 61:9
**communication** [1] - 54:20
**community** [5] - 50:8, 58:17, 60:9, 62:25, 65:11
**companies** [2] - 62:13, 63:19
**company** [5] - 36:24, 37:19, 56:14, 56:15, 72:25
**compare** [2] - 19:22, 21:9
**comparing** [2] - 25:4, 62:17
**comparison** [1] - 12:10
**compassion** [1] - 70:21
**competitive** [1] - 49:25
**complemented** [1] - 4:9
**complete** [1] - 81:15

**completed** [2] - 37:17, 56:12

**completely** [5] - 5:19, 6:8, 7:7, 17:2, 24:1

**comply** [2] - 79:15, 79:18

**comprehend** [1] - 54:19

**computation** [1] - 7:9

**computer** [1] - 36:18

**computer-aided** [1] - 36:18

**conceding** [1] - 18:1

**concerned** [1] - 58:20

**conclude** [2] - 82:17, 82:21

**concluded** [1] - 82:25

**concrete** [1] - 37:3

**conditions** [2] - 79:16, 79:19

**conduct** [9] - 5:22, 11:6, 24:18, 62:21, 63:4, 65:25, 67:12, 69:6, 71:11

**conducting** [1] - 59:16

**confident** [2] - 7:19, 58:25

**conflict** [1] - 9:10

**confront** [1] - 26:12

**confronted** [1] - 26:9

**Congress** [1] - 60:20

**conjoins** [1] - 26:4

**connections** [2] - 59:15, 69:14

**conscience** [1] - 72:8

**consequences** [1] - 73:8

**consider** [7] - 31:5, 39:8, 40:5, 51:2, 69:2, 69:5, 77:19

**consideration** [11] - 33:8, 34:2, 34:9, 41:5, 54:25, 57:19, 64:8, 68:23, 73:17, 75:14, 77:3

**considerations** [1] - 77:22

**considered** [6] - 13:8, 57:13, 59:6, 59:9, 66:10, 76:8

**considering** [1] - 27:6

**consistent** [1] - 80:7

**conspiracies** [1] - 63:21

**conspiracy** [9] - 2:9, 11:6, 58:12, 59:2, 60:10, 63:9, 63:11, 64:2, 65:2

**conspirators** [1] - 65:20

**constant** [1] - 80:18

**Constitution** [1] - 16:2

**constructed** [1] - 5:6

**construction** [7] - 8:23, 15:16, 17:5, 36:23, 37:4, 37:5, 37:8

**construed** [1] - 26:22

**consulting** [1] - 36:12

**contacted** [1] - 37:25

**contained** [5] - 19:1, 19:25, 20:4, 20:24, 29:17

**contains** [1] - 76:9

**contesting** [1] - 17:24

**context** [5] - 5:12, 5:16, 5:24, 6:18, 17:10

**continue** [8] - 12:16, 49:15, 51:1, 51:4, 51:5, 64:11, 72:19, 82:19

**continued** [1] - 12:8

**continues** [2] - 53:6, 53:7

**continuing** [9] - 18:6, 20:18, 24:7, 24:17, 27:1, 27:7, 27:12, 27:17, 81:13

**contractor** [1] - 37:2

**contradicted** [1] - 70:23

**contributed** [2] - 65:25, 66:23

**controls** [1] - 12:22

**conversation** [1] - 38:3

**conversely** [1] - 32:19

**converted** [1] - 34:4

**convicted** [1] - 22:14

**cool** [1] - 49:7

**coolest** [1] - 49:5

**cooperate** [7] - 57:2, 59:18, 69:12, 69:15, 72:16, 74:16, 75:11

**cooperating** [1] - 57:3

**cooperation** [12] - 57:9, 57:16, 57:18, 59:8, 59:10, 59:20, 68:18, 69:9, 72:17, 81:13, 81:16

**cooperators** [1] - 69:16

**copies** [1] - 11:22

**copy** [1] - 2:14

**core** [1] - 67:9

**corporate** [1] - 36:14

**correct** [6] - 4:4, 4:5, 7:19, 28:19, 42:21, 68:7

**correction** [2] - 35:20, 56:4

**corrupting** [2] - 35:5, 35:8

**cost** [2] - 11:2, 82:9

**counsel** [3] - 2:14, 16:11, 80:11

**count** [1] - 2:9

**counted** [1] - 24:18

**country** [1] - 65:5

**couple** [6] - 12:6, 29:18, 55:14, 57:17, 66:21, 68:2

**course** [7] - 26:10, 36:17, 44:6, 58:18, 59:7, 60:1, 67:17

**court** [9] - 9:12, 12:21, 16:12, 23:13, 26:9, 26:12, 27:10, 38:22, 76:23

**Court** [78] - 1:21, 1:22, 2:1, 2:2, 2:11, 2:23, 2:24, 3:9, 3:22, 4:4, 5:3, 6:9, 7:3, 7:22, 7:25, 8:16, 9:9, 12:12, 12:18, 12:19, 12:22, 13:22, 14:16, 14:19, 14:22, 14:23, 15:21, 16:16, 17:1, 17:7, 17:8, 17:10, 18:4, 19:11, 22:6, 25:13, 26:3, 26:18, 27:3, 27:8, 28:12, 28:23, 29:12, 29:15, 29:23, 30:19, 30:25, 31:5, 33:8, 33:13, 34:9, 36:6, 36:8, 38:13, 38:18, 56:13, 57:19, 58:10, 68:24, 69:1, 75:13, 75:22, 76:8, 76:19, 77:2, 77:9, 77:16, 77:21, 77:24, 78:20, 78:24, 80:19, 81:7, 81:22, 83:11, 83:11

**COURT** [112] - 1:1, 2:2, 2:18, 2:20, 2:23, 3:11, 3:15, 4:3, 6:2, 7:13, 8:15, 8:20, 10:8, 12:1, 14:12, 17:7, 17:16, 19:13, 19:15, 19:18, 21:5, 21:7, 23:8, 26:16, 26:18, 27:25, 28:2, 28:4, 28:11, 28:17, 28:20, 28:23, 29:5, 29:8, 29:10, 36:1, 36:3, 38:15, 38:21, 38:24, 41:6, 41:15, 41:22, 41:24, 42:2,

42:5, 42:12, 42:14, 42:16, 42:20, 42:25, 43:6, 43:8, 43:11, 43:18, 43:23, 44:16, 44:19, 45:2, 45:6, 45:10, 45:14, 45:18, 45:21, 45:24, 46:7, 46:9, 46:13, 48:4, 48:9, 51:9, 51:11, 51:16, 51:18, 51:23, 55:8, 57:11, 57:14, 57:24, 58:2, 58:4, 68:23, 69:1, 69:8, 70:3, 70:8, 73:25, 75:2, 75:4, 75:7, 75:16, 75:18, 75:20, 75:22, 76:1, 76:5, 76:7, 78:3, 78:10, 78:14, 80:9, 80:15, 80:19, 80:21, 80:25, 81:2, 81:7, 81:18, 81:20, 81:22, 82:15, 82:17

**Court's** [6] - 21:1, 28:12, 28:15, 35:24, 80:7, 80:11

**Courthouse** [3] - 1:22, 82:4, 83:12

**courtroom** [1] - 3:24

**COURTROOM** [1] - 81:21

**courts** [10] - 6:5, 8:10, 9:1, 12:14, 13:25, 15:25, 16:5, 24:6, 26:11, 27:14

**Courts** [2] - 8:21, 79:6

**cousins** [1] - 37:5

**CPI** [2] - 32:4, 32:7

**craziness** [1] - 49:22

**cream** [1] - 66:25

**create** [3] - 21:20, 71:25, 72:10

**created** [6] - 4:7, 31:3, 32:16, 32:22, 33:5, 34:7

**creates** [2] - 21:16, 22:7

**creating** [2] - 18:7, 61:12

**creative** [2] - 61:7, 61:9

**credit** [6] - 59:8, 60:25, 61:6, 61:11, 63:22, 64:6

**crew** [1] - 55:22

**crime** [1] - 76:22

**crimes** [1] - 67:4

**Criminal** [2] - 22:22, 28:25

**criminal** [15] - 18:6,

20:18, 22:22, 24:8, 24:17, 25:17, 25:18, 27:1, 27:7, 27:12, 27:17, 61:2, 63:4, 63:20, 66:18

**criteria** [3] - 19:1, 22:13, 33:17

**culpability** [3] - 31:21, 59:22, 64:25

**culpable** [4] - 59:5, 68:21, 75:1, 75:10

**current** [4] - 9:15, 9:20, 31:20, 59:24

**custody** [2] - 47:7, 78:4

**cut** [1] - 53:12

**cutoff** [1] - 62:16

**cuts** [1] - 61:19

### D

**dad** [5] - 47:7, 51:19, 54:8, 54:9, 56:13

**dad's** [1] - 47:8

**Daddy** [5] - 47:8, 47:10, 54:20, 55:2

**damages** [1] - 71:3

**data** [2] - 74:6, 74:9

**DATE** [1] - 83:10

**date** [4] - 2:13, 7:3, 49:2, 67:23

**dates** [1] - 63:7

**daughter** [1] - 52:4

**days** [4] - 37:12, 54:16, 81:25, 82:8

**dead** [1] - 37:23

**dealership** [1] - 41:18

**dealing** [2] - 18:3, 30:19

**deals** [1] - 4:21

**dealt** [1] - 19:14

**dear** [1] - 70:18

**death** [1] - 22:15

**debate** [1] - 12:8

**debt** [1] - 79:21

**deceased** [1] - 38:8

**decide** [3] - 13:24, 21:20, 68:13

**decided** [9] - 6:8, 10:3, 18:20, 21:15, 22:25, 33:6, 37:10, 56:25, 70:13

**deciding** [3] - 7:22, 14:6, 33:8

**decision** [17] - 4:6, 6:1, 12:23, 14:18, 14:21, 15:9, 15:20, 19:10, 19:11, 19:17, 21:23, 22:13, 62:1, 64:24, 68:10, 77:5

**decisions** [2] - 16:21, 26:22
**decrease** [1] - 31:19
**deduction** [2] - 26:15, 60:17
**deeds** [1] - 67:12
**deep** [5] - 70:15, 72:13, 73:6, 75:21
**deeply** [3] - 52:8, 71:6, 71:20
**defeat** [1] - 5:9
**Defendant** [1] - 1:8
**defendant** [41] - 7:4, 18:5, 19:7, 24:7, 25:11, 25:16, 26:19, 26:23, 27:1, 27:5, 27:7, 27:16, 57:24, 58:11, 58:19, 59:2, 59:20, 60:18, 61:13, 63:22, 64:5, 65:1, 65:9, 65:17, 65:19, 65:24, 66:5, 66:23, 67:11, 68:1, 69:10, 77:3, 77:25, 78:18, 79:4, 79:11, 79:13, 79:15, 79:18, 79:24, 80:10
**DEFENDANT** [8] - 1:16, 2:22, 52:17, 70:5, 70:11, 78:2, 78:13, 82:24
**defendant's** [8] - 11:6, 13:16, 17:13, 27:10, 27:18, 64:13, 78:25, 80:4
**defendants** [8] - 22:22, 24:15, 59:21, 60:22, 61:10, 61:13, 68:4, 68:14
**defendants'** [1] - 62:13
**defense** [12] - 11:3, 14:2, 16:11, 23:11, 24:24, 25:6, 25:13, 58:6, 58:21, 60:5, 60:14, 62:21
**defense's** [3] - 24:15, 24:20, 58:9
**defer** [4] - 8:21, 12:17, 13:12, 17:8
**deference** [1] - 12:16
**deferred** [1] - 2:13
**define** [1] - 15:17
**defined** [2] - 6:17, 6:18
**defining** [1] - 12:15
**definitely** [1] - 3:6
**definition** [6] - 4:10, 5:2, 6:12, 6:13, 10:8, 66:13

**definitions** [3] - 4:19, 7:18, 15:3
**defrauded** [1] - 76:15
**degree** [5] - 31:20, 31:21, 69:12, 77:16
**deliberately** [1] - 18:20
**Delray** [3] - 37:11, 41:19, 43:22
**demonstrate** [1] - 72:20
**demonstrating** [1] - 73:4
**denial** [1] - 27:5
**departure** [5] - 17:22, 23:5, 29:13, 33:14, 70:17
**departures** [2] - 30:10, 30:11
**deprivation** [2] - 5:4, 5:9
**deprived** [2] - 4:22, 10:16
**DEPUTY** [1] - 81:21
**described** [2] - 68:17, 73:18
**deserve** [3] - 60:25, 64:6, 67:11
**deserves** [2] - 50:2, 68:22
**design** [2] - 21:3, 56:18
**designate** [1] - 81:2
**designated** [4] - 81:8, 81:24, 82:1, 82:2
**designed** [1] - 5:21
**designer** [1] - 56:14
**designs** [1] - 36:13
**despite** [1] - 46:17
**destruction** [1] - 5:9
**detail** [1] - 4:10
**determination** [2] - 3:21, 17:1
**determining** [2] - 31:5, 77:1
**deterrence** [4] - 60:8, 63:3, 66:18, 77:10
**deterrent** [1] - 62:23
**detriment** [3] - 4:23, 5:8, 10:16
**devastated** [2] - 37:24, 39:9
**devastating** [1] - 39:6
**developed** [1] - 20:8
**development** [2] - 37:4, 37:5
**dichotomy** [2] - 35:9, 55:19
**dictate** [1] - 69:4
**Dictionary** [4] - 4:20,

5:8, 10:12, 10:14
**dictionary** [4] - 5:2, 6:16, 6:18, 66:12
**died** [1] - 38:7
**difference** [5] - 25:24, 25:25, 33:24, 50:7, 50:9
**different** [7] - 6:14, 19:9, 19:21, 25:8, 41:3, 53:5, 71:24
**differently** [2] - 6:9, 71:5
**difficult** [1] - 39:15
**dilemma** [1] - 21:16
**diminution** [2] - 10:15, 10:19
**dinner** [1] - 47:13
**direct** [2] - 12:19, 34:21
**direction** [2] - 14:1, 20:23
**directly** [6] - 8:6, 9:10, 12:22, 16:15, 16:17, 63:8
**directs** [2] - 5:2, 14:24
**disadvantage** [2] - 4:23, 5:9
**disadvantages** [1] - 10:16
**disagree** [2] - 11:21, 76:25
**disagreed** [1] - 12:15
**disagreement** [1] - 64:3
**disappearance** [1] - 10:19
**disclosure** [1] - 79:20
**discretion** [1] - 14:3
**discriminate** [1] - 37:19
**discuss** [1] - 30:1
**discussion** [1] - 15:11
**disparities** [2] - 69:4, 76:24
**disparity** [4] - 59:7, 61:12, 69:5, 69:8
**disqualified** [2] - 25:16, 26:14
**disqualify** [2] - 26:20, 27:12
**disqualifying** [1] - 26:8
**disrupt** [1] - 67:5
**distinction** [1] - 68:1
**distinguish** [2] - 22:21, 33:22
**distinguishable** [1] - 19:20
**District** [7] - 1:22, 81:3, 81:4, 81:5,

81:9, 83:11, 83:12
**DISTRICT** [3] - 1:1, 1:2, 1:11
**district** [11] - 26:9, 26:10, 26:11, 26:12, 27:10, 27:15, 61:10, 64:16, 76:19, 79:14, 80:25
**divert** [1] - 16:5
**division** [1] - 79:9
**DIVISION** [1] - 1:2
**divorce** [6] - 43:11, 43:14, 43:19, 46:10, 46:12, 71:23
**divorced** [8] - 40:14, 42:9, 42:24, 44:2, 46:5, 46:16, 47:12, 53:23
**DME** [3] - 37:19, 59:13, 62:13
**DMEs** [2] - 62:10, 65:24
**Docket** [3] - 29:14, 29:17, 29:19
**doctor** [1] - 66:23
**doctrine** [2] - 9:5, 9:8
**document** [1] - 73:10
**DOJ** [1] - 1:14
**DOJ-USAO** [1] - 1:14
**dollar** [3] - 5:17, 5:20, 31:19
**dollars** [6] - 30:13, 32:10, 32:11, 33:2, 33:3, 67:6
**done** [13] - 30:2, 31:11, 33:11, 39:20, 47:14, 49:11, 55:15, 58:24, 66:9, 72:16, 72:25, 73:7, 74:16
**door** [2] - 35:13, 55:17
**doors** [1] - 62:9
**double** [2] - 21:20, 30:16
**doubt** [2] - 3:25, 63:14
**down** [10] - 6:9, 7:11, 21:20, 48:20, 57:4, 57:8, 70:13, 70:22, 75:23, 77:15
**downward** [13] - 17:22, 23:4, 29:13, 29:25, 30:2, 30:10, 31:6, 31:9, 33:9, 33:14, 34:1, 57:20, 74:12
**Dr** [1] - 66:23
**drafting** [1] - 36:18
**draftsman** [1] - 36:21
**Draheim** [1] - 27:8
**draw** [1] - 32:13
**dried** [1] - 63:20

**driving** [1] - 49:19
**dropped** [1] - 37:7
**drove** [1] - 37:14
**drug** [6] - 34:16, 35:1, 38:3, 38:5, 38:7, 80:17
**drugs** [3] - 34:20, 37:7, 37:19
**due** [2] - 31:18, 49:1
**Dupree** [17] - 4:7, 8:3, 8:5, 8:10, 8:17, 12:25, 13:18, 13:24, 14:4, 14:23, 14:24, 15:22, 15:24, 16:3, 16:4, 16:17, 17:8
**durable** [2] - 63:19, 65:4
**during** [2] - 45:8, 62:7
**duty** [1] - 71:14
**dynamic** [1] - 68:17

**E**

**Eagles** [2] - 52:16, 52:23
**early** [2] - 63:10, 77:8
**earn** [2] - 69:18, 74:13
**earning** [1] - 78:19
**easier** [3] - 65:13, 65:22, 70:14
**East** [2] - 1:23, 83:13
**Easter** [1] - 40:12
**Eastern** [1] - 52:20
**easy** [1] - 19:18
**education** [2] - 56:2, 72:24
**effect** [8] - 6:25, 7:3, 7:5, 7:6, 9:23, 54:13, 71:8
**effects** [1] - 37:20
**Egozi** [8] - 1:13, 2:7, 2:16, 7:13, 23:9, 27:14, 58:2, 75:24
**EGOZI** [23] - 2:17, 7:15, 8:19, 8:25, 10:10, 12:2, 23:10, 27:24, 28:1, 28:3, 28:16, 28:19, 28:22, 57:12, 58:3, 58:5, 68:25, 69:3, 69:11, 81:19, 82:12, 82:16, 82:22
**Egozi's** [1] - 57:10
**eight** [1] - 56:6
**either** [9] - 3:4, 13:12, 20:22, 25:16, 25:21, 27:16, 46:15, 80:13, 80:23
**elective** [1] - 32:10
**electricity** [1] - 39:17

**Eleventh** [25] - 4:6, 4:12, 6:4, 7:24, 8:1, 8:3, 8:9, 8:16, 9:5, 9:13, 9:16, 9:22, 10:2, 13:20, 13:23, 14:6, 17:3, 19:15, 27:4, 30:9, 66:21, 67:3, 67:20, 68:5, 68:11
**eligibility** [3] - 24:16, 26:20, 27:13
**eligible** [2] - 17:21, 18:9
**Elmo** [2] - 3:14, 14:14
**embedded** [1] - 20:2
**emotion** [1] - 40:13
**emotional** [2] - 40:8, 70:13
**emotionally** [1] - 71:21
**emphasize** [1] - 6:23
**employee** [1] - 36:24
**en** [3] - 4:6, 9:9, 19:15
**encompass** [1] - 10:21
**encounters** [1] - 59:16
**encouraging** [1] - 58:17
**end** [14] - 8:6, 24:23, 29:25, 56:19, 59:4, 59:20, 60:6, 60:11, 63:21, 68:6, 68:15, 68:19, 71:9, 71:10
**ended** [1] - 63:16
**ends** [1] - 65:16
**engage** [1] - 22:10
**engaged** [9] - 5:22, 18:6, 20:17, 24:7, 24:17, 27:1, 27:7, 27:12, 27:17
**engineer** [1] - 36:14
**engineering** [5] - 36:11, 36:20, 37:5, 56:18, 72:25
**English** [2] - 25:3, 25:9
**enhancement** [17] - 17:24, 17:25, 18:2, 20:17, 22:11, 24:19, 27:17, 27:21, 30:23, 31:1, 33:5, 33:20, 33:21, 34:4, 34:5, 60:16, 76:13
**enrolled** [1] - 72:23
**ensure** [5] - 71:15, 72:15, 72:21, 73:15, 76:24
**enter** [2] - 37:10, 66:16
**entered** [1] - 2:8

**enterprise** [8] - 18:6, 20:18, 24:8, 24:17, 27:2, 27:7, 27:12, 27:17
**enthusiasm** [1] - 41:20
**ENTIN** [2] - 83:3, 83:10
**Entin** [1] - 83:10
**entire** [1] - 74:21
**entirety** [2] - 48:17, 51:2
**entitled** [1] - 83:6
**Entry** [3] - 29:14, 29:17, 29:19
**entry** [1] - 82:8
**epitome** [1] - 50:2
**equipment** [2] - 63:19, 65:4
**equivalent** [2] - 31:22, 32:21
**erroneous** [1] - 15:25
**error** [9] - 10:1, 16:9, 16:10, 16:13, 16:14, 16:19, 16:20, 16:22, 16:25
**escape** [1] - 73:7
**especially** [5] - 35:6, 44:13, 52:20, 68:3, 71:9
**Esquire** [2] - 1:13, 1:16
**essentially** [20] - 7:24, 9:14, 13:17, 13:25, 14:4, 23:19, 26:1, 59:16, 59:21, 60:11, 60:15, 60:25, 61:15, 61:21, 61:24, 62:9, 64:4, 64:14, 65:3, 65:21
**establish** [1] - 8:6
**established** [2] - 31:16, 31:22
**evaluating** [1] - 13:22
**event** [2] - 13:2, 40:2
**events** [1] - 47:10
**eventually** [2] - 37:17, 59:25
**evidence** [1] - 11:12
**evident** [1] - 53:15
**ex** [4] - 43:7, 45:13, 45:15
**ex-wife** [3] - 43:7, 45:13
**ex-wives** [1] - 45:15
**exact** [4] - 14:7, 16:22, 21:11, 46:11
**exactly** [5] - 11:5, 25:1, 45:17, 60:22, 69:4

**examination** [1] - 30:3
**examined** [2] - 18:9, 18:16
**example** [2] - 5:7, 70:25
**exceeded** [3] - 5:20, 5:24, 11:4
**exceeding** [1] - 5:15
**exceeds** [1] - 5:17
**excessive** [1] - 60:15
**exclude** [2] - 22:14, 22:25
**excluded** [1] - 33:16
**excluding** [2] - 25:17, 27:16
**exercise** [1] - 9:19
**exhausting** [1] - 8:22
**Exhibit** [1] - 64:13
**exhibited** [1] - 50:22
**exist** [1] - 22:11
**exotic** [1] - 41:16
**expect** [1] - 57:16
**experience** [1] - 49:23
**expert** [1] - 13:8
**expert-based** [1] - 13:8
**expertise** [1] - 60:21
**explain** [2] - 34:13, 71:18
**explained** [2] - 16:13, 38:1
**exposed** [1] - 37:4
**express** [2] - 5:10, 73:6
**extensive** [1] - 62:8
**extra** [1] - 79:3
**extricated** [1] - 35:18

## F

**F.3d** [2] - 9:7, 27:9
**F.4th** [2] - 8:3, 67:4
**F.App'x** [1] - 27:4
**facility** [5] - 81:2, 81:8, 81:23, 82:1, 82:2
**fact** [17] - 18:25, 19:5, 19:21, 22:18, 23:2, 23:12, 23:15, 23:22, 34:2, 34:17, 56:5, 59:8, 67:15, 69:21, 77:7, 80:11, 81:12
**factor** [1] - 63:2
**factors** [4] - 66:7, 76:10, 77:6, 77:20
**facts** [4] - 15:7, 15:8, 64:20, 64:23
**factual** [1] - 28:1
**failed** [1] - 5:19
**failure** [3] - 10:20, 15:4, 27:18

**fair** [7] - 10:23, 13:8, 13:15, 62:2, 63:22, 64:8, 74:15
**falling** [2] - 64:1, 64:3
**falling-out** [2] - 64:1, 64:3
**familiar** [2] - 3:3, 19:10
**family** [18] - 35:25, 38:12, 39:16, 39:22, 40:9, 40:10, 40:14, 41:13, 41:14, 46:3, 47:11, 48:1, 53:8, 53:14, 53:23, 71:9, 72:6, 72:9
**family's** [1] - 39:10
**fans** [1] - 52:15
**far** [2] - 58:22, 59:10
**fast** [1] - 67:21
**fast-moving** [1] - 67:21
**father** [15] - 35:15, 36:7, 40:15, 47:4, 49:8, 51:5, 54:14, 56:15, 63:7, 63:12, 63:14, 63:15, 71:14, 72:5
**father's** [1] - 72:24
**fatherhood** [2] - 47:4, 48:24
**fathers** [2] - 49:6, 49:17
**fault** [3] - 56:23, 72:3
**faulty** [1] - 64:9
**favor** [4] - 20:10, 20:11, 23:17, 26:4
**fear** [2] - 59:1, 71:25
**fears** [2] - 71:8, 72:1
**features** [1] - 41:2
**February** [3] - 37:12, 39:5, 44:21
**Federal** [2] - 1:22, 83:12
**federal** [4] - 15:24, 16:1, 76:23, 82:4
**feed** [1] - 34:16
**fell** [1] - 46:3
**felt** [1] - 64:10
**fend** [1] - 35:7
**Ferguson** [1] - 82:3
**few** [6] - 3:8, 37:17, 45:5, 60:6, 60:14, 67:6
**field** [1] - 31:7
**Fields** [1] - 1:17
**fifth** [2] - 52:21, 53:2
**figure** [1] - 76:20
**filed** [10] - 2:24, 3:7, 9:21, 17:23, 29:12, 29:16, 29:19, 58:23,

64:16, 82:8
**filing** [1] - 67:20
**filled** [1] - 70:15
**fills** [1] - 72:13
**final** [1] - 80:6
**finalized** [1] - 46:15
**finally** [2] - 13:16, 67:10
**financial** [4] - 53:11, 79:3, 79:7, 79:19
**findings** [1] - 28:23
**fine** [2] - 29:5, 29:6
**fines** [1] - 79:22
**First** [2] - 11:17, 14:21
**first** [21] - 7:25, 11:10, 11:18, 12:6, 12:18, 14:16, 17:9, 23:18, 24:1, 30:8, 31:25, 34:20, 39:11, 39:25, 44:15, 46:25, 56:16, 56:22, 56:25, 57:2, 57:23
**fit** [1] - 56:18
**five** [7] - 39:1, 42:13, 42:14, 43:13, 50:23, 63:10, 64:16
**fix** [5] - 20:8, 20:10, 20:12, 21:24
**fixed** [1] - 20:20
**fixing** [2] - 22:1, 23:7
**flew** [1] - 48:20
**flights** [1] - 37:13
**FLORIDA** [1] - 1:2
**Florida** [11] - 1:4, 1:15, 1:18, 1:23, 34:25, 35:2, 38:11, 81:9, 83:12, 83:13
**focus** [3] - 7:21, 23:25, 39:3
**folks** [1] - 82:18
**follow** [3] - 12:22, 16:18, 76:24
**following** [2] - 28:23, 79:18
**football** [1] - 37:22
**Footnote** [1] - 12:4
**FOR** [2] - 1:13, 1:16
**force** [1] - 49:19
**foregoing** [1] - 83:4
**foremost** [1] - 11:10
**forfeiture** [1] - 80:4
**forget** [1] - 9:20
**forgives** [1] - 71:19
**forma** [1] - 82:10
**format** [1] - 21:16
**formerly** [1] - 68:4
**FORT** [1] - 1:2
**Fort** [3] - 1:4, 1:23, 83:13
**forth** [1] - 76:10

**fortunately** [1] - 76:23
**forward** [1] - 79:8
**forwarded** [1] - 79:6
**four** [14] - 25:17, 33:20, 33:24, 34:5, 42:9, 42:24, 43:12, 44:1, 58:11, 59:2, 59:14, 60:18, 61:4, 66:24
**four-defendant** [2] - 58:11, 59:2
**four-level** [4] - 33:20, 33:24, 34:5, 60:18
**FPR** [1] - 83:10
**framed** [1] - 24:24
**framework** [3] - 12:12, 32:16, 33:6
**frank** [3] - 61:7, 61:10, 65:14
**frankly** [2] - 17:1, 65:19
**fraud** [17] - 2:10, 31:1, 59:16, 60:12, 61:22, 62:12, 63:7, 63:16, 63:24, 64:11, 64:15, 65:6, 66:16, 66:19, 67:9, 76:20
**fraudulent** [4] - 60:10, 65:21, 66:1, 66:24
**frequency** [1] - 76:18
**Friday** [1] - 81:14
**friend** [18] - 38:25, 41:3, 41:11, 43:21, 44:6, 44:25, 46:17, 48:21, 49:8, 54:2, 54:3, 54:4, 54:8, 54:9, 54:10, 69:23
**friends** [16] - 35:25, 39:10, 41:3, 41:14, 42:25, 43:18, 44:7, 44:8, 44:11, 44:12, 44:22, 45:1, 53:8, 54:1, 55:3
**friendship** [1] - 44:10
**front** [5] - 9:16, 34:18, 64:20, 67:20, 68:5
**frustrating** [1] - 44:24
**fulfill** [1] - 72:12
**fulfilling** [1] - 72:18
**fully** [4] - 56:24, 72:16, 73:14, 74:20
**furthering** [1] - 72:24
**future** [7] - 38:13, 49:18, 50:25, 71:21, 73:1, 73:2, 73:22

## G

**gaining** [1] - 73:3
**gains** [1] - 79:3

**game** [1] - 52:25
**gangbusters** [1] - 57:3
**gap** [2] - 60:18, 60:22
**Garcon** [1] - 19:17
**Gaugush** [12] - 1:16, 2:6, 2:18, 24:1, 24:9, 29:20, 60:15, 61:6, 61:17, 61:24, 62:17, 73:25
**GAUGUSH** [51] - 2:19, 3:6, 3:13, 3:16, 4:5, 6:3, 14:11, 14:13, 17:15, 17:19, 19:14, 19:17, 19:19, 21:6, 21:14, 26:17, 28:6, 29:22, 36:2, 36:4, 36:8, 38:16, 45:12, 45:17, 48:5, 51:14, 51:17, 55:10, 57:15, 58:1, 70:6, 74:1, 75:3, 75:6, 75:9, 75:17, 75:19, 75:21, 75:25, 76:2, 76:6, 78:9, 80:7, 80:13, 80:16, 80:20, 80:22, 81:1, 81:6, 81:10, 82:23
**general** [4] - 37:2, 60:8, 63:3, 66:18
**generally** [1] - 4:17
**generosity** [1] - 66:6
**generous** [6] - 50:10, 55:10, 65:10, 65:13, 65:16, 65:22
**gentlemen** [1] - 82:11
**genuine** [3] - 3:22, 4:13, 6:15
**genuinely** [7] - 6:10, 8:22, 14:25, 15:19, 16:6, 17:6, 35:22
**gifts** [1] - 42:18
**given** [6] - 13:22, 60:4, 62:25, 76:3, 77:6, 81:12
**glad** [2] - 3:4, 29:20
**glean** [1] - 64:21
**GLENDA** [2] - 1:20, 83:6
**glowing** [1] - 45:15
**go-to** [1] - 53:13
**goal** [1] - 72:24
**goals** [1] - 77:12
**gold** [1] - 11:4
**Gould** [13] - 33:22, 45:15, 58:14, 58:15, 59:5, 60:7, 60:19, 69:13, 74:12, 74:13, 75:4, 75:11, 78:16
**Government** [28] -

2:6, 7:19, 14:3, 15:2, 16:7, 16:21, 26:13, 28:17, 32:4, 35:13, 35:19, 55:25, 57:6, 57:23, 58:7, 58:13, 58:20, 58:25, 59:25, 61:15, 72:17, 74:14, 74:17, 75:12, 76:25, 79:1, 81:13, 82:13
**GOVERNMENT** [1] - 1:13
**Government's** [8] - 5:25, 15:6, 15:21, 17:2, 18:18, 26:4, 64:14, 81:18
**grade** [2] - 52:21, 53:2
**gradual** [1] - 31:18
**graduated** [1] - 56:11
**grammatically** [2] - 25:8, 25:25
**grandfather** [1] - 37:2
**grandmother** [2] - 53:20, 54:22
**grandson** [1] - 38:13
**grant** [4] - 33:9, 33:13, 64:9, 77:17
**granted** [1] - 77:14
**granting** [1] - 33:25
**grapple** [1] - 71:4
**grass** [1] - 53:12
**gravitate** [1] - 50:6
**gravity** [1] - 73:14
**Grayson** [30] - 35:14, 40:12, 40:14, 40:18, 40:22, 42:8, 42:11, 42:12, 42:18, 42:25, 43:2, 43:10, 43:13, 43:14, 43:15, 43:16, 47:6, 47:7, 47:17, 49:1, 49:21, 49:22, 53:17, 53:22, 53:24, 54:3, 54:17, 54:18
**Grayson's** [3] - 54:4, 54:23, 55:1
**greater** [2] - 8:7, 77:11
**greatest** [1] - 71:8
**greatly** [1] - 47:17
**grew** [4] - 46:4, 48:12, 49:24, 52:14
**gross** [1] - 78:19
**ground** [2] - 36:13, 36:23
**group** [2] - 37:18, 37:20
**growing** [1] - 40:14
**grows** [1] - 71:15
**growth** [2] - 50:18, 50:22
**guarantee** [1] - 75:17
**Guess** [1] - 49:21

**guidance** [1] - 71:12
**guided** [1] - 70:21
**guideline** [11] - 4:8, 4:11, 4:13, 4:14, 7:7, 16:1, 17:9, 31:3, 32:9, 77:13, 77:22
**guidelines** [41] - 3:21, 4:2, 4:8, 5:21, 6:24, 7:2, 7:3, 9:20, 11:10, 12:10, 13:1, 13:4, 13:6, 13:9, 14:8, 15:15, 15:23, 19:6, 21:9, 24:5, 26:25, 28:24, 29:25, 30:3, 30:5, 31:13, 31:15, 32:13, 58:5, 59:3, 59:24, 60:20, 61:22, 64:24, 66:3, 67:16, 68:16, 69:5, 76:9, 77:5, 77:20
**guiding** [1] - 55:23
**guilty** [6] - 2:8, 2:12, 57:1, 57:4, 77:7, 77:8
**guy** [4] - 40:20, 43:5, 53:13, 69:21
**guys** [1] - 23:23

## H

**habit** [1] - 34:16
**Habitat** [4] - 47:22, 50:11, 53:9, 55:15
**half** [6] - 30:16, 37:10, 44:13, 56:21, 66:14, 68:12
**halfway** [1] - 46:2
**hand** [2] - 52:25, 53:3
**handful** [1] - 15:3
**handsome** [1] - 40:20
**Hanna's** [1] - 55:2
**happier** [1] - 53:4
**happy** [2] - 52:23, 53:22
**happy-go-lucky** [1] - 53:22
**hard** [5] - 45:8, 54:22, 65:11, 65:20, 74:14
**hardship** [1] - 72:10
**harm** [5] - 5:4, 5:10, 5:11, 10:13, 31:21
**harmed** [1] - 11:2
**harsh** [1] - 65:12
**harshly** [1] - 5:23
**Hauck** [2] - 52:25, 53:1
**health** [4] - 61:15, 67:5, 67:9, 79:20
**healthcare** [5] - 2:10, 30:8, 30:15, 31:1,

64:15
**hear** [6] - 3:4, 29:20, 57:22, 58:2, 70:10, 80:15
**heard** [4] - 53:9, 54:2, 61:8, 80:16
**hearing** [3] - 56:16, 82:17, 82:21
**hearse** [1] - 38:9
**heart** [4] - 44:14, 45:25, 52:8, 52:12
**heavily** [1] - 72:8
**heck** [1] - 76:16
**held** [3] - 8:17, 16:4, 74:20
**hello** [2] - 38:19, 45:20
**help** [13] - 38:10, 39:13, 39:23, 39:25, 40:1, 44:23, 47:1, 47:18, 47:19, 51:7, 53:7, 71:15, 74:14
**helped** [1] - 53:11
**hereby** [3] - 78:3, 80:5, 83:3
**Heritage** [1] - 10:12
**herring** [1] - 6:12
**hesitation** [1] - 71:3
**high** [5] - 36:16, 36:17, 37:22, 38:6, 68:19
**higher** [2] - 60:6, 66:20
**highest** [1] - 46:20
**highlighted** [1] - 18:17
**highs** [4] - 46:20, 48:14, 49:4, 53:6
**hill** [1] - 29:3
**himself** [5] - 35:18, 40:6, 43:10, 50:3, 81:16
**History** [2] - 22:22, 29:1
**history** [4] - 22:23, 25:17, 25:18, 61:2
**hit** [2] - 37:8, 60:14
**hold** [4] - 13:10, 15:4, 70:18, 74:15
**holding** [4] - 8:7, 9:11, 12:9, 16:18
**holds** [1] - 16:22
**holiday** [1] - 44:4
**holidays** [2] - 40:11, 43:3
**homes** [1] - 35:3
**honest** [1] - 48:3
**honesty** [1] - 70:21
**Honor** [81] - 2:17, 2:19, 2:22, 3:6, 3:13, 3:16, 4:5, 7:15, 8:25, 10:10, 11:23, 11:25,

14:11, 14:16, 16:4, 17:4, 17:15, 17:19, 17:20, 19:17, 19:22, 20:11, 21:6, 23:2, 23:10, 26:17, 27:24, 28:3, 28:6, 28:16, 28:19, 28:22, 29:4, 29:9, 29:22, 29:23, 33:18, 36:2, 45:11, 45:19, 48:5, 48:7, 51:14, 51:17, 55:10, 57:12, 57:21, 58:3, 58:11, 59:1, 59:23, 61:10, 62:5, 64:12, 64:23, 65:1, 65:13, 67:10, 67:15, 68:25, 69:16, 69:24, 69:25, 70:5, 70:6, 70:11, 73:6, 73:24, 74:1, 75:9, 75:25, 78:2, 80:13, 80:16, 80:22, 81:10, 82:12, 82:16, 82:22, 82:23, 82:24
**Honorable** [1] - 1:21
**HONORABLE** [1] - 1:10
**hope** [5] - 38:2, 41:4, 71:18, 75:15, 82:19
**hopefully** [2] - 49:16, 51:5
**hopes** [1] - 38:10
**hospitalized** [1] - 37:23
**hour** [1] - 37:15
**hours** [2] - 47:16, 79:13
**House** [1] - 5:7
**house** [5] - 37:25, 43:23, 46:2, 47:8, 53:12
**household** [1] - 47:21
**Howard** [1] - 66:22
**human** [1] - 41:4
**Humanity** [4] - 47:22, 50:11, 53:9, 55:15
**humbly** [1] - 73:17
**hundred** [1] - 67:6
**hurt** [1] - 71:10
**husband** [1] - 41:13

**I**

**idea** [1] - 61:18
**identical** [2] - 19:5, 26:23
**imagine** [1] - 81:25
**imbalance** [2] - 74:19
**immediately** [2] - 63:14, 79:25
**impact** [6] - 28:11,

28:14, 33:18, 52:10, 71:1, 71:23
**impacted** [1] - 34:23
**impacts** [1] - 67:8
**impede** [1] - 38:13
**impending** [1] - 37:13
**implement** [1] - 21:24
**implications** [1] - 72:6
**import** [3] - 8:2, 9:15, 23:22
**important** [6] - 13:19, 24:24, 39:3, 39:18, 40:8, 40:15
**importantly** [1] - 55:5
**imposed** [3] - 27:21, 80:10, 82:7
**impossible** [3] - 5:2, 5:11, 5:20
**impress** [1] - 3:8
**imprisonment** [4] - 29:24, 58:16, 79:11, 80:1
**improve** [3] - 35:19, 56:1
**improvement** [1] - 56:5
**improving** [1] - 64:7
**in-ground** [1] - 36:13
**incarceration** [1] - 71:20
**incentive** [1] - 60:8
**incentives** [1] - 64:10
**include** [2] - 12:16, 48:1
**included** [1] - 64:19
**income** [1] - 79:3
**inconsistency** [1] - 22:4
**inconsistent** [1] - 16:1
**incorrect** [1] - 24:1
**indeed** [1] - 13:8
**independent** [1] - 38:12
**indicate** [1] - 18:11
**indication** [1] - 18:22
**indictment** [2] - 57:1, 57:15
**indirect** [1] - 34:22
**individual** [4] - 18:25, 62:22, 67:8, 67:22
**individually** [2] - 18:10, 58:19
**individuals** [4] - 61:3, 65:4, 68:2, 69:20
**indulgence** [1] - 76:3
**ineligible** [1] - 29:2
**inflation** [8] - 31:4, 31:17, 32:1, 32:4, 33:7, 61:7, 61:21, 62:4

**inflationary** [6] - 30:6, 30:17, 31:18, 32:6, 34:2, 62:18
**influence** [1] - 63:15
**influences** [2] - 35:5, 35:8
**inform** [1] - 64:24
**information** [3] - 2:9, 57:6, 63:8
**injury** [1] - 22:15
**insert** [1] - 21:20
**inserting** [1] - 19:9
**instance** [2] - 21:12, 21:13
**instead** [1] - 82:14
**instilled** [1] - 70:19
**insurance** [1] - 66:20
**Insurance** [1] - 66:25
**integrity** [2] - 70:20, 73:16
**intend** [1] - 18:13
**intended** [26] - 3:2, 5:1, 5:11, 6:6, 6:20, 8:7, 8:12, 9:18, 10:4, 10:21, 10:23, 11:5, 11:19, 12:16, 13:14, 13:19, 14:9, 17:12, 30:17, 67:18, 68:7, 68:16, 74:23, 75:5, 82:14
**intentionally** [2] - 18:20, 19:8
**interact** [1] - 15:23
**interest** [2] - 78:20, 80:4
**interested** [1] - 40:18
**interpretation** [9] - 3:18, 4:14, 12:11, 12:13, 15:17, 19:2, 20:20, 28:7, 30:5
**interpreted** [2] - 4:1, 21:2
**interpreting** [1] - 13:13
**intervening** [1] - 9:9
**intervention** [1] - 20:16
**introduce** [2] - 36:6, 38:18
**introduction** [1] - 34:13
**investigative** [1] - 2:12
**invite** [1] - 45:12
**invited** [1] - 43:16
**involved** [5] - 10:16, 36:15, 65:10, 65:25, 69:14
**ironically** [1] - 9:19
**irrelevant** [3] - 7:7,

15:8, 17:2
**irreplaceable** [1] - 71:22
**issue** [23] - 3:3, 6:22, 10:6, 11:8, 11:9, 12:7, 13:22, 14:6, 14:7, 16:14, 17:17, 21:19, 22:16, 23:15, 23:17, 23:18, 25:4, 25:5, 25:12, 26:10, 26:12, 28:7, 68:13
**issues** [5] - 11:16, 26:13, 35:1, 40:5, 58:9
**itself** [10] - 4:9, 4:11, 14:9, 16:1, 17:9, 18:24, 19:1, 20:3, 23:25, 26:20

**J**

**Jackson** [1] - 49:1
**James** [1] - 1:21
**JAMES** [1] - 1:10
**January** [3] - 55:25, 56:4, 72:22
**Jason** [1] - 78:7
**job** [2] - 37:18, 52:3
**Jocelyn** [1] - 16:21
**Joey** [1] - 74:19
**Johnson's** [1] - 15:13
**join** [1] - 42:11
**jointly** [1] - 78:6
**Joseph** [5] - 1:13, 2:7, 33:22, 78:16
**journey** [1] - 49:12
**Jr** [1] - 82:3
**JSON** [1] - 74:6
**JUDGE** [2] - 1:10, 1:11
**judges** [2] - 4:7, 14:24
**judgment** [4] - 13:8, 77:24, 80:6, 82:8
**justice** [1] - 78:21
**justify** [1] - 31:9

**K**

**K-O-U-Z-N-E-T-S-O-V-A** [1] - 38:23
**Kadar** [3] - 51:15, 52:1, 55:8
**KADAR** [5] - 51:21, 51:25, 52:1, 52:18, 55:9
**Kaley** [1] - 9:6
**keenly** [1] - 72:9
**keep** [1] - 54:12
**keeps** [1] - 16:7
**Keiser** [1] - 8:17
**key** [1] - 53:14

**kickbacks** [3] - 59:17, 65:3
**kid** [1] - 40:14
**kids** [5] - 44:8, 49:8, 49:18, 50:20, 53:21
**kind** [13] - 35:2, 41:17, 41:20, 47:9, 48:16, 49:22, 50:1, 50:20, 51:2, 52:12, 55:19, 70:12, 78:14
**kindergarten** [1] - 40:22
**kinds** [1] - 30:15
**Kisor** [5] - 8:18, 9:3, 12:14, 13:2, 16:5
**knock** [1] - 55:17
**knocking** [4] - 35:13, 55:25, 61:16, 62:9
**knowing** [1] - 30:13
**knowledge** [2] - 71:4, 73:3
**known** [5] - 42:20, 46:1, 48:11, 48:12, 50:19
**knows** [1] - 74:12
**Kouznetsova** [3] - 38:17, 38:20, 43:20
**KOUZNETSOVA** [23] - 38:19, 38:23, 38:25, 41:11, 41:16, 41:23, 41:25, 42:4, 42:6, 42:13, 42:15, 42:17, 42:22, 43:2, 43:7, 43:9, 43:12, 43:25, 44:18, 44:20, 45:4, 45:7, 45:11
**Kyiv** [3] - 39:7, 44:25, 45:7

**L**

**lacking** [1] - 4:10
**landed** [1] - 34:24
**language** [1] - 26:23
**larger** [1] - 63:16
**last** [20] - 6:12, 8:4, 11:21, 14:16, 31:4, 31:23, 32:14, 33:12, 38:10, 38:21, 42:9, 45:2, 50:23, 51:14, 57:24, 65:10, 67:14, 72:22, 81:12, 81:14
**lasted** [1] - 66:13
**lasting** [1] - 72:1
**late** [1] - 63:9
**LAUDERDALE** [1] - 1:2
**Lauderdale** [3] - 1:4, 1:23, 83:13
**law** [6] - 12:9, 13:24,

14:1, 67:21, 77:10, 77:19
**Law** [1] - 10:18
**laws** [1] - 66:18
**lead** [2] - 62:20, 70:21
**leader** [14] - 27:11, 47:25, 50:6, 55:22, 59:2, 59:12, 60:10, 64:2, 65:1, 65:2, 69:12, 69:21
**leaders** [1] - 60:24
**leads** [1] - 66:19
**learn** [1] - 44:11
**learned** [4] - 36:16, 36:17, 36:21, 37:19
**learning** [1] - 36:20
**least** [4] - 15:3, 19:15, 22:20, 59:5
**leave** [3] - 19:2, 46:12, 82:10
**leaves** [2] - 4:16, 13:25
**leaving** [2] - 12:22, 60:6
**lectern** [3] - 3:9, 25:2, 70:7
**left** [5] - 23:11, 31:7, 34:22, 45:5, 58:24
**legal** [2] - 58:9, 72:18
**legislative** [1] - 12:11
**legitimate** [1] - 62:10
**Legos** [1] - 54:5
**lenity** [1] - 20:25
**less** [6] - 22:25, 59:4, 60:11, 68:20, 68:21, 69:22
**lesson** [2] - 40:24
**lessons** [1] - 40:18
**letter** [5] - 41:6, 41:7, 51:18, 51:19, 51:24
**letters** [6] - 29:16, 29:18, 35:22, 51:20, 55:12, 66:12
**level** [24] - 5:18, 7:8, 18:2, 26:21, 27:19, 28:25, 30:22, 31:6, 32:24, 33:9, 33:19, 33:20, 33:21, 33:24, 34:4, 34:5, 60:16, 60:17, 60:18, 61:16, 69:17, 71:24, 76:13
**Level** [4] - 74:5, 74:7, 74:10, 74:25
**levels** [2] - 61:3, 61:4
**life** [18] - 34:23, 35:16, 35:19, 40:21, 41:3, 49:12, 50:12, 52:10, 54:9, 54:10, 63:5, 67:12, 70:21, 71:25, 72:21, 73:12

**life's** [1] - 71:15
**lifestyle** [1] - 66:14
**light** [4] - 13:21, 13:24, 23:2, 68:3
**likelihood** [3] - 58:22, 68:11, 77:17
**likely** [4] - 22:25, 63:1, 68:6, 68:13
**limited** [1] - 24:15
**line** [1] - 12:21
**liquor** [1] - 34:17
**Lisa** [2] - 51:15, 52:1
**list** [1] - 39:18
**listed** [1] - 28:8
**listing** [1] - 57:6
**literally** [2] - 25:11, 48:13
**litigate** [2] - 21:21, 23:15
**litigated** [1] - 23:17
**litigation** [1] - 21:19
**live** [8] - 39:7, 41:19, 42:16, 43:21, 43:22, 48:20, 56:1, 71:6
**lived** [1] - 37:18
**lives** [4] - 3:25, 40:10, 52:11, 81:5
**living** [3] - 37:20, 54:15, 59:13
**located** [4] - 39:16, 79:10, 81:9, 82:3
**logic** [1] - 26:8
**logical** [1] - 67:25
**logically** [1] - 25:8
**look** [15] - 3:3, 4:8, 4:12, 5:13, 6:16, 24:4, 49:11, 52:9, 58:18, 60:1, 60:8, 63:2, 63:3, 66:7, 73:10
**looked** [3] - 18:15, 31:13, 74:5
**looking** [5] - 3:7, 12:7, 15:15, 17:4, 25:1
**looks** [4] - 23:3, 53:24, 69:20, 71:16
**lose** [1] - 37:12
**losing** [6] - 4:22, 4:23, 5:9, 10:13, 54:13, 54:17
**loss** [93] - 3:1, 3:2, 3:18, 3:23, 4:4, 4:17, 4:19, 4:21, 5:1, 5:15, 5:16, 5:17, 5:20, 5:24, 6:6, 6:10, 6:13, 6:14, 6:19, 6:20, 8:7, 8:8, 8:12, 9:18, 10:4, 10:9, 10:21, 10:23, 10:24, 11:3, 11:6, 11:10, 11:13, 11:18,

11:19, 12:7, 12:15, 12:16, 13:14, 13:15, 13:19, 14:10, 14:25, 15:3, 15:4, 15:5, 15:11, 15:12, 15:13, 17:5, 17:11, 17:12, 17:13, 20:7, 30:16, 30:17, 30:18, 30:20, 30:23, 31:2, 31:3, 32:16, 32:17, 32:23, 32:25, 33:1, 61:14, 61:22, 62:2, 62:14, 66:2, 66:4, 66:25, 67:17, 67:18, 68:7, 68:16, 74:21, 74:22, 75:4, 75:5, 82:14
**losses** [1] - 31:20
**lost** [3] - 10:13, 54:9
**love** [6] - 43:4, 46:3, 49:9, 53:14, 71:13
**loved** [2] - 55:4, 72:11
**lovely** [1] - 51:18
**lover** [1] - 47:20
**loves** [3] - 41:17, 48:1, 55:5
**low** [1] - 29:25
**lower** [9] - 8:10, 13:25, 16:11, 31:21, 34:7, 60:7, 61:1, 67:1
**lowering** [1] - 66:3
**lowest** [1] - 46:20
**lows** [3] - 46:20, 48:14, 53:6
**lucky** [2] - 53:22, 67:21

## M

**main** [1] - 3:17
**maintain** [1] - 10:20
**maintains** [1] - 14:3
**man** [2] - 48:23, 66:8
**manager** [1] - 28:8
**mandate** [2] - 9:1, 14:9
**mandates** [1] - 9:8
**mandatory** [2] - 29:11, 79:16
**manner** [2] - 4:1, 80:12
**manual** [3] - 7:3, 7:8, 32:10
**markets** [1] - 67:6
**marriages** [1] - 46:4
**married** [3] - 42:8, 46:7, 46:8
**Marshal** [1] - 82:3
**Maryland** [2] - 48:20, 79:10
**matching** [1] - 16:9

**material** [2] - 36:22, 78:24
**math** [1] - 56:17
**matter** [9] - 2:2, 3:8, 15:12, 46:19, 46:21, 70:9, 72:17, 72:20, 83:6
**matters** [2] - 5:12, 15:14
**Matthew** [1] - 78:7
**maturity** [2] - 50:18, 50:22
**Maus** [1] - 6:1
**mean** [12] - 5:5, 6:14, 8:11, 10:22, 15:11, 21:11, 23:16, 24:2, 46:4, 52:12, 64:6, 67:13
**meaning** [3] - 10:9, 15:17, 17:11
**means** [26] - 5:4, 6:19, 8:7, 8:12, 9:25, 10:22, 17:5, 18:12, 21:13, 21:17, 21:21, 21:22, 23:3, 23:20, 23:21, 25:7, 25:14, 25:15, 27:20, 28:9, 56:7, 56:8, 63:11, 68:21
**meant** [4] - 11:19, 23:14, 23:16, 23:24
**measure** [5] - 11:11, 11:13, 11:14, 14:10, 68:7
**Medicaid** [1] - 79:9
**medical** [3] - 63:19, 65:4, 67:4
**Medicare** [11] - 11:7, 62:8, 63:16, 65:6, 65:21, 66:1, 76:15, 76:18, 76:20, 79:9, 79:10
**meet** [7] - 13:2, 41:8, 41:10, 41:15, 42:22, 43:6, 65:16
**memo** [10] - 4:18, 5:25, 13:16, 14:17, 34:10, 34:14, 35:21, 56:10, 57:8, 64:13
**memorandum** [5] - 3:17, 17:21, 29:13, 57:5, 58:9
**mentally** [1] - 71:21
**mention** [3] - 7:10, 7:14, 74:2
**mentioned** [2] - 56:9, 64:25
**mentioning** [1] - 33:15
**merely** [2] - 3:7, 9:10
**merit** [1] - 59:9

**merits** [1] - 68:11
**mess** [1] - 45:22
**messed** [1] - 61:25
**met** [9] - 32:24, 41:9, 41:18, 42:19, 43:7, 43:9, 43:10, 43:14
**Miami** [4] - 1:15, 79:7, 80:24, 82:4
**microphone** [2] - 3:12, 70:8
**middle** [1] - 63:11
**might** [1] - 57:21
**miles** [1] - 53:13
**millennial** [1] - 40:5
**million** [27] - 30:23, 31:2, 31:3, 32:11, 32:15, 32:17, 32:18, 32:20, 32:22, 32:23, 33:1, 33:2, 61:14, 62:3, 62:6, 62:15, 65:25, 66:1, 66:4, 66:6, 67:7, 74:23, 74:24, 76:15
**mind** [3] - 76:16, 76:21, 76:22
**mind-boggling** [1] - 76:21
**mini** [1] - 53:24
**misapplied** [1] - 16:25
**missed** [3] - 4:24, 11:1, 41:8
**missing** [2] - 15:6, 16:8
**mistake** [6] - 55:4, 66:10, 66:11, 66:13, 71:5, 72:7
**mistaken** [1] - 74:4
**mistakes** [1] - 72:22
**mitigating** [2] - 58:17, 65:9
**mixing** [1] - 16:8
**model** [4] - 40:3, 49:9, 50:4, 71:17
**modified** [1] - 12:12
**mom** [6] - 44:24, 45:3, 45:4, 52:14, 53:10, 54:22
**moment** [1] - 12:3
**moments** [3] - 48:24, 49:4, 49:13
**monetary** [3] - 31:14, 31:20, 31:22
**money** [11] - 10:25, 39:22, 39:24, 40:3, 62:11, 62:14, 63:19, 64:4, 65:13, 65:18, 65:20
**monitor** [1] - 78:23
**month** [1] - 33:23
**monthly** [1] - 78:19

**months** [17] - 29:2, 29:24, 45:5, 57:7, 58:6, 58:7, 58:16, 60:6, 68:2, 68:12, 70:1, 74:9, 74:25, 77:12, 78:5, 80:1
**Moran** [1] - 6:4
**morning** [1] - 39:9
**Moss** [8] - 6:4, 7:14, 9:13, 9:14, 9:15, 13:24, 14:4
**most** [9] - 24:23, 37:1, 39:3, 39:18, 40:8, 49:20, 71:11, 76:14
**mostly** [1] - 39:1
**mother** [2] - 38:25, 51:16
**mother's** [1] - 51:23
**motion** [2] - 29:21, 69:18
**motivated** [2] - 55:16, 66:16
**move** [2] - 12:2, 12:3
**moved** [1] - 35:1
**moving** [2] - 34:25, 67:21
**MR** [80] - 2:17, 2:19, 3:6, 3:13, 3:16, 4:5, 6:3, 7:15, 8:19, 8:25, 10:10, 12:2, 14:11, 14:13, 17:15, 17:19, 19:14, 19:17, 19:19, 21:6, 21:14, 23:10, 26:17, 27:24, 28:1, 28:3, 28:6, 28:16, 28:19, 28:22, 29:22, 36:2, 36:4, 36:7, 36:8, 36:10, 38:16, 45:12, 45:17, 48:5, 48:7, 48:10, 51:10, 51:13, 51:14, 51:17, 55:10, 57:12, 57:15, 58:1, 58:3, 58:5, 68:25, 69:3, 69:11, 70:6, 74:1, 75:3, 75:6, 75:9, 75:17, 75:19, 75:21, 75:25, 76:2, 76:6, 78:9, 80:7, 80:13, 80:16, 80:20, 80:22, 81:1, 81:6, 81:10, 81:19, 82:12, 82:16, 82:22, 82:23
**MS** [34] - 38:19, 38:23, 38:25, 41:11, 41:16, 41:23, 41:25, 42:4, 42:6, 42:13, 42:15, 42:17, 42:22, 43:2, 43:7, 43:9, 43:12, 43:20, 43:25, 44:18,

44:20, 45:4, 45:7, 45:11, 45:19, 45:22, 46:1, 46:8, 46:11, 46:14, 51:21, 51:25, 52:18, 55:9
**multiple** [1] - 6:18
**must** [6] - 16:18, 23:21, 25:8, 41:8, 73:2, 82:7

**N**

**name** [4] - 38:19, 38:21, 48:10, 52:1
**national** [1] - 76:20
**natural** [2] - 47:25, 50:6
**natural-born** [1] - 47:25
**navigate** [1] - 71:15
**nearly** [2] - 63:18, 65:25
**necessarily** [3] - 10:6, 10:22, 13:7
**necessary** [3] - 28:13, 45:24, 77:11
**necessities** [1] - 39:19
**need** [10] - 27:21, 32:1, 39:17, 39:19, 40:23, 44:8, 44:11, 53:12, 65:5
**needed** [3] - 39:22, 44:24
**needless** [1] - 65:4
**needs** [4] - 39:16, 65:12, 66:9, 77:2
**negative** [2] - 26:5
**never** [12] - 7:5, 14:18, 20:20, 30:13, 30:14, 40:20, 43:10, 43:14, 47:3, 54:9, 72:15, 73:16
**New** [1] - 40:11
**new** [2] - 9:23, 79:21
**next** [9] - 17:17, 27:20, 39:15, 39:20, 61:6, 62:21, 64:12, 64:25, 65:23
**nexus** [2] - 34:21, 34:22
**night** [1] - 39:6
**NO** [1] - 1:3
**nobody** [2] - 52:19, 74:12
**none** [6] - 4:25, 14:22, 15:13, 22:16, 26:10, 31:16
**nonetheless** [1] - 23:1
**noon** [1] - 82:5
**normal** [2] - 60:1,

64:22
**north** [1] - 35:1
**Northeast** [1] - 1:14
**Northern** [1] - 81:3
**Note** [1] - 24:5
**note** [5] - 12:15, 12:17, 13:19, 15:2, 74:18
**noted** [4] - 66:18, 79:22, 80:18, 82:15
**notes** [3] - 2:23, 29:12, 83:5
**nothing** [4] - 20:12, 39:17, 45:15, 82:16
**notice** [1] - 82:7
**notify** [1] - 81:20
**noting** [3] - 62:5, 63:6, 65:8
**November** [19] - 6:25, 9:20, 9:23, 10:2, 20:13, 20:15, 21:3, 23:7, 32:9, 32:12, 32:20, 33:1, 33:2, 45:9, 67:24, 81:21, 81:23, 82:4
**Number** [1] - 2:4
**number** [3] - 2:24, 58:10, 76:14
**numbers** [3] - 32:5, 33:6, 76:12
**numerous** [1] - 29:16
**nurse** [1] - 47:15

**O**

**object** [2] - 80:11, 82:13
**objection** [7] - 16:11, 17:13, 18:1, 20:7, 27:18, 28:10, 81:19
**objections** [11] - 2:24, 2:25, 6:11, 6:21, 12:21, 14:17, 17:21, 17:23, 28:1, 28:21, 80:13
**obligations** [2] - 72:18, 79:4
**observed** [1] - 39:2
**observing** [1] - 40:16
**obtaining** [1] - 24:19
**obviously** [2] - 5:21, 30:3
**occasion** [1] - 38:5
**occupation** [1] - 51:9
**occur** [1] - 5:11
**occurrence** [1] - 68:13
**OF** [3] - 1:2, 1:4, 1:10
**offend** [2] - 62:23, 63:1
**offender** [17] - 17:22,

22:21, 22:24, 23:4, 23:24, 24:16, 24:21, 25:6, 27:19, 33:14, 33:16, 33:17, 33:19, 34:3, 60:17, 60:23, 61:1
**offenders** [1] - 21:8
**offense** [11] - 5:18, 7:8, 22:15, 25:18, 27:11, 28:25, 56:21, 61:16, 62:21, 66:17, 73:19
**offenses** [3] - 30:8, 30:12, 31:20
**offered** [1] - 38:2
**offering** [1] - 40:1
**Office** [4] - 78:22, 78:23, 79:2, 79:6
**office** [7] - 9:21, 20:6, 20:7, 31:8, 74:3, 79:14, 80:18
**OFFICER** [3] - 29:4, 29:6, 29:9
**officer's** [1] - 6:21
**Official** [2] - 1:21, 83:11
**officially** [1] - 46:16
**often** [1] - 63:20
**oftentimes** [1] - 34:11
**old** [1] - 63:10
**Oleck** [1] - 41:12
**on-point** [1] - 16:15
**once** [2] - 28:14, 64:6
**one** [61] - 2:9, 4:19, 6:6, 6:17, 7:20, 12:3, 16:7, 16:10, 18:15, 19:2, 19:21, 19:25, 22:3, 22:22, 25:15, 25:18, 25:23, 26:13, 28:9, 28:24, 29:3, 30:6, 30:12, 30:22, 31:6, 33:9, 34:10, 34:15, 35:16, 40:1, 41:3, 44:15, 44:16, 46:5, 49:5, 49:7, 50:15, 52:13, 56:6, 56:7, 56:10, 56:22, 57:15, 60:3, 60:5, 61:9, 63:15, 63:19, 64:15, 66:10, 66:11, 71:8, 72:2, 72:4, 74:3, 75:23, 76:19
**one's** [2] - 10:15, 72:3
**one-count** [1] - 2:9
**one-level** [2] - 31:6, 33:9
**one-off** [1] - 66:10
**one-point** [1] - 25:18
**one-third** [2] - 60:3, 60:5

**ones** [3] - 10:1, 10:7, 72:12
**ongoing** [2] - 57:18, 81:14
**opened** [1] - 44:14
**operate** [2] - 13:9, 81:13
**operator** [1] - 28:8
**opinion** [1] - 11:24
**opinions** [1] - 68:14
**opportunities** [1] - 11:1
**opportunity** [3] - 52:5, 59:11, 59:17
**oppose** [1] - 28:18
**opposed** [2] - 9:10, 35:23
**order** [4] - 59:21, 73:1, 79:4, 80:8
**Order** [1] - 2:1
**ordered** [5] - 2:12, 78:5, 79:24, 80:5, 82:2
**ordering** [1] - 69:20
**ordinarily** [1] - 74:7
**organizing** [1] - 39:24
**originally** [5] - 17:23, 31:16, 39:6, 74:5, 83:6
**Orton** [2] - 6:4, 16:18
**Orton's** [1] - 16:18
**otherwise** [1] - 47:18
**ourselves** [1] - 49:17
**outcome** [1] - 10:19
**overcome** [1] - 38:3
**overdose** [1] - 38:7
**overdosed** [1] - 37:23
**overdue** [1] - 32:5
**overnight** [1] - 37:14
**overruled** [3] - 12:18, 15:22, 27:19
**overruling** [1] - 12:23
**overstated** [1] - 67:8
**owe** [1] - 62:10
**own** [7] - 12:11, 12:13, 12:23, 13:21, 31:8, 37:6, 72:4
**owner** [1] - 28:8
**Oxford** [2] - 4:19, 10:14

**P**

**P.A** [1] - 1:17
**p.m** [1] - 82:25
**page** [8] - 8:15, 9:7, 10:11, 12:5, 15:21, 24:4, 24:25, 27:4
**pages** [1] - 27:9
**Pages** [1] - 1:8

**paid** [3] - 62:13, 66:4, 78:6
**pain** [2] - 71:6, 72:8
**Palm** [1] - 56:3
**panel** [1] - 9:11
**PANY** [16] - 1:7, 2:22, 36:7, 36:10, 45:19, 45:22, 46:1, 46:8, 46:11, 46:14, 52:17, 70:5, 70:11, 78:2, 78:13, 82:24
**pany** [1] - 62:25
**Pany** [48] - 2:3, 2:5, 2:8, 2:20, 17:21, 18:8, 29:12, 29:17, 29:24, 33:15, 34:3, 34:7, 35:21, 36:4, 36:7, 38:15, 45:13, 55:19, 55:21, 56:22, 56:25, 57:22, 58:14, 58:18, 60:6, 63:6, 63:11, 64:1, 66:16, 67:1, 67:10, 68:15, 68:18, 68:22, 69:18, 70:3, 73:9, 74:5, 74:16, 75:8, 75:10, 77:6, 77:17, 78:3, 78:5, 81:8, 81:12, 82:19
**pany's** [1] - 7:8
**Pany's** [10] - 2:11, 15:13, 32:17, 32:25, 34:18, 35:13, 56:13, 59:8, 62:2, 80:17
**paperwork** [1] - 46:15
**paradox** [2] - 59:19, 66:8
**paragraph** [4] - 27:20, 28:14, 28:17, 74:4
**paragraphs** [3] - 27:23, 28:5, 28:8
**Paredes** [1] - 27:4
**parent** [1] - 71:22
**parents** [5] - 37:23, 37:25, 38:4, 48:12, 70:19
**parents'** [1] - 71:23
**Part** [3] - 79:10, 79:17, 79:23
**part** [10] - 7:7, 15:6, 36:12, 36:19, 36:25, 55:20, 55:22, 56:19, 73:12, 80:6
**part-time** [3] - 36:12, 36:19, 36:25
**particular** [5] - 4:14, 6:1, 19:5, 30:15, 60:2
**particularly** [1] - 51:23
**parties** [5] - 2:14,

42:10, 43:16, 76:8
**parts** [1] - 20:14
**party** [2] - 3:4, 23:17
**passed** [1] - 6:24
**past** [2] - 36:10, 72:22
**path** [2] - 37:6, 73:16
**PATRICIA** [2] - 83:3, 83:10
**pauperis** [1] - 82:10
**pay** [5] - 78:5, 78:18, 78:25, 79:24, 82:9
**payable** [1] - 79:5
**paying** [3] - 59:16, 63:17, 65:3
**payment** [3] - 63:18, 78:20, 78:23
**payments** [1] - 79:1
**pending** [6] - 9:25, 10:1, 14:5, 17:3, 68:3, 68:4
**Pennsylvania** [3] - 52:15, 52:20
**Pensacola** [1] - 80:23
**people** [21] - 5:22, 23:1, 23:15, 30:10, 34:12, 35:1, 39:17, 44:11, 48:5, 49:20, 50:6, 50:13, 50:14, 50:15, 52:10, 54:2, 55:3, 55:11, 55:23, 56:10, 57:7
**per** [1] - 19:25
**percent** [2] - 11:8, 78:19
**period** [1] - 59:14
**permission** [1] - 35:24
**person** [23] - 30:12, 35:9, 35:10, 35:22, 38:7, 38:8, 46:25, 48:19, 51:6, 52:7, 53:20, 55:4, 56:11, 56:19, 56:20, 59:4, 70:13, 70:20, 71:10, 73:11, 73:18, 74:7, 79:13
**personal** [1] - 40:21
**personally** [1] - 66:5
**perspective** [3] - 17:5, 33:15, 35:15
**persuasive** [2] - 19:4, 26:11
**perverse** [1] - 60:8
**phrase** [2] - 26:5, 66:11
**phrases** [1] - 26:5
**physical** [1] - 40:3
**physically** [1] - 71:21
**pick** [2] - 23:10, 50:16
**picked** [3] - 35:4, 46:2, 64:15

**picture** [2] - 38:8, 53:24
**pike** [2] - 75:23, 77:15
**place** [2] - 23:18, 33:4
**placed** [1] - 79:12
**places** [2] - 29:1, 47:13
**plain** [13] - 10:8, 16:9, 16:10, 16:14, 16:19, 16:20, 16:22, 16:25, 17:11, 24:2, 25:3, 25:9
**plain-error** [4] - 16:19, 16:20, 16:22, 16:25
**plainly** [1] - 15:25
**play** [1] - 47:9
**played** [1] - 52:16
**playing** [2] - 26:2, 54:5
**plea** [3] - 2:8, 2:11, 74:23
**plead** [1] - 57:1
**pleaded** [1] - 57:4
**pleading** [1] - 29:15
**pleadings** [1] - 3:3
**pled** [2] - 77:7
**plus** [1] - 44:1
**PM** [1] - 1:6
**pocket** [1] - 10:25
**podium** [1] - 70:9
**point** [50] - 7:11, 7:16, 10:5, 11:3, 11:4, 11:16, 12:24, 14:16, 15:7, 16:8, 16:15, 17:18, 17:22, 21:8, 22:21, 22:23, 22:24, 23:4, 23:24, 24:2, 24:16, 24:20, 24:24, 25:6, 25:18, 25:19, 26:14, 27:19, 33:14, 33:16, 33:17, 33:18, 34:3, 40:9, 40:13, 41:21, 57:21, 60:17, 60:23, 61:1, 61:7, 61:8, 61:17, 62:19, 62:22, 64:12, 65:12, 67:14, 67:19, 77:15
**Point** [1] - 13:14
**pointed** [4] - 20:7, 23:20, 25:1, 27:14
**points** [7] - 3:8, 16:7, 25:17, 25:18, 26:14, 55:14, 60:14
**policy** [2] - 22:13, 61:24
**pool** [2] - 36:23, 42:10
**pools** [3] - 36:13, 36:15, 36:25
**Pools** [2] - 36:14
**position** [3] - 58:21,

72:15, 81:18
**positive** [4] - 46:21, 52:10, 73:5
**positively** [1] - 72:19
**possession** [2] - 10:15, 10:20
**possible** [3] - 3:14, 73:22, 81:16
**possibly** [1] - 54:24
**post** [1] - 13:18
**post-Dupree** [1] - 13:18
**power** [5] - 4:24, 72:16, 73:15, 74:16, 75:12
**POWERS** [2] - 1:20, 83:7
**practically** [1] - 24:14
**practitioners** [1] - 6:5
**precedent** [12] - 7:23, 8:6, 8:12, 9:2, 9:6, 9:8, 12:19, 13:21, 15:22, 16:9, 16:16, 16:24
**preceding** [1] - 8:15
**preclude** [2] - 26:23, 79:1
**preexisting** [1] - 9:24
**pregnancies** [1] - 49:2
**preliminary** [1] - 80:7
**premiums** [1] - 66:20
**prepared** [2] - 40:23, 45:23
**preponderance** [1] - 11:12
**prerogative** [1] - 12:23
**presence** [1] - 36:11
**present** [1] - 2:5
**presentation** [2] - 55:20, 80:16
**presented** [1] - 41:12
**presentence** [7] - 2:12, 2:15, 2:21, 73:9, 76:9, 79:17, 79:23
**presenting** [1] - 76:3
**preserve** [1] - 16:11
**preserved** [1] - 10:1
**pretty** [6] - 8:24, 40:10, 40:13, 62:8, 74:10, 75:22
**principal** [2] - 52:24, 53:2
**principals** [1] - 12:6
**principles** [2] - 11:18, 70:18
**printout** [1] - 12:4
**priorities** [1] - 35:16
**prison** [8] - 59:4, 59:22, 68:19, 68:20,

69:19, 70:1, 77:12, 78:4
**prison-wise** [1] - 59:22
**Prisons** [4] - 78:4, 78:22, 81:8, 81:24
**probability** [1] - 77:15
**Probation** [2] - 78:22, 79:2
**probation** [7] - 6:21, 20:6, 20:7, 29:2, 74:3, 79:14, 80:18
**PROBATION** [3] - 29:4, 29:6, 29:9
**problem** [4] - 20:19, 22:7, 23:6, 38:3
**procedural** [1] - 14:24
**proceedings** [2] - 82:25, 83:5
**process** [4] - 4:22, 37:16, 38:2, 62:7
**profited** [1] - 66:5
**profound** [1] - 71:2
**program** [4] - 37:17, 61:15, 76:15, 80:21
**promotes** [1] - 77:10
**pronounce** [1] - 22:8
**pronounced** [8] - 8:17, 8:18, 74:6, 78:1, 78:2, 78:8, 78:11, 80:12
**proof** [1] - 43:3
**proper** [2] - 7:18, 14:10
**property** [2] - 47:23, 80:5
**proposed** [2] - 6:22, 6:23
**prospect** [1] - 72:12
**prospects** [1] - 64:7
**protect** [1] - 82:13
**proud** [1] - 39:8
**provide** [2] - 73:1, 73:22
**provided** [4] - 32:4, 38:4, 69:9, 77:17
**provides** [1] - 77:9
**providing** [1] - 65:3
**provision** [4] - 9:24, 24:21, 25:3, 25:5
**provisions** [2] - 9:24, 24:25
**prudential** [1] - 10:5
**PSI** [1] - 45:14
**PSIs** [1] - 64:20
**PSR** [5] - 6:11, 14:17, 17:21, 74:3, 74:22
**public** [1] - 69:19
**published** [1] - 6:5
**Pulsifer** [13] - 18:13,

19:10, 19:11, 19:20, 19:21, 19:23, 22:4, 22:6, 22:12, 25:4, 25:13, 26:3
**punish** [1] - 69:16
**punished** [2] - 69:13, 75:7
**punishment** [1] - 77:10
**purpose** [1] - 26:1
**purposes** [3] - 15:8, 21:1, 22:1
**purse** [1] - 34:16
**put** [8] - 4:18, 6:11, 32:5, 32:6, 35:2, 40:21, 41:1, 57:5
**putting** [2] - 33:4, 50:3

## Q

**qualifying** [1] - 26:24
**questioned** [1] - 47:4
**questions** [2] - 38:1, 53:11
**quick** [2] - 5:7, 43:13
**quit** [1] - 63:13
**quite** [1] - 65:19
**quote** [5] - 8:5, 8:6, 8:7, 8:16, 39:11
**quoted** [1] - 16:4
**quotes** [1] - 12:14
**quoting** [1] - 16:3

## R

**racking** [1] - 65:6
**radar** [1] - 52:1
**Rainsford** [1] - 11:23
**raised** [4] - 6:22, 17:17, 70:18, 70:20
**raising** [1] - 53:16
**rambling** [1] - 50:1
**Random** [1] - 5:7
**range** [8] - 29:1, 29:5, 29:6, 58:5, 59:24, 68:16, 77:13, 77:22
**rate** [1] - 78:18
**rather** [2] - 32:20, 74:9
**ratifying** [1] - 60:20
**rattling** [1] - 15:2
**raves** [1] - 47:7
**RDAP** [2] - 80:20, 80:21
**re** [2] - 62:23, 63:1
**re-offend** [2] - 62:23, 63:1
**reach** [1] - 32:15
**read** [14] - 3:2, 9:12, 10:23, 13:10, 13:25, 18:19, 25:11, 25:12,

25:16, 27:15, 41:6, 51:20, 55:13, 70:14
**reading** [13] - 7:19, 9:1, 13:15, 18:5, 18:18, 22:4, 23:11, 24:15, 24:20, 25:3, 41:7, 45:14, 54:5
**reads** [1] - 25:13
**real** [3] - 11:8, 44:22, 50:7
**realized** [1] - 56:1
**really** [17] - 4:7, 4:16, 7:16, 15:18, 18:3, 22:8, 46:5, 48:2, 50:23, 53:21, 62:15, 63:23, 64:7, 64:10, 65:5, 67:15, 74:15
**reason** [13] - 3:20, 11:4, 11:9, 14:5, 46:5, 55:13, 58:23, 59:6, 59:11, 62:6, 63:20, 69:11, 81:25
**reasonable** [3] - 11:11, 11:13, 11:14
**reasonably** [1] - 11:19
**reasoning** [2] - 14:5, 23:19
**reasons** [7] - 12:18, 12:20, 24:10, 34:6, 48:18, 63:16, 66:15
**rebut** [1] - 63:8
**rebuttal** [1] - 7:12
**receive** [3] - 12:16, 18:5, 19:7
**received** [6] - 2:14, 2:20, 26:19, 26:24, 58:15, 77:3
**recent** [1] - 64:15
**recently** [1] - 59:13
**recidivate** [1] - 22:25
**recidivism** [3] - 22:16, 22:19, 34:8
**recognize** [1] - 70:22
**recommend** [2] - 80:19, 81:7
**recommendation** [1] - 80:23
**recommendations** [1] - 80:14
**recommended** [1] - 20:14
**recommending** [1] - 58:21
**recommends** [1] - 59:25
**reconsider** [1] - 13:21
**record** [2] - 74:18, 82:13
**red** [1] - 6:12
**reduction** [8] - 4:24,

17:18, 26:21, 27:19, 60:23, 74:8, 76:13, 77:18
**refer** [2] - 3:20, 6:1
**referenced** [1] - 79:17
**referring** [2] - 5:14, 19:6
**reflect** [2] - 31:20, 35:23
**reflected** [2] - 74:6, 74:7
**reflecting** [1] - 71:1
**reflects** [2] - 13:7, 18:25
**reformation** [1] - 63:23
**reformed** [1] - 63:14
**regarding** [1] - 17:17
**regardless** [2] - 11:19, 62:19
**regret** [3] - 15:10, 71:2, 73:7
**regrettable** [1] - 66:11
**regulation** [2] - 8:22, 16:6
**regurgitate** [1] - 3:7
**rehab** [5] - 37:10, 37:12, 37:16, 38:2, 38:5
**rehabs** [1] - 35:3
**rejected** [1] - 12:20
**rejecting** [1] - 27:10
**relapsed** [1] - 38:7
**related** [1] - 21:19
**relationship** [1] - 53:15
**relationships** [1] - 60:12
**relatively** [1] - 58:25
**release** [7] - 29:2, 79:11, 79:12, 79:13, 79:15, 79:17, 80:2
**released** [1] - 79:14
**relevant** [1] - 24:18
**relies** [1] - 71:12
**relitigating** [1] - 11:15
**relocate** [1] - 44:24
**relocated** [1] - 39:22
**rely** [2] - 6:5, 7:13
**remain** [1] - 29:3
**remains** [1] - 29:6
**remember** [5] - 42:17, 48:22, 48:24, 51:23, 71:22
**remind** [1] - 24:9
**remiss** [1] - 74:1
**remorse** [1] - 70:16
**rendering** [1] - 24:21
**repairs** [1] - 53:12

**repayment** [1] - 62:8
**repeat** [1] - 72:22
**repercussions** [1] - 72:1
**report** [10] - 2:12, 2:15, 2:21, 37:11, 73:9, 76:9, 78:24, 79:13, 79:17, 79:23
**REPORTED** [1] - 1:19
**reported** [1] - 83:6
**Reporter** [2] - 1:21, 83:11
**represented** [3] - 2:5, 2:6, 77:14
**request** [7] - 25:19, 29:13, 33:13, 33:25, 38:12, 57:20, 81:12
**require** [3] - 33:23, 35:12, 35:18
**required** [2] - 18:7, 77:22
**requirement** [4] - 19:25, 25:12, 26:6, 79:20
**requirements** [3] - 18:25, 20:3, 25:20
**requires** [1] - 77:19
**resident** [1] - 38:11
**residential** [1] - 36:13
**resolution** [1] - 72:19
**resolve** [2] - 10:6, 16:18
**resolved** [3] - 16:15, 28:21, 68:7
**resort** [2] - 3:20, 4:15
**resorts** [1] - 6:7
**resounding** [1] - 50:24
**respect** [9] - 5:13, 5:24, 20:19, 28:24, 29:21, 53:7, 66:17, 70:20, 77:10
**respectful** [1] - 52:13
**respective** [1] - 2:14
**respond** [1] - 14:11
**responded** [1] - 23:21
**response** [3] - 5:25, 6:21, 20:6
**responsibility** [3] - 56:24, 70:16, 73:20
**rest** [2] - 12:20, 28:21
**rested** [1] - 12:10
**restitution** [10] - 29:10, 62:7, 78:6, 78:18, 78:24, 79:4, 79:5, 79:8, 79:22, 80:2
**restriction** [3] - 79:19, 79:20, 79:21
**result** [3] - 11:1,

31:19, 69:9
**resulted** [1] - 22:15
**resulting** [3] - 4:23, 5:18, 25:18
**reticulated** [1] - 13:9
**return** [1] - 73:21
**returning** [1] - 73:3
**review** [5] - 16:9, 16:10, 16:19, 16:20, 16:22
**reviewed** [2] - 2:21, 29:15
**reviewing** [1] - 12:13
**revised** [2] - 31:15, 31:17
**revived** [1] - 37:23
**ribbing** [2] - 52:21, 52:22
**ride** [1] - 38:10
**risk** [2] - 10:19, 34:7
**risks** [1] - 10:25
**road** [1] - 37:14
**rob** [1] - 34:16
**robust** [1] - 22:20
**rock** [1] - 37:8
**role** [18] - 17:24, 18:2, 20:17, 22:11, 24:7, 24:19, 26:2, 26:18, 26:24, 27:16, 33:20, 34:4, 49:9, 50:4, 60:16, 71:16, 72:5, 72:12
**rough** [1] - 49:13
**rounds** [1] - 37:17
**RPR** [2] - 1:20, 83:10
**ruin** [1] - 5:9
**rule** [4] - 12:11, 12:13, 16:9, 20:25
**Rule** [11] - 57:11, 58:22, 59:1, 59:3, 60:1, 60:3, 69:18, 74:13, 75:15, 77:2, 77:15
**ruled** [2] - 11:17, 26:3
**rules** [4] - 7:23, 24:16, 76:23
**ruling** [1] - 27:21
**run** [1] - 46:18

## S

**sadly** [1] - 38:6
**safe** [1] - 71:16
**safety** [4] - 21:9, 26:24, 27:5, 27:13
**Salas** [1] - 27:4
**Salas-Paredes** [1] - 27:4
**sale** [1] - 30:9
**salesperson** [1] -

41:18
**Sam** [81] - 35:13, 36:12, 36:16, 37:4, 37:7, 37:16, 37:25, 38:1, 38:4, 38:5, 38:11, 39:11, 39:18, 39:25, 40:10, 40:17, 40:20, 40:22, 41:8, 41:11, 41:15, 41:18, 41:22, 42:7, 42:8, 42:10, 42:16, 42:20, 42:25, 43:10, 43:11, 43:15, 43:16, 43:18, 44:3, 44:5, 44:14, 44:16, 45:14, 46:1, 47:16, 47:19, 47:23, 48:11, 48:17, 48:21, 49:1, 49:3, 49:11, 49:20, 49:24, 50:2, 50:16, 50:18, 51:3, 52:7, 52:10, 52:14, 52:21, 52:24, 53:3, 53:5, 53:6, 53:10, 53:14, 54:3, 55:1, 55:2, 55:5, 55:7, 55:15, 55:19, 55:21, 56:13, 56:14, 73:9
**Sam's** [18] - 36:7, 36:10, 36:11, 36:15, 37:2, 37:3, 38:25, 40:10, 41:2, 43:6, 45:12, 51:16, 51:19, 53:24, 54:2, 54:3, 54:19
**Samuel** [4] - 2:3, 68:15, 69:18, 77:25
**SAMUEL** [1] - 1:7
**sat** [2] - 6:9, 57:4
**satisfy** [2] - 18:8, 79:4
**saw** [3] - 48:14, 53:24, 70:12
**scary** [1] - 49:4
**scenario** [3] - 24:20, 59:1, 59:21
**schedule** [1] - 78:20
**scheme** [3] - 59:5, 59:12, 69:13
**Schnecksville** [1] - 52:15
**school** [15] - 36:16, 36:17, 37:22, 38:6, 50:3, 50:21, 52:2, 52:24, 55:24, 56:2, 56:3, 56:7, 72:23, 73:3
**score** [1] - 74:25
**Scout** [1] - 1:17
**scratch** [1] - 9:17
**sea** [1] - 4:7
**Second** [2] - 11:24,

12:7
**second** [5] - 13:1, 28:24, 47:22, 50:2, 80:23
**Section** [11] - 2:10, 17:8, 17:10, 21:8, 21:10, 24:5, 26:19, 26:21, 26:23, 27:15, 76:11
**section** [1] - 79:7
**secure** [1] - 71:16
**see** [14] - 4:21, 5:13, 10:11, 14:17, 19:23, 27:20, 40:18, 52:9, 58:22, 69:20, 72:17, 73:8, 73:9, 73:17
**seeing** [2] - 49:8, 76:18
**seeking** [3] - 30:1, 30:10, 73:7
**seem** [3] - 7:13, 21:12, 69:24
**sees** [2] - 58:13, 64:14
**self** [7] - 19:25, 20:24, 35:20, 56:4, 56:5, 81:15, 81:23
**self-contained** [2] - 19:25, 20:24
**self-correction** [2] - 35:20, 56:4
**self-improvement** [1] - 56:5
**self-surrender** [2] - 81:15, 81:23
**semicolon** [1] - 25:25
**semicolons** [2] - 25:7, 25:24
**send** [2] - 39:21, 60:9
**SENIOR** [1] - 1:10
**sense** [7] - 5:16, 5:23, 6:19, 11:5, 67:25, 70:16, 70:19
**sent** [1] - 39:20
**sentence** [17] - 2:13, 28:12, 28:15, 29:23, 55:1, 58:16, 60:7, 64:22, 73:21, 74:8, 77:1, 77:9, 77:21, 80:1, 80:10, 80:12, 82:7
**sentenced** [8] - 7:4, 33:23, 34:19, 67:22, 68:2, 68:4, 68:15, 68:19
**sentences** [1] - 64:15
**Sentencing** [31] - 4:2, 5:5, 13:3, 13:5, 18:16, 18:19, 19:8, 20:8, 20:13, 20:21, 21:3, 21:15, 21:18,

21:23, 21:25, 22:17, 22:18, 23:6, 31:9, 31:11, 31:13, 31:24, 32:1, 32:7, 33:5, 33:11, 34:6, 60:21, 61:18, 61:19, 68:8
**SENTENCING** [1] - 1:10
**sentencing** [20] - 3:16, 4:7, 4:18, 5:21, 5:25, 6:23, 13:16, 14:17, 14:24, 17:20, 21:1, 26:25, 29:13, 34:10, 34:14, 35:21, 56:9, 56:20, 64:13, 76:12
**sentencings** [1] - 34:12
**separate** [2] - 19:6, 26:5
**separated** [6] - 20:1, 20:3, 25:7, 25:24, 43:15, 46:11
**serious** [6] - 5:18, 5:22, 67:5, 72:14, 73:5, 76:22
**seriously** [2] - 22:15, 56:8
**seriousness** [2] - 66:17, 69:6
**Service** [1] - 82:3
**Services** [1] - 79:9
**session** [3] - 57:9, 57:10, 81:14
**sessions** [1] - 57:8
**set** [7] - 7:21, 23:22, 30:9, 55:23, 70:25, 76:10, 81:22
**seven** [5] - 41:9, 41:25, 42:2, 42:20, 56:6
**Seventh** [1] - 27:9
**several** [2] - 26:4, 65:10
**severally** [1] - 78:7
**severe** [1] - 5:22
**severely** [1] - 75:7
**sex** [1] - 22:14
**shall** [10] - 7:3, 78:5, 78:18, 78:23, 79:5, 79:11, 79:13, 79:15, 79:18, 79:24
**share** [4] - 30:4, 30:24, 52:5, 55:6
**shared** [1] - 49:3
**sharing** [1] - 48:24
**sheer** [4] - 65:23, 67:15, 67:21, 68:11
**shift** [1] - 63:4
**shifting** [2] - 13:22, 14:1

**shifts** [1] - 47:15
**ship** [1] - 30:9
**shipment** [1] - 39:21
**shook** [2] - 52:25, 53:3
**show** [2] - 19:22, 53:7
**showed** [1] - 6:13
**sic** [2] - 42:19, 44:12
**side** [3] - 24:25, 51:6
**signal** [1] - 60:9
**significant** [2] - 72:10, 72:21
**significantly** [1] - 68:21
**similar** [4] - 18:13, 20:6, 24:10, 58:17
**similarly** [1] - 68:14
**Simon** [2] - 1:16, 2:5
**simply** [4] - 8:2, 58:23, 62:2, 63:7
**single** [5] - 26:9, 40:20, 53:10, 57:5
**single-spaced** [1] - 57:5
**sit** [1] - 7:11
**sitting** [1] - 34:18
**situated** [1] - 68:15
**situation** [1] - 70:17
**six** [3] - 41:25, 42:2, 72:25
**Sixth** [2] - 11:17, 14:21
**skill** [1] - 55:23
**skip** [1] - 7:17
**sleeve** [1] - 52:8
**Sloan** [2] - 48:6, 48:10
**SLOAN** [4] - 48:7, 48:10, 51:10, 51:13
**small** [4] - 36:25, 40:9, 41:13, 48:25
**snatch** [1] - 34:16
**snippets** [1] - 4:18
**snowstorm** [1] - 37:13
**sober** [2] - 35:3, 35:7
**society** [1] - 73:4
**solely** [2] - 56:23, 77:5
**soliciting** [2] - 59:17, 65:3
**someday** [1] - 56:15
**someone** [8] - 4:22, 5:19, 22:14, 34:15, 34:22, 35:6, 50:2
**sometimes** [1] - 60:3
**somewhat** [1] - 59:25
**somewhere** [1] - 44:25
**son** [36] - 35:14, 38:2, 40:10, 40:12, 41:11, 41:13, 41:14, 41:15,

41:16, 41:22, 42:18, 43:21, 44:4, 44:16, 46:6, 47:3, 47:5, 48:25, 49:10, 50:4, 50:23, 52:4, 52:6, 53:4, 53:16, 55:2, 55:7, 63:10, 71:9, 71:10, 71:16, 73:2, 73:4, 73:22, 81:5
**sons** [2] - 49:5, 49:21
**soon** [1] - 73:22
**sophisticated** [1] - 27:20
**sorrow** [1] - 72:13
**sorry** [5] - 7:2, 39:12, 56:6, 71:6, 77:4
**sort** [11] - 11:4, 11:15, 25:19, 58:10, 62:3, 62:17, 63:4, 63:23, 66:15, 66:25, 67:20
**sounds** [2] - 15:4, 75:16
**source** [1] - 72:11
**South** [2] - 34:25, 35:2
**SOUTHERN** [1] - 1:2
**Southern** [4] - 81:3, 81:5, 81:9, 83:12
**space** [3] - 59:13, 60:12, 66:16
**spaced** [1] - 57:5
**spare** [1] - 37:15
**speaking** [5] - 24:14, 39:1, 53:20, 55:11
**speaks** [1] - 40:4
**special** [6] - 29:11, 54:7, 79:19, 79:22, 79:25, 80:3
**specific** [6] - 62:1, 62:6, 62:23, 64:20, 66:22, 81:2
**specifically** [6] - 8:5, 13:20, 16:15, 16:17, 31:17, 45:1
**speech** [1] - 48:22
**spell** [1] - 38:21
**spend** [1] - 48:16
**spending** [2] - 59:4, 68:20
**spends** [1] - 69:22
**sphere** [1] - 13:18
**spit** [1] - 32:8
**split** [2] - 20:14, 47:7
**spoken** [2] - 51:20, 53:10
**sports** [4] - 47:9, 47:14, 49:24, 50:20
**spot** [1] - 37:12
**spouse** [1] - 45:16
**stand** [5] - 3:10, 50:24, 51:3, 70:15,

73:6

**standard** [6] - 13:2, 13:22, 16:14, 16:25, 64:18, 79:16

**standards** [1] - 36:22

**star** [1] - 11:4

**stark** [1] - 70:17

**start** [6] - 3:1, 39:10, 58:20, 59:23, 60:13, 69:19

**started** [7] - 34:20, 36:21, 39:5, 44:13, 44:21, 55:16, 55:20

**starting** [1] - 40:22

**State** [1] - 56:3

**state** [2] - 71:1, 76:19

**statements** [1] - 76:8

**States** [12] - 1:22, 2:3, 2:7, 9:6, 11:23, 27:3, 27:8, 39:7, 66:22, 79:6, 79:25, 83:11

**STATES** [3] - 1:1, 1:4, 1:11

**statute** [3] - 16:1, 19:23, 77:23

**statutory** [5] - 15:16, 17:4, 19:2, 76:10

**stay** [2] - 35:7

**stenographer** [1] - 38:22

**STENOGRAPHICALLY** [1] - 1:19

**step** [3] - 48:15, 49:16, 51:4

**Stephan** [1] - 2:3

**STEPHEN** [1] - 1:7

**Stephen** [4] - 36:7, 77:25, 78:3

**steps** [1] - 72:14

**Steve's** [1] - 55:2

**Steven** [3] - 36:4, 77:25, 78:2

**still** [14] - 7:19, 9:3, 13:24, 21:15, 24:18, 33:14, 33:17, 46:17, 47:12, 47:13, 48:1, 54:14, 71:12

**Stinson** [5] - 9:3, 12:8, 12:10, 12:17, 12:19

**stop** [2] - 35:13, 64:5

**stopped** [4] - 35:14, 63:6, 63:17, 64:9

**stops** [1] - 64:7

**store** [1] - 34:17

**stories** [1] - 52:13

**story** [2] - 38:1, 49:22

**straight** [1] - 49:13

**strangers** [1] - 53:8

**stray** [1] - 73:16

**Street** [1] - 1:14

**strength** [1] - 72:11

**stress** [1] - 7:16

**strictly** [1] - 15:15

**strikes** [1] - 76:14

**strived** [1] - 72:11

**strong** [1] - 70:19

**stronger** [1] - 51:7

**struck** [1] - 18:15

**structure** [1] - 19:23

**structured** [2] - 22:2, 30:5

**struggled** [1] - 37:16

**struggling** [1] - 65:15

**students** [1] - 53:19

**studies** [2] - 22:19, 22:20

**studying** [1] - 56:8

**stuff** [4] - 46:15, 49:23, 50:21, 70:13

**subject** [1] - 12:8

**subjects** [1] - 57:6

**submitted** [4] - 11:7, 41:6, 41:7, 62:13

**Subsection** [1] - 22:8

**subsection** [6] - 18:24, 19:1, 19:14, 20:1, 20:3, 20:24

**subsections** [2] - 19:24, 61:22

**Subsections** [1] - 18:17

**subsequently** [1] - 79:2

**subset** [1] - 24:15

**substance** [1] - 79:21

**substantial** [2] - 57:18, 69:17

**substantially** [1] - 22:24

**substantive** [2] - 9:23, 68:9

**substantively** [1] - 31:23

**successful** [2] - 62:16, 63:24

**suffer** [1] - 72:6

**suffering** [1] - 10:13

**sufficient** [2] - 26:19, 77:11

**suggest** [1] - 3:1

**suggested** [1] - 22:5

**Suite** [1] - 1:18

**summer** [1] - 45:8

**Super** [1] - 52:16

**superfluity's** [1] - 22:7

**superfluous** [2] - 22:9, 24:22

**superfluousness** [1] - 24:2

**supervised** [5] - 29:2, 79:12, 79:15, 79:16, 80:2

**supervisor** [1] - 27:6

**supplement** [1] - 31:12

**supplemental** [3] - 9:17, 9:21, 67:19

**supply** [1] - 37:3

**support** [12] - 38:4, 38:12, 40:3, 49:15, 51:4, 51:5, 58:17, 62:25, 71:12, 72:11, 82:18

**supposed** [1] - 18:23

**Supreme** [9] - 7:25, 9:9, 12:12, 12:18, 12:19, 13:21, 16:16, 22:6, 26:3

**surrender** [4] - 81:15, 81:16, 81:23, 82:2

**surrounded** [1] - 35:4

**suspension** [1] - 63:18

**sustained** [3] - 17:14, 28:4, 28:20

**swimming** [5] - 36:13, 36:23, 40:18, 40:19, 54:6

**Sylvan** [2] - 36:14

**system** [1] - 65:7

## T

**table** [3] - 5:13, 70:7, 74:22

**tables** [2] - 31:16, 31:22

**talks** [2] - 5:14, 5:16

**Tampa** [4] - 1:18, 52:15, 52:20

**targets** [1] - 57:7

**task** [1] - 19:18

**tasked** [1] - 7:22

**taught** [1] - 70:24

**tea** [1] - 13:25

**teacher** [2] - 52:2, 54:21

**teaching** [1] - 53:18

**teammate** [1] - 37:22

**tears** [2] - 38:4, 52:24

**technicality** [1] - 67:15

**tend** [1] - 65:16

**Tequesta** [1] - 43:22

**term** [21] - 3:18, 3:23, 3:24, 4:4, 4:17, 4:21, 5:3, 6:10, 6:14, 10:23, 13:15, 14:25, 15:10, 15:11, 17:11,

29:24, 68:19, 69:19, 69:25, 78:4, 79:12

**terms** [13] - 5:10, 5:14, 10:25, 17:1, 19:6, 26:1, 26:2, 30:4, 57:19, 59:22, 66:13, 73:12, 74:18

**tethered** [2] - 68:16, 69:6

**text** [7] - 14:9, 23:25, 24:2, 24:10, 24:21, 39:11, 39:13

**Thanksgiving** [2] - 40:11, 43:24

**THE** [118] - 1:10, 1:13, 1:16, 2:2, 2:18, 2:20, 2:23, 3:11, 3:15, 4:3, 6:2, 7:13, 8:15, 8:20, 10:8, 12:1, 14:12, 17:7, 17:16, 19:13, 19:15, 19:18, 21:5, 21:7, 23:8, 26:16, 26:18, 27:25, 28:2, 28:4, 28:11, 28:17, 28:20, 28:23, 29:4, 29:5, 29:6, 29:8, 29:9, 29:10, 36:1, 36:3, 38:15, 38:21, 38:24, 41:6, 41:15, 41:22, 41:24, 42:2, 42:5, 42:12, 42:14, 42:16, 42:20, 42:25, 43:6, 43:8, 43:11, 43:18, 43:23, 44:16, 44:19, 45:2, 45:6, 45:10, 45:14, 45:18, 45:21, 45:24, 46:7, 46:9, 46:13, 48:4, 48:9, 51:9, 51:11, 51:16, 51:18, 51:23, 55:8, 57:11, 57:14, 57:24, 58:2, 58:4, 68:23, 69:1, 69:8, 70:3, 70:8, 73:25, 75:2, 75:4, 75:7, 75:16, 75:18, 75:20, 75:22, 76:1, 76:5, 76:7, 78:3, 78:10, 78:14, 80:9, 80:15, 80:19, 80:21, 80:25, 81:2, 81:7, 81:18, 81:20, 81:21, 81:22, 82:15, 82:17

**themselves** [1] - 50:14

**thereby** [1] - 5:18

**therefore** [5] - 6:25, 18:8, 26:14, 27:18, 77:24

**they've** [1] - 22:19

**thinking** [2] - 31:8,

55:1

**thinks** [1] - 21:25

**Third** [3] - 11:18, 11:21, 14:18

**third** [3] - 60:3, 60:5, 78:17

**thorough** [1] - 59:10

**thousand** [4] - 30:13, 53:13, 67:6

**thousands** [2] - 36:15, 53:18

**three** [19] - 19:24, 22:20, 25:19, 25:20, 25:23, 29:3, 30:22, 31:2, 32:24, 37:12, 42:9, 42:12, 42:24, 44:1, 56:21, 66:14, 76:13, 79:12, 80:1

**three-level** [3] - 30:22, 32:24, 76:13

**three-point** [1] - 25:19

**threshold** [2] - 32:24, 61:14

**throughout** [2] - 3:25, 53:5

**throw** [2] - 13:18, 14:4

**throwing** [1] - 12:25

**thrown** [1] - 8:13

**thrust** [1] - 3:17

**tie** [1] - 56:25

**tied** [1] - 22:16

**title** [1] - 80:4

**today** [20] - 21:1, 22:2, 30:1, 32:20, 32:23, 34:18, 36:9, 43:9, 45:23, 48:8, 48:18, 49:21, 56:16, 56:20, 70:15, 71:17, 72:3, 73:6, 76:4, 80:17

**today's** [2] - 2:13, 32:11

**toddler** [1] - 50:19

**toddlers** [1] - 48:13

**together** [13] - 13:9, 13:10, 20:5, 24:12, 24:14, 41:21, 47:12, 47:13, 47:14, 48:12, 54:6, 57:5

**took** [7] - 32:24, 36:17, 38:8, 46:14, 52:21, 52:22, 57:7

**tools** [2] - 8:23, 15:16

**total** [2] - 28:25, 80:1

**touch** [1] - 14:25

**toward** [1] - 14:1

**towards** [1] - 50:6

**town** [1] - 40:10

**trace** [2] - 34:17, 34:19

**trade** [3] - 60:11, 69:14, 69:21

**TRANSCRIPT** [1] - 1:10
**transcription** [2] - 83:4
**treat** [1] - 44:7
**treated** [1] - 5:23
**treatment** [3] - 38:6, 38:7, 79:21
**trials** [1] - 57:17
**TriCare** [1] - 66:25
**tried** [4] - 5:18, 34:10, 34:13, 74:13
**triggers** [1] - 31:2
**trip** [1] - 37:14
**true** [2] - 25:10, 83:4
**truly** [4] - 48:19, 49:5, 49:19, 51:3
**trumps** [1] - 6:6
**truth** [1] - 65:14
**truths** [1] - 73:13
**try** [2] - 46:12, 47:11
**trying** [9] - 22:17, 23:12, 34:16, 35:6, 35:7, 49:10, 50:3, 69:16, 72:18
**turkey** [2] - 63:13, 64:10
**turn** [3] - 37:24, 64:25, 71:2
**turning** [1] - 67:12
**tutoring** [2] - 56:9, 56:10
**twice** [2] - 31:11, 33:11
**two** [32] - 11:20, 11:22, 12:18, 13:10, 18:2, 19:6, 20:3, 20:14, 22:11, 24:11, 25:23, 26:21, 27:19, 33:19, 33:21, 34:4, 39:3, 41:10, 44:13, 45:4, 48:5, 48:25, 53:25, 57:7, 60:16, 60:17, 61:2, 68:12, 74:2, 76:13, 78:15
**two-level** [9] - 18:2, 26:21, 27:19, 33:19, 33:21, 34:4, 60:16, 60:17, 76:13
**Tyler's** [1] - 38:10
**type** [2] - 6:15, 55:18

## U

**U.S** [9] - 1:22, 8:20, 78:22, 78:23, 79:2, 79:6, 82:2, 83:12
**U.S.C** [2] - 2:10, 76:10
**Ukraine** [5] - 39:5, 39:7, 39:21, 39:25,

44:13
**ultimately** [3] - 35:11, 63:15, 69:17
**unable** [2] - 72:12, 82:9
**Unabridged** [1] - 5:8
**unanimously** [1] - 27:15
**uncles** [1] - 37:3
**under** [13] - 16:14, 18:4, 18:5, 19:2, 19:7, 24:15, 26:19, 26:21, 26:25, 30:24, 32:15, 33:16, 64:9
**undermined** [1] - 14:4
**undesirable** [1] - 10:18
**undo** [1] - 71:2
**unexpected** [1] - 79:3
**unfair** [1] - 59:6
**unfortunately** [1] - 73:11
**United** [12] - 1:22, 2:3, 2:6, 9:6, 11:23, 27:3, 27:8, 39:7, 66:22, 79:6, 79:25, 83:11
**UNITED** [3] - 1:1, 1:4, 1:11
**unless** [3] - 14:25, 15:25, 16:14
**unlike** [2] - 16:12, 22:12
**unlikely** [3] - 5:1, 5:11, 62:23
**unopposed** [2] - 27:24, 28:3
**unpaid** [1] - 79:21
**unrelated** [1] - 46:25
**unwarranted** [4] - 59:7, 61:12, 69:4, 76:24
**unwaveringly** [1] - 49:15
**up** [33] - 9:16, 23:10, 23:18, 25:2, 31:8, 31:10, 32:13, 33:10, 35:1, 35:4, 36:4, 39:9, 40:14, 43:21, 45:12, 46:2, 48:12, 49:24, 50:16, 51:14, 52:14, 59:4, 59:20, 60:6, 60:11, 61:25, 65:6, 68:6, 68:15, 68:20, 71:10, 71:15, 71:16
**upstanding** [1] - 63:5
**usage** [2] - 3:25, 5:2
**USAO** [1] - 1:14
**uses** [1] - 36:17

## V

**vacuum** [1] - 66:7
**valuable** [1] - 41:1
**value** [2] - 10:19, 31:19
**valued** [1] - 36:24
**values** [2] - 31:14, 70:18
**valve** [4] - 21:9, 26:24, 27:5, 27:13
**variance** [17] - 29:14, 29:25, 30:2, 30:11, 31:6, 31:9, 33:9, 33:15, 34:1, 57:20, 59:24, 61:5, 62:20, 64:9, 67:13, 74:12, 76:2
**various** [4] - 4:18, 10:10, 14:6, 63:25
**Ventura** [1] - 78:10
**Verdeza** [11] - 8:1, 8:3, 8:15, 9:12, 9:14, 12:24, 15:20, 15:21, 16:10, 16:13, 16:20
**versions** [1] - 49:17
**versus** [3] - 2:3, 8:20, 9:6
**video** [1] - 43:3
**viewed** [1] - 29:16
**violation** [1] - 2:10
**virtually** [1] - 26:22
**virtue** [5] - 60:20, 60:23, 61:1, 61:15, 68:10
**vitality** [1] - 12:8
**void** [1] - 71:25
**volume** [1] - 65:23
**volunteering** [1] - 53:9
**vs** [1] - 1:6

## W

**wait** [3] - 47:8, 68:12
**waive** [1] - 57:1
**wake** [2] - 39:9, 72:14
**walk** [1] - 47:22
**walls** [1] - 54:12
**wants** [2] - 56:14, 56:16
**war** [2] - 39:5, 44:21
**ways** [1] - 6:14
**weaken** [1] - 9:10
**weakening** [1] - 9:15
**Webster** [1] - 5:7
**weddings** [1] - 48:22
**week** [1] - 40:16
**weeks** [2] - 11:22, 12:6

**weighs** [1] - 72:8
**Westlaw** [1] - 12:2
**whereas** [2] - 18:24, 25:20
**white** [1] - 67:4
**whole** [4] - 23:24, 49:2, 71:23, 72:23
**wife** [11] - 42:16, 42:19, 43:6, 43:7, 43:8, 43:14, 43:15, 44:3, 45:13, 49:3
**Wilke** [1] - 16:5
**Wilkie** [2] - 8:20, 82:3
**win** [1] - 52:21
**wise** [1] - 59:22
**wish** [1] - 72:25
**wishes** [1] - 3:5
**withdraw** [1] - 28:10
**withdrawn** [2] - 18:1, 28:16
**withholding** [2] - 60:16, 60:23
**witnessed** [1] - 37:20
**witnesses** [1] - 63:25
**wives** [1] - 45:15
**woman** [1] - 53:10
**wonderful** [1] - 55:7
**word** [19] - 6:17, 10:9, 18:12, 18:17, 18:18, 18:20, 19:9, 20:1, 20:2, 20:20, 20:22, 21:2, 21:16, 21:20, 23:2, 26:4, 57:25
**wording** [3] - 21:7, 21:9, 21:12
**words** [2] - 6:18, 13:23
**wore** [1] - 52:7
**works** [3] - 36:12, 36:18, 53:20
**worries** [1] - 75:19
**worry** [4] - 54:17, 54:21, 71:20, 75:21
**worth** [7] - 25:1, 32:21, 33:15, 62:5, 63:5, 64:8, 65:8
**write** [2] - 45:22, 70:13

## Y

**year** [9] - 8:4, 11:21, 21:4, 32:14, 36:15, 40:22, 46:14, 55:17, 72:23
**Year** [1] - 40:12
**years** [36] - 29:3, 31:5, 31:25, 32:2, 33:12, 34:19, 37:10, 39:1, 39:8, 41:9, 41:25, 42:2, 42:9, 42:21,

42:24, 43:12, 44:2, 44:14, 45:4, 46:1, 48:13, 50:23, 52:2, 54:9, 54:14, 56:21, 59:14, 62:18, 63:10, 64:16, 65:10, 66:14, 66:22, 72:25, 79:12, 80:2
**you-all** [1] - 41:9
**young** [3] - 40:5, 40:20, 71:12
**yourself** [2] - 36:6, 38:18

## Z

**Zappoli** [5] - 33:22, 58:14, 60:18, 74:20, 78:16
**zero** [20] - 17:18, 17:22, 21:8, 22:21, 22:24, 23:4, 23:24, 24:16, 24:20, 25:6, 26:14, 27:19, 33:14, 33:16, 33:17, 33:18, 34:3, 60:17, 60:23, 61:1
**zero-point** [20] - 17:18, 17:22, 21:8, 22:21, 22:24, 23:4, 23:24, 24:16, 24:20, 25:6, 26:14, 27:19, 33:14, 33:16, 33:17, 33:18, 34:3, 60:17, 60:23, 61:1